ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS (234843)
AUSTIN P. BRANE (286227)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
abrane@rgrdlaw.com
ksciarani@rgrdlaw.com
     – and –
DENNIS J. HERMAN (220163)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com

Attorneys for Lead Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURPLE MOUNTAIN TRUST, Individually and on Behalf of All Others Similarly Situated, ) ) | Case No. 3:18-cv-03948-JD |
| Plaintiff, ) ) | CLASS ACTION |
| vs. ) ) ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| WELLS FARGO & COMPANY, TIMOTHY J. SLOAN, JOHN R. SHREWSBERRY, STEPHEN SANGER, AND MARY MACK, ) ) ) ) | |
| Defendants. ) | DEMAND FOR JURY TRIAL |

1465291_1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND OVERVIEW .................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    PARTIES ...........................................................................................................6

IV.     BACKGROUND TO THE CLASS PERIOD .................................................8

        Wells Fargo's Auto Insurance Schemes Secretly and Illegally Defrauded Its
        Customers Out of Millions of Dollars .............................................................8

        Prior to the Class Period, Defendants Proclaimed Their "Immediate and Highest
        Priority" Was Restoring Trust in Wells Fargo.............................................11

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        MATERIAL OMISSIONS DURING THE CLASS PERIOD .........................14

        BancAnalysts Association of Boston Conference ...........................................15

        October Retail Banking Customer Activity Report Call & Wells Fargo's Written
        Responses to Senate Committee on Banking, Housing, and Urban Affairs.....................19

        Goldman Sachs U.S. Financial Services Conference & November Retail Banking
        Customer Activity Report Call .......................................................................22

        4Q16 and FY16 Earnings Release and Conference Call .................................24

        January Retail Banking Customer Activity Report Call...................................27

        2016 Annual Report on Form 10-K & 2017 Proxy Statement .........................29

        February 2017 Retail Banking Customer Activity Report Call.........................33

        Board of Directors' Internal Investigation Report & 1Q17 Earnings Release and
        Conference Call ...............................................................................................35

        2017 Annual Shareholders Meeting.................................................................39

        1Q17 10-Q & Wells Fargo 2017 Investor Day .................................................41

        Morgan Stanley Financials Conference ...........................................................44

        2Q17 Earnings Release and Conference Call ...................................................46

VI.     ADDITIONAL FALSE AND MISLEADING STATEMENTS AND MATERIAL
        OMISSIONS IN WELLS FARGO'S CLASS PERIOD SEC FILINGS.........................48

        3Q16 Form 10-Q...............................................................................................48

        2016 Annual Report on Form 10-K ..................................................................52

1

2                                                                                                    **Page**

3

        1Q17 Form 10-Q ................................................................................................57

VII.    THE TRUE FACTS REGARDING WELLS FARGO'S ILLEGAL INSURANCE
        SCHEME BEGIN TO BE DISCLOSED.................................................................61

        *The New York Times* Exposé Forces Wells Fargo to Admit to Its Illegal Charging
        of Customers for Automobile Insurance They Did Not Need or Want ...........................61

        Analysts and the Public Are Shocked by the New Disclosures of Wells Fargo's
        Conduct ................................................................................................................64

        August 4, 2017 Reports and Wells Fargo's 2Q17 10-Q Disclose the Full Scope of
        the Company's Illegal and Secretive Automobile Insurance Practices ...........................67

VIII.   POST-CLASS PERIOD EVENTS AND ADMISSIONS .................................................71

IX.     LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS...................76

X.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE .......................................78

XI.     THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS'
        FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS...........79

XII.    CLASS ACTION ALLEGATIONS ...............................................................................81

XIII.   COUNT I ....................................................................................................................82

XIV.   COUNT II ...................................................................................................................82

XV.    PRAYER FOR RELIEF ..............................................................................................83

XVI.   JURY DEMAND ........................................................................................................83

1.     Lead Plaintiff Construction Laborers Pension Trust for Southern California ("Southern California Laborers" or "Lead Plaintiff"), individually and on behalf of all other similarly situated persons or entities, hereby alleges the following against defendant Wells Fargo & Company ("Wells Fargo" or the "Company") and certain of its officers and directors:[1]

## I.      INTRODUCTION AND OVERVIEW

2.     This is a securities class action on behalf of persons who purchased or otherwise acquired Wells Fargo common stock between November 3, 2016 and August 3, 2017, inclusive (the "Class Period"), seeking remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.     For a decade prior to the Class Period, Wells Fargo secretly and unlawfully enrolled more than 800,000 of its auto loan customers in unnecessary and expensive insurance.  The Company's practices pushed roughly 274,000 of its customers into delinquency and resulted in approximately 27,000 wrongful vehicle repossessions.  Affected customers were enrolled in insurance programs without their knowledge, and the insurance premiums were tacked on to their auto loan payments and automatically deducted from their deposit accounts.  Wells Fargo was also improperly withholding unused insurance premiums on auto loans that were paid off early.

4.     The Company's illicit insurance practices were documented in a 60-page report delivered to Wells Fargo's most senior executives by September 2016, just as the Company was reeling from the disclosure of similar fraudulent sales practices involving the opening of millions of fake deposit and credit accounts in the names of its customers.  The report detailed how Wells Fargo had charged premiums to hundreds of thousands of borrowers who already had adequate coverage on their cars, continued collecting premiums even after borrowers questioned the charges, and that tens of thousands of customers had their vehicles wrongfully repossessed as a result.  Wells Fargo has claimed that it ended the insurance practices in September 2016 after receiving the report.  Wells

---

[1]     Lead Plaintiff's allegations are based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Wells Fargo, as well as media and analyst reports about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1  Fargo's chief regulators, the Office of the Comptroller of the Currency (the "OCC") and the Bureau

2  of Consumer Financial Protection ("CFPB"), eventually fined the Company $500 million for its

3  decade-long illegal insurance fraud.

4       5.     Although Wells Fargo reported the illegal insurance practices to the OCC in the

5  summer of 2016, the Company and its executives concealed the illegal practices from investors and

6  the public for more than a year.  Shockingly, defendants did so even as they professed that rebuilding

7  trust in the Company that had been decimated in the fake account scandal was their "highest

8  priority," and assured investors of their commitment to increased disclosure and transparency.  As

9  analysts stated during the Class Period: "banking is a business of trust[; d]amage to the Wells Fargo

10  brand could result in permanent loss of customers" and a "*loss of customer trust would be the*

11  *biggest potential threat to Wells Fargo's competitive advantage*."

12       6.     Even as defendants told investors that their in-depth investigations into Wells Fargo's

13  Community Banking Division had not turned up any problems other than the fake account scandal,

14  defendants chose to conceal the illegal auto insurance practices and their impact on hundreds of

15  thousands of Wells Fargo customers.

16       7.     "I am not aware of any issues," Wells Fargo's new CEO, Timothy Sloan, said on

17  November 3, 2016, shortly after being elevated to replace former CEO John Stumpf, who had lost

18  his job as a result of the fake account scandal.  "We are going to leave no stone unturned," he told

19  investors.  "I don't want there to be a question about how we interact with customers at Wells

20  Fargo."  Sloan repeated these statements again and again during the Class Period, assuring investors

21  that "if we find something that's important, we'll communicate that."  "[G]iven our desire to be very

22  transparent, we'll probably err on the side of overcommunicating as opposed to undercomunicating,"

23  he claimed, and assured investors that "[t]here is not another large shoe to drop."

24       8.     These statements were all lies.  As Sloan admitted in testimony before the U.S. Senate

25  Committee on Banking, Housing, and Urban Affairs after the Class Period, the details of Wells

26  Fargo's insurance fraud were "escalated to me in 2016, in late August, early September."  Wells

27  Fargo's former Senior Vice President of Consumer Lending and a member of the Company's

28  Operating Committee, Franklin R. Codel ("Codel"), has likewise admitted the Company knew of the

1   practices in July 2016 and quickly escalated them to senior management and the Company's Board

2   of Directors.  Defendants knew that their insurance fraud should have been disclosed to investors.

3   As Codel admitted, the Company purposely failed to disclose the insurance fraud during the Class

4   Period even though they "***knew there was going to be a day where we were talking about this in the***

5   ***public domain***."

6         9.       Despite these admissions, Wells Fargo's illicit insurance practices were not publicly

7   disclosed until July 27, 2017, when *The New York Times* published an exposé titled "Wells Fargo

8   Forced Unwanted Auto Insurance on Borrowers," describing in detail some of the practices

9   defendants had known about for over a year.  The article, which was based on a leaked copy of the

10   internal report, revealed what defendants would subsequently admit: Wells Fargo had illegally

11   imposed auto insurance on hundreds of thousands of borrowers that they did not need or want, and

12   that it had known about the problem for more than a year, but had not disclosed it.

13         10.      Only after defendants learned that *The New York Times* article would expose their

14   scheme did Wells Fargo belatedly issue a press release describing some of its previously secret

15   practices.  In that press release, issued just hours after *The New York Times* article, the Company

16   admitted that it had been aware of the illegal collateral protection insurance ("CPI") practices since

17   July 2016, and that the Company had been engaged in efforts to calculate the refunds required to

18   make its victims whole.  The Company's release admitted, in part:

19
20            In response to customer concerns, in July 2016 Wells Fargo initiated a review of the CPI program and related third-party vendor practices.  Based on the initial findings, the company discontinued its CPI program in September 2016. . . .

21
22
23            Wells Fargo's review determined that certain external vendor processes and internal controls were inadequate.  As a result, customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.

24                                   *        *        *

25    •       Approximately 490,000 customers had CPI placed for some or all of the time they had adequate vehicle insurance coverage of their own. . . .

26

27    •       In five states that have specific notification and disclosure requirements, approximately 60,000 customers did not receive complete disclosures from our vendor as required prior to CPI placement. . . .

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD         - 3 -

- For approximately 20,000 customers, the additional costs of the CPI could have contributed to a default that resulted in the repossession of their vehicle.

11.    On August 4, 2017, Wells Fargo issued its report on Form 10-Q for the second quarter of 2017 ("2Q17 10-Q"), which included further details about the insurance scheme, including that it extended beyond the CPI policies described in the earlier press release to include guaranteed automobile protection ("GAP") policies issued to its customers.  Wells Fargo also disclosed in the quarterly report that its legal costs could reach upwards of $3.3 billion – well beyond the $1.7 billion it had previously set aside in the wake of the fake account scandal.

12.    When the first of these illicit insurance practices were disclosed, Wells Fargo's spokesperson Jennifer A. Temple publicly conceded that Wells Fargo's senior executives took "full responsibility for these errors."  Wells Fargo further disclosed it would be refunding at least $80 million paid on policies placed between 2012 and 2016.

13.    Investors were stunned by the disclosures, coming after nearly a year of assurances that the Company and its executives were committed to rebuilding trust in Wells Fargo through transparency, and repeated assertions that defendants were unaware of any questionable or improper practices in the Community Banking Division other than the fake account scandal.  On July 28, 2017, for example, Piper Jaffray issued a report titled "Here We Go Again," which recounted the information in *The New York Times* article and Company press release, and then went on to state, in part:

- What questions do we have? (1) *Issue was identified in July '16* and discontinued in September '16, around the time when the original account scandal was disclosed and already being addressed by the company.  *Why didn't the company address these issues publicly while they were already dealing with the account scandal rather than address them now?* . . . .

- Our take. . . . *We believe these revelations could result in lawsuits that may cost WFC multiples of the $80M disclosed today and the company's relationship with some states could be further impaired*.

14.    The market's reaction to these disclosures was swift, with the price of Wells Fargo common stock falling from a close of $54.71 per share on July 27, 2017, to as low as $53.18 per share in intraday trading on July 28, 2017, before closing at $53.30 per share – down $1.41 per share

1    on unusually high trading volume of more than 32.5 million shares.  On August 4, 2017, driven by

2    the additional disclosures and the market's recognition of additional risks of regulatory and litigation

3    costs from the insurance scandal, the price of Wells Fargo common stock fell even further, trading as

4    low as $51.91 per share on August 4, 2017, before closing at $52.84 per share – again on unusually

5    high trading volume of more than 44.6 million shares.

6           15.    On October 3, 2017, Sloan was called before the U.S. Senate Committee on Banking,

7    Housing, and Urban Affairs to answer questions about Wells Fargo's illicit insurance practices.  At

8    that hearing, senators accused Wells Fargo of lying to the committee a year earlier during testimony

9    about the fake account scandal.  Senators demanded to know why the Company had covered up the

10   insurance fraud, and were "incredulous" that Wells Fargo had kept the practices hidden from the

11   public for more than a year:

12        [Senator Brown: ] ***The company, pure and simple, lied to this Committee and lied
          to the public***.  The company recently disclosed it knew in July 2016 that customers
13        had auto insurance policies added to their auto loans without their consent – about
          800,000 customers, roughly the size of the State that Senator Rounds represents.
14
               ***Every day since you have become the head of Wells Fargo for the last 11***
15        ***months, every day you have made a decision to not disclose this information to the***
          ***public***.  Your company knew about the auto insurance policy when former CEO Mr.
16        Stumpf testified.   When did you first become aware of the force-placed auto
          insurance policy problem? And why did you think it was OK to continue covering it
17        up?

18             Mr. Sloan[:]  Well, ***I do not think it was OK to cover it up, Senator Brown***.
          In fact, when the issue was escalated to me in 2016, in late August, early September,
19        I talked to our team about it, and we decided at that point in time to end and tell our
          vendor to quit providing that insurance to our customers. . . .
20
                                    *        *        *
21
               Senator Brown[:]  But that it took you, you the company—you personally 8
22        months, ***you the company 13 months to disclose such a violation of the public trust***
          ***just makes me incredulous***.
23
                             **II.     JURISDICTION AND VENUE**
24
                  16.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein
25
     arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5
26
     promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28
27
     U.S.C. §1331 and §27 of the Exchange Act.
28

17.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the false and misleading statements alleged herein were disseminated from this District and Wells Fargo is headquartered in this District.

18.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities markets.

### III.     PARTIES

19.     Lead Plaintiff Construction Laborers Pension Trust for Southern California is a multi-employer pension plan with more than 31,000 participants, and approximately $1.8 billion in assets, located in El Monte, California.  Lead Plaintiff purchased Wells Fargo common stock during the Class Period, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.

20.     Defendant Wells Fargo & Company is a Delaware corporation with its headquarters located in San Francisco, California.  Wells Fargo is a diversified financial services company that provides retail, commercial and corporate banking services, principally in the United States, which, during the Class Period, was the largest bank by market capitalization.  Wells Fargo common stock is listed and trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WFC." As of July 26, 2017, the Company had approximately five billion shares issued and outstanding.

21.     During all relevant times, Wells Fargo was divided into three operating segments: Community Banking, Wholesale Banking, and Wealth and Investment Management.  The Community Banking Division included business lines of financial products and services for consumers and small businesses, including checking and savings accounts, credit and debit cards, and automobile, student, mortgage, home equity and small business lending.  Dealer Services is the group within Wells Fargo's Community Banking Division responsible for consumer auto loans and the related insurance products.

22.     Defendant Timothy J. Sloan ("Sloan") is, and was at all relevant times, President and Chief Executive Officer ("CEO") of Wells Fargo and a member of its Operating Committee.  Sloan

1    made, or had authority over, the content and dissemination of the false statements and omissions

2    identified herein, and is liable for those false statements and omissions.  Sloan was a control person

3    of Wells Fargo within the meaning of §20(a) of the Exchange Act.

4       23.  Defendant John R. Shrewsberry ("Shrewsberry") is, and was at all relevant times, a

5    Senior Vice President and the Chief Financial Officer ("CFO") of Wells Fargo and a member of the

6    Company's Operating Committee.  Shrewsberry made, or had authority over, the content and

7    dissemination of the false statements and omissions identified herein, and is liable for those false

8    statements and omissions.  Shrewsberry was a control person of Wells Fargo within the meaning of

9    §20(a) of the Exchange Act.

10       24.  Defendant Stephen Sanger ("Sanger") was at all relevant times, Chairman of Wells

11    Fargo's  Board of Directors and the Lead Independent Director.  Sanger led the four-director

12    Oversight Committee which conducted the independent investigation of Wells Fargo's "retail

13    banking sales practices and related matters" announced on September 27, 2016.  Sanger retired from

14    the Board at the end of 2017.  Sanger made, or had authority over, the content and dissemination of

15    the false statements and omissions identified herein, and is liable for those false statements and

16    omissions.  Sanger was a control person of Wells Fargo within the meaning of §20(a) of the

17    Exchange Act.

18       25.  Defendant Mary Mack ("Mack") was at all relevant times Senior Executive Vice

19    President, Community Banking, and a member of the Company's Operating Committee.  Mack is

20    currently Senior Executive Vice President, Community Banking and Consumer Lending.  Mack

21    made, or had authority over, the content and dissemination of the false statements and omissions

22    identified herein, and is liable for those false statements and omissions.  Mack was a control person

23    of Wells Fargo within the meaning of §20(a) of the Exchange Act.

24       26.  Defendants Sloan, Shrewsberry, Sanger and Mack are sometimes referred to herein as

25    the "Individual Defendants."

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD   - 7 -

# IV.     BACKGROUND TO THE CLASS PERIOD

**Wells Fargo's Auto Insurance Schemes Secretly and
Illegally Defrauded Its Customers Out of Millions of Dollars**

27.     For more than a decade, Wells Fargo's Community Banking Division charged hundreds of thousands of its own customers for insurance they did not need or want and improperly withheld excess insurance premiums.  Wells Fargo engaged in a scheme and course of conduct designed to bilk unsuspecting auto finance customers by enrolling them, without their consent or knowledge, in CPI that they neither requested or needed.  Wells Fargo also failed to refund GAP insurance premiums that it owed to people who had paid off their car loans early.

28.     As Wells Fargo has now admitted, it was aware of the fact it was illegally charging customers for unwanted and unneeded automobile insurance in the summer of 2016, had reported the practice to its regulators – albeit only after a decade of ripping off its own customers – and had discontinued the practice by September 30, 2016.  Indeed, by July 2016, the Company had commissioned the global consulting firm Oliver Wyman to conduct an internal investigation, which resulted in the issuance of a 60-page report "***prepared for the bank's executives***" (the "Oliver Wyman Report"), which was completed, and a copy provided to the OCC, later that summer.  The Oliver Wyman Report concluded that "[m]ore than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need" and that the illegal practice and resulting costs "pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions," according to the *Times*.  Despite knowing the magnitude of the insurance issues, defendants did not disclose the Company's illegal practices to its customers or investors until after *The New York Times* article was published on July 27, 2017.

29.     Through Wells Fargo's partnership with insurance giant National General Insurance Company ("National General"), when customers took out auto loans with Wells Fargo, their loan information was sent to National General.  If proof of auto insurance was not received by National General, notices were required to be sent to borrowers in order to prompt them to obtain the required coverage.  However, for years, neither Wells Fargo nor National General, which underwrote the CPI policies, checked their internal databases to see if borrowers had insurance coverage, or, if they did

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                                    - 8 -

1  check their databases, they simply ignored what they learned.  As a result, Wells Fargo imposed on

2  customers redundant auto insurance coverage that was more expensive than the coverage borrowers

3  had obtained on their own.

4         30.  In some instances, even where customers on which such policies had been forcibly

5  imposed notified the bank that they had obtained their own insurance coverage, Wells Fargo

6  continued to maintain coverage on their vehicles and charge customers premiums to do so.  In many

7  cases, and frequently without sufficient notice, Wells Fargo automatically deducted the premiums

8  for the CPI policies from customers' bank accounts along with the regularly scheduled principal and

9  interest payments for their auto loans.  The illegal forced placement and, in many cases, automatic

10  deduction of CPI premiums from borrowers' bank accounts, resulted in account delinquencies,

11  overdrawn accounts, increased interest rates, repossessed vehicles and damage to borrowers' credit.

12         31.  The July 27, 2017, *The New York Times* article, based on a copy of the Oliver Wyman

13  Report obtained by the newspaper, described the practices:

> Here is how the process worked: When customers financed cars with Wells Fargo, the buyers' information would go to National General, which was supposed to check a database to see if the owner had insurance coverage.  If not, the insurer would automatically impose coverage on the customers' accounts, adding an extra layer of premiums and interest to their loans.

> When customers who checked their bills saw the charges and notified Wells Fargo that they already had car insurance, the bank was supposed to cancel the insurance and credit the borrower with the amount that had been charged.

> The Oliver Wyman report indicated that many customers appear not to have notified Wells Fargo of the redundant insurance. This may have been because their payments were deducted automatically from their bank accounts and they did not spot the charges.

> According to documents on a Wells Fargo website titled "understanding your auto loan," the bank had strict rules about the order in which it would apply a customer's car payment to costs associated with the loan: First to be deducted from a payment would be the interest owed on the car loan.  Then the bank would deduct interest charged on the lender-placed insurance.  The third deduction would be principal on the loan, followed by the amount of premium owed on the insurance.

> This payment structure had the effect of increasing the overall interest borrowers paid on their loans, the Oliver Wyman report noted, because fewer dollars went to reducing the principal outstanding.

> Wells Fargo was also aggressive in repossessing vehicles: Some customers endured multiple repossessions, the report said.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD        - 9 -

32.     The Company was also failing to refund GAP insurance premiums that it owed to people who had paid off their car loans early.  GAP is a type of insurance purchased by borrowers (typically for $400 to $600) that is intended to protect a lender against the fact that a car – the collateral for its loan – loses significant value the moment it is driven off the dealership lot.  GAP insurance makes up that difference for a lender if, for instance, a car is wrecked or stolen at a time when its market value is lower than the remaining balance on the loan.  Car buyers who finance their purchases typically add the cost of the GAP coverage to the amount of the loan.  The interest that borrowers pay on the coverage goes to the bank that made the loan.  Laws in nine states require that unused GAP insurance premiums be refunded when a loan is paid off early, and all 50 states require that the amount of any unused insurance be credited to borrowers' accounts, reducing the amount of the final payment they owe.  However, before and during the Class Period, Wells Fargo withheld those sums without crediting or refunding the premiums for unused insurance to its borrowers.

33.     The August 7, 2017, *The New York Times* article described the practice:

> The latest inquiry, by officials at the Federal Reserve Bank of San Francisco, where the bank has its headquarters, involves a different, specialized type of insurance that is sold to consumers when they buy a car.  Called guaranteed auto protection insurance, or GAP, it is intended to protect a lender against the fact that a car – the collateral for its loan – loses significant value the moment it is driven off the lot.

> GAP insurance, also known as guaranteed asset protection, makes up that difference for a lender if, for instance, a car is stolen before the loan is paid off. Regular car insurance typically covers only the current market value.

> Because Wells Fargo is a large auto lender, tens of thousands of customers may have been affected by the bank's actions on GAP insurance.

> It is not mandatory for car buyers to carry GAP insurance, which typically costs $400 to $600.  But car dealers push the insurance, and lenders like it because of the protection it provides.  When borrowers pay off the loans early, they are entitled to a refund of some of the GAP insurance premium because the coverage they paid for is no longer needed.

> ***Laws in nine states require that customers get unused insurance money back***.  They are Alabama, Colorado, Indiana, Iowa, Maryland, Massachusetts, Oklahoma, Oregon and South Carolina.

> *                *                *

> A failure to refund the insurance money harmed borrowers whose cars were repossessed by increasing what they owed, a figure that the bank reports to consumer

credit bureaus.  ***All 50 states require that the amount of unused insurance be credited to those borrowers' accounts, reducing the amount owed***.

\*       \*       \*

GAP coverage is similar to home mortgage insurance, which shields lenders against a default if a borrower loses his or her job and cannot make the payments.

Car buyers who finance their purchases typically add the cost of the GAP coverage to the amount of the loan.  The interest that borrowers pay on the coverage goes to the bank that made the loan.

34.     After conducting their own investigation, federal regulators confirmed in April of 2018 that the Company had deliberately and "forcibly" placed unnecessary insurance coverage on millions of auto loan borrowers prior to the Class Period.  On April 20, 2018, the CFPB and OCC announced that $500 million in fines had been imposed against Wells Fargo for its decade-long illegal insurance schemes.  The federal regulators confirmed that defendants knew, but concealed, before and during the Class Period, that Wells Fargo's auto insurance practices were illegal and had impacted hundreds of thousands of Wells Fargo customers, including the wrongful repossession of 27,000 vehicles.  The CFPB found, for example:

Since 2005, [Wells Fargo] forcibly placed insurance for the vehicles of about 2 million borrowers who secured auto loans with the bank.  According to [Wells Fargo]'s own analyses, it forcibly placed duplicative or unnecessary insurance on hundreds of thousands of those borrowers' vehicles.  In addition, for some borrowers, after appropriately placing Force-Placed Insurance policies, [Wells Fargo] improperly maintained Force-Placed Insurance policies on the borrowers' accounts after the borrowers had obtained adequate insurance on their vehicles and after adequate proof of insurance had been provided.  If borrowers failed to pay the amounts [Wells Fargo] charged them for the Force-Placed Insurance, they faced additional fees and, in some instances, experienced delinquency, loan default, and even repossession.

35.     The OCC made similar findings, stating in part:

[P]rior to June 2012, and continuing through October 2016, the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and charged premiums, interest, and other fees on borrowers' accounts where the borrowers had demonstrated adequate insurance under the terms of their automobile loan note/contract.

**Prior to the Class Period, Defendants Proclaimed Their "Immediate and Highest Priority" Was Restoring Trust in Wells Fargo**

36.     Despite the well-known problems with the Community Banking Division's auto insurance practices, defendants repeatedly failed to disclose those practices when boasting to

investors about the strides Wells Fargo had made in correcting the reputational harm the Company had self-inflicted with the fake account scandal. Defendants did so even while assuring investors that the fake account scandal was an isolated incident and no other illicit or fraudulent sales practices had come to light in their ongoing and purportedly extensive investigations into not only the fake account scandal, but practices Company-wide.

37. On September 8, 2016, investors learned that Wells Fargo had been hit with $190 million in fines and customer restitution payments stemming from a years-long practice of selling products and services customers did not request or want. Wells Fargo said it would pay $100 million to the CFPB, $50 million to the City and County of Los Angeles, $35 million to the OCC, and $5 million to its customers as restitution for harm incurred as a result of the unauthorized accounts. A September 8, 2016, CFPB press release announcing the penalties stated, in part:

> "Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses," said CFPB Director Richard Cordray. "Because of the severity of these violations, Wells Fargo is paying the largest penalty the CFPB has ever imposed. Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences."

38. In the wake of the settlements, the investment community focused on the damage to Wells Fargo's reputation and loss of customers' trust. Before the fake account scandal hit, Wells Fargo had sought to distinguish itself from other banks whose reputations had been tarnished in the 2008 financial crisis by boasting of its deep customer relationships and its purported conservative lending practices. As numerous analysts recognized, the revelation that Wells Fargo had opened two million unauthorized deposit and credit card accounts was a "black eye for a company that has long touted its corporate values" and "Wells Fargo's reputation as a consumer-friendly bank suffered a significant blow."

39. In the wake of the fake account scandal, defendants claimed that restoring customers' trust was their "highest priority" at Wells Fargo. As the Company said in its September 8, 2016, press release discussing the fines and payments it had agreed to make to settle the scandal:

> Wells Fargo reached these agreements consistent with our commitment to customers and in the interest of putting this matter behind us. Wells Fargo is committed to putting our customers' interests first 100 percent of the time, and we

regret and take responsibility for any instances where customers may have received a product that they did not request.

* * *

In addition, as noted in a message emailed to all Wells Fargo team members today, the company said "Our entire culture is centered on doing what is right for our customers. However, at Wells Fargo, when we make mistakes, we are open about it, we take responsibility, and we take action."

40.     Still, defendants were well aware that words alone would be insufficient to restore customer trust in the Company and repair its damaged reputation, particularly in light of congressional hearings that were conducted, prosecutorial investigations that were opened, and lawsuits that were filed in the wake of the revelation of the misleading sales practices that Wells Fargo had employed.  At each opportunity, Wells Fargo detailed the steps it was taking to fix the problems and prevent that type of widespread consumer harm from happening again.  To that end, on September 13, 2016, Wells Fargo announced it would eliminate the products sales goals that, along with a high-pressure culture, led to the years of unauthorized account openings.  Then-CEO Stumpf bluntly stated that the bank does not "'want a dime that we have not earned, we have returned it and we apologized.'"  Yet, Wells Fargo's management repeatedly failed to disclose the illicit sales practices in its auto loan programs, which involved the same type of practices that had led to the fake account scandal: charging millions of customers fees for products they had not requested, did not want and did not need.  For example, during testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on September 20, 2016, Stumpf misled senators and the public into believing that similar conduct had not occurred elsewhere in the Company:

[Q (Senator Vitter):] Finally, what level of confidence, from 0 percent to 100 percent, do you have that this type of fraudulent activity does not exist in other Wells business lines?

[A (Stumpf):]  We have looked at other things, other businesses.  They are different, and we believe that this is, you know, situated in our regional bank.  Other areas have different levels of compliance and different volumes and different requirements.  ***We have looked across a number of things, and I have confidence that we have this one solved, and we have made a lot of changes***.

41.     Thereafter, the Company continued to reassure investors that it had ended the culture of stealing from its customers and had put its scandals behind it.  Following Stumpf's senate testimony on September 20, 2016, Wells Fargo issued a press release touting the "Series of New

1    Actions to Strengthen Culture and Rebuild Trust of Customers" Wells Fargo was taking.  A week

2    later, on September 27, 2016, the Company announced that Wells Fargo's Board of Directors had

3    "launched an independent investigation into the Company's retail banking sales practices and related

4    matters."  And on October 12, 2016, the Company announced that Stumpf would retire, effective

5    immediately.

6         42.    As part of that messaging, during the Company's October 14, 2016, third quarter of

7    2016 ("3Q16") earnings call, Sloan made clear that his "***immediate and highest priority is to restore***

8    ***trust in Wells Fargo***."  Sloan told investors that he was "fully committed, along with the entire

9    leadership team, to fixing these issues and taking the necessary actions to restore our customers'

10   trust."  The Company repeatedly told investors that it was committed to transparency, representing

11   that the Company was being as transparent as "we've ever been."  An October 19, 2016, article in

12   the *Charlotte Observer* quoted defendant Mack as saying "'[t]he one thing I know that people need

13   in times of uncertainty is communication," "[t]hey need to hear what we know and don't know.'"

14        43.    The message was clear: investors could trust it was a new day of honesty and

15   transparency at Wells Fargo.  In fact, that was a lie.

16   **V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND**
         **MATERIAL OMISSIONS DURING THE CLASS PERIOD**
17

18        44.    Defendants' intentional practice of defrauding Wells Fargo's customers by charging

19   them for CPI they did not need or want and failing to return unused GAP insurance premiums, and

20   the concealment of those practices, rendered certain statements made by defendants during the Class

21   Period false or misleading.  Defendants' misstatements and omissions concerning what the Company

22   had discovered (or not discovered) with regard to unauthorized products forced on Wells Fargo

23   customers, the progress defendants had made in restoring customers' trust, and the effectiveness of

24   its internal and disclosure controls gave investors an impression of a state of affairs that differed

25   materially from reality.  For example, during the Class Period, the Company made the following

26   false and misleading statements:

27        •    ***Sloan***, in discussing the Company's review of "sales practices across the rest of the
              company":  "***We are going to leave no stone unturned.  I am not aware of any***

28

*issues*, but I don't want there to be a question about how we interact with customers at Wells Fargo.  We're going to put that to rest."

- **When specifically asked in written questions by members of the U.S. Congress**, "[h]ave you discovered other types of misconduct involving other products aside from credit cards or basic banking (such as misconduct related to applications for mortgages or personal or other loans, or lines of credit, **insurance**, or other investment areas)?," Wells Fargo falsely misrepresented that "the activity at issue here was limited to certain team members within the Community Banking Division."

- **Sloan**, in response to an analyst's question about "activities outside of retail banking focused and reviews focused on sales practices": "My primary objective and the objective of our senior leadership team is to restore trust in Wells Fargo.  That includes rebuilding pride in our Company and a vision of meeting our customers' financial needs."

- **Mack**: our "number one priority remains rebuilding trust."

- **Sloan**: "And ***if we find something that's important, we'll communicate that***.  But if nothing happens we may not communicate it.  But we'll take it as it comes.  But I think ***given our desire to be very transparent, we'll probably err on the side of overcommunicating*** as opposed to undercommunicating that."

- **Sloan and Sanger**:  Proclaimed that an independent investigation by the Company's Board of Directors into the Community Banking Division's practices had been an "exhaustive" examination of Wells Fargo's misdeeds, and reassured investors and the public that, "***[t]here is not another large shoe to drop***."

45.     Defendants' misstatements and omissions on conference calls, in press releases, at investor conferences, and in SEC filings, as set forth herein, were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  As a result of defendants' positive statements and omissions, Wells Fargo common stock traded at artificially inflated prices, reaching a high of more than $59.00 per share during the Class Period.

**BancAnalysts Association of Boston Conference**

46.     On November 3, 2016, the first day of the Class Period, defendants Sloan and Mack presented at the BancAnalysts Association of Boston Conference.

47.     In response to an audience member's question, Sloan touted the thoroughness of the Company-wide review and assured investors he was "not aware" of any undisclosed problems

concerning sales practices or culture within the Community Banking Division or elsewhere at the Company:

> Sure, good question. So everybody hear the question? That is the activities outside of retail banking focused and reviews focused on sales practices and culture. The short answer is, yes. I announced in Charlotte last week, it was relatively well covered by the media, that we are going to engage separate from the requirements under the consent order. *We are going to engage a separate firm to look at sales practices across the rest of the Company. We are going to leave no stone unturned.*

> *I am not aware of any issues*, but I don't want there to be a question about how we interact with customers at Wells Fargo. We're going to put that to rest. That is going to be done in a very comprehensive way and it is going to be done relatively quickly, but it is going to be done right.

48. In his opening remarks, Sloan told investors that the Company was looking at sales practices across the Company, conveying to investors that if they found something they would disclose it:

> We will be engaging a separate independent consultant to review sales practices across the Company. This is beyond what we are required to do under the consent orders because we want to do what is right for our customers.

49. A slide displayed during Sloan and Mack's presentations similarly led investors to believe that defendants' "primary objective is to restore trust in Wells Fargo." To that end, the same slide stated the Company's internal review was all-encompassing, stating that defendants were "[r]eviewing sales practices *across the entire company*, beyond the requirements of the Consent Orders, to ensure that we are always doing what is right for our customers." Defendants promised "[c]ontinued transparency of business trends."

50. Sloan also led investors to believe defendants had done and were doing all they could to restore trust in the Company:

> *I am fully committed*, along with the rest of our entire leadership team, and you will hear from one of the best, Mary Mack, in just a few minutes, to fixing these issues and taking the necessary steps *to restore our customers' trust*.

> *           *           *

> I want to conclude my remarks with my near-term priorities. *My primary objective and the objective of our senior leadership team is to restore trust in Wells Fargo*. That includes rebuilding pride in our Company and a vision of meeting our customers' financial needs.

51.     Mack's opening remarks likewise assured investors that Wells Fargo was doing the right thing for its customers:

> We eliminated product sales goals, as you all well know, in retail banking as of October 1 to make sure that ***nothing gets in the way of doing what is right for our customers***.
>
> *                *                *
>
> So ***the vast majority of our team members did the right thing and still do the right thing every day on behalf of customers*** . . . .

52.     Defendants' November 3, 2016, statements set forth in ¶¶46-51 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)     These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and similarly involved secretly harming customers by charging them for products the customers did not need or want;

(c)     By July 2016, an internal review had put the Company on notice of the illegal insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto insurance practices;

(d)     By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class Period, defendants were in frequent discussion with the Company's regulators regarding its illegal auto insurance practices and the need for customer remediation;

(e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

(f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants disclosed during the Class Period.  The Company was in frequent communication before and during the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal nature of the practices, the fact they occurred in the same Community Banking Division as the fake account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions taken against the Company, the undisclosed auto insurance practices exposed the Company to a massive loss of public trust, additional significant regulatory actions, fines and litigation.

53.     Defendants' November 3, 2016, misstatements and omissions were materially false and misleading for the additional reason that defendants, both leading up to and during the Class Period, promised investors that their primary objective was restoring customers' trust and that they were being more transparent than ever, including conducting an exhaustive review of the Company's culture and sales practices.  For example, during the Company's October 14, 2016, 3Q16 earnings call, Sloan made clear that his "immediate and highest priority is to restore trust in Wells Fargo" and that defendants were "trying to be more transparent . . . than we've ever been."  Similarly, in an October 19, 2016 article in the *Charlotte Observer*, Mack acknowledged that "'[t]he one thing I know people need in times of uncertainty is communication,'" "'[t]hey need to hear what we know and don't know.'"  That context underscores the misleading impression of the state of affairs defendants' Class Period misstatements and material omissions gave investors.

54.     Following the Company's November 3, 2016, statements, analysts keyed in on defendants' promises of transparency and a complete review of the Company in hopes of rebuilding consumers' trust.  For example, a November 3, 2016, research note from Sandler O'Neil + Partners

1  noted, "[m]anagement's clear near-term priority is to restore trust in the company" and that

2  "[m]anagment intends to be transparent with business trends" in the retail bank.  A November 3,

3  2016, research note from RBC Capital Markets commented that Wells Fargo's "review of sales

4  practices will extend beyond retail banking to ensure all facets of the company have adequate

5  controls in place."  Likewise, a November 3, 2016, research note from Evercore ISI highlighted that

6  "[management] noted that [Wells Fargo] is reviewing sales practices across the firm . . . , **but**

7  **provided no update**."   A November 7, 2016, research note from Credit Suisse highlighted

8  defendants' focus on restoring trust: "Management is clearly committed to making any and all

9  changes to restore trust, broadly, in Wells Fargo."   Analysts also focused on the Company's

10  statements around potential litigation losses.  A November 4, 2016, research note from J.P. Morgan

11  noted that "Wells [Fargo] sharply increased the high end of potential losses from litigation in their

12  10-Q – up to $1.7 billion as of 9/30 from $1.0 billion for 6/30."

13  **October Retail Banking Customer Activity Report**
   **Call & Wells Fargo's Written Responses to Senate**
14  **Committee on Banking, Housing, and Urban Affairs**

15     55.     On November 17, 2016, defendants held the first in a new series of monthly

16  conference calls labeled the "Retail Banking Customer Activity Report Call."   Defendants

17  purportedly held these calls to demonstrate that the Company was providing complete and accurate

18  disclosures to investors regarding its retail banking practices.

19     56.     Defendants Shrewsberry and Mack presented on the November 17, 2016, call.

20  Shrewsberry told investors that "our highest priority right now is rebuilding trust in Wells Fargo,

21  which includes being transparent about the trends in retail banking and updating you on those trends

22  as we move forward."

23     57.     On November 18, 2016, Wells Fargo submitted written responses to questions from

24  the U.S. Senate Committee on Banking, Housing, and Urban Affairs.  When asked directly whether

25  defendants had "discovered other types of misconduct involving other products aside from credit

26  cards or basic banking," the Company failed to disclose the fact that defendants discovered in July

27  2016 that the Company had illegally forced auto insurance policies on hundreds of thousands of

28  consumers.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                    - 19 -

[Question:] As was asked at the hearing, *are you confident that this type of fraudulent activity does not exist in other Wells business lines*? Have you discovered other types of misconduct involving other products aside from credit cards or basic banking (such as misconduct related to applications for mortgages or personal or other loans, or lines of credit, *insurance*, or other investment areas)? If so, how did the company obtain this information? When was the first reported case, how many cases have been discovered, and what is the nature of these cases? Have you reported those cases to federal financial regulators?

Response: We believe that the activity at issue here was limited to certain team members within the Community Banking Division.

58.     The Company's written responses further represented that the Company "has policies, procedures, and internal controls that are reasonably designed to comply with its legal obligations to monitor, detect, and report suspicious activities."

59.     And in response to a pointed question about the Company's failure to timely disclose the fake account scandal in Wells Fargo's SEC filings, the Company told investors that "[w]e will continue to review developments related to sales practices matters and make additional disclosures as the facts and circumstances warrant."

60.     Defendants' November 17 and 18, 2016, statements set forth in ¶¶55-59 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading. The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)     These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and similarly involved secretly harming customers by charging them for products the customers did not need or want;

(c)     By July 2016, an internal review had put the Company on notice of the illegal insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the Company's practices. Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

the illegal auto insurance practices and their negative impact on Wells Fargo customers. The Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto insurance practices;

(d)     By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve. From that time and continuing through the Class Period, defendants were in frequent discussion with the Company's regulators regarding its illegal auto insurance practices and the need for customer remediation;

(e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

(f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants disclosed during the Class Period. The Company was in frequent communication before and during the Class Period with regulators concerning the illegal auto insurance practices. In light of the illegal nature of the practices, the fact they occurred in the same Community Banking Division as the account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions taken against the Company, the undisclosed auto insurance practices exposed the Company to a massive loss of public trust, additional significant regulatory actions, fines and litigation.

61.     Defendants' November 17 and 18, 2016, misstatements and omissions were materially false and misleading for the additional reason that defendants, both leading up to and during the Class Period, promised investors that their primary objective was restoring customers' trust and that they were being more transparent than ever, including conducting an exhaustive review of the Company's culture and sales practices. That context underscores the misleading impression of the state of affairs defendants' Class Period misstatements and material omissions gave investors. For example, the Company's new practice of holding monthly conference calls to purportedly update investors on trends in the retail bank, including the November 17, 2016, call, was meant to bolster

the misleading impression that defendants were being completely transparent, especially with regard to the retail banking division.

**Goldman Sachs U.S. Financial Services Conference &**
**November Retail Banking Customer Activity Report Call**

62.     On December 6, 2016, defendant Sloan presented for Wells Fargo at the Goldman Sachs U.S. Financial Services Conference.  During the call, in response to an analyst's question about what needs to change at Wells Fargo, Sloan again represented to investors that defendants had disclosed any untoward sales practices that defendants had uncovered:

> What I have told our team is, look, I don't want to just look at [our retail] businesses. We are going to bring in other consultants and we are going to look at sales practices in every business of this Company.  Even though ***I am not aware of any issues***, but I don't want there ever to be a concern about sales practices in Wells Fargo.

63.     Sloan also spoke to the Company-wide review:

> As part of our review of sales practices across the country we will be engaging a separate independent consultant so that we're going to be looking at all of our businesses.  We are actively engaged with our regulators to comply with the consent orders and taking actions to ensure that we are always doing what is right for our customers.

64.     In addition, Sloan touted the Company's recently added "strateg[ic] priority . . . rebuilding trust."

65.     On December 16, 2016, defendants Shrewsberry and Mack spoke on the Company's November 2016 Retail Banking Customer Activity Report Call.  Defendant Mack assured investors that her "***number one priority remains rebuilding trust***."  Shrewsberry emphasized Wells Fargo's claimed "increased transparency" with investors: "As you know, ***we're committed to maintaining increased transparency*** . . . ."

66.     Defendants' December 6 and 16, 2016, statements set forth in ¶¶62-65 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000

1   borrowers despite those borrowers having the required insurance, and the unlawful withholding of

2   insurance premiums after a customer's automobile loan had been paid off;

3           (b)     These practices occurred within the Company's Community Banking

4   Division, the same division where the recently disclosed fake account scandal had occurred, and

5   similarly involved secretly harming customers by charging them for products the customers did not

6   need or want;

7           (c)     By July 2016, an internal review had put the Company on notice of the illegal

8   insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

9   Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

10  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

11  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

12  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

13  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

14  insurance practices;

15          (d)     By September 2016, the Company's illegal auto insurance practices had been

16  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

17  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

18  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

19  auto insurance practices and the need for customer remediation;

20          (e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance

21  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

22          (f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants

23  disclosed during the Class Period.  The Company was in frequent communication before and during

24  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

25  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

26  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

27  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

28  massive loss of public trust, additional significant regulatory actions, fines and litigation.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                                    - 23 -

1    67.    Defendants' December 6 and 16, 2016, statements and omissions were materially

2  false and misleading for the additional reason that defendants, both leading up to and during the

3  Class Period, promised investors that their primary objective was restoring customers' trust and that

4  they were being more transparent than ever, including conducting an exhaustive review of the

5  Company's culture and sales practices.  That context underscores the misleading impression of

6  affairs defendants' Class Period misstatements and material omissions gave investors.  For example,

7  the Company's new practice of holding monthly conference calls to purportedly update investors on

8  trends in the retail bank, including the December 16, 2016, call, was meant to bolster the misleading

9  impression that defendants were being completely transparent, especially with regard to the retail

10  banking division.

11    68.    Following defendants' December 2016 statements, a Sandler O'Neil + Partners

12  research note keyed in on defendants' representations that they were "committed to update investors

13  regularly on the company's retail bank segment."  As analysts did before and during the Class Period

14  following the fake account scandal, a December 19, 2016, research note from Morningstar Equity

15  Research focused on defendants' representations of working to rebuild trust, stating:  "Customers

16  Are Sticking With Wells for Now, but Relationship Repair Will Drive Success in 2017."  And

17  consistent with the market's focus during this crucial stage of Wells Fargo's efforts to regain

18  consumers' trust, analysts at Morningstar "plan[ned] to focus our attention on the status of Wells

19  Fargo's regulatory relationships and its efforts to repair its retail brand and win new customers."

20    69.    In the meantime, Wells Fargo was quietly overhauling Dealer Services, the unit

21  within the Community Banking Division responsible for the auto insurance scandal.  On January 10,

22  2017, Wells Fargo announced that Dawn Martin Harp would retire effective April 1 as head of

23  Dealer Services, which she oversaw while the auto insurance scandal was being perpetrated.  Bill

24  Katafias, Executive Vice President of Dealer Services would also leave in April.  Wells Fargo did

25  not disclose their departures were in response to the auto insurance scandal.

26  **4Q16 and FY16 Earnings Release and Conference Call**

27    70.    On January 13, 2017, Wells Fargo issued a press release reporting its fourth quarter

28  and fiscal year 2016 ("4Q16" and "FY16") financial results for the period ended December 31, 2016.

The release quoted Sloan, who touted the Company's success in rebuilding its credibility, stating, in part:

> "*We continued to make progress in the fourth quarter in rebuilding the trust of our customers, team members and other key stakeholders*. I am pleased with the progress we have made in customer remediation, the ongoing review of sales practices across the company and fulfilling our regulatory requirements for sales practices matters."

71.     The Company held a conference call later that same day for investors. Wrapping up his prepared comments, Sloan spoke to the issue of restoring customers' trust, heralding progress the Company had purportedly made: "It's been only four months since we signed the sales practices consent orders but *we've already made progress in restoring customers' and team members' trust, and we've remained committed to being transparent with investors*."

72.     During the question and answer portion of the January 13, 2017, earnings call, Sloan again harped that defendants were leaving "no stone unturned" and "if we find something that's important, we'll communicate that":

> And then, separately, because, as I said in my earlier remarks*, we want to leave no stone unturned here, we've said, and we have, brought in a separate consultant to look at sales practice across other businesses within the Company*. And my guess, it will take much of this year to complete that work.

> And *if we find something that's important, we'll communicate that*. But if nothing happens we may not communicate it. But we'll take it as it comes. But I *think given our desire to be very transparent, we'll probably err on the side of overcommunicating* as opposed to undercommunicating that.

73.     Defendants' January 13, 2017, statements set forth in ¶¶70-72 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading. The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)     These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and

1  similarly involved secretly harming customers by charging them for products the customers did not

2  need or want;

3              (c)     By July 2016, an internal review had put the Company on notice of the illegal

4  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

5  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

6  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

7  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

8  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

9  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

10  insurance practices;

11              (d)     By September 2016, the Company's illegal auto insurance practices had been

12  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

13  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

14  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

15  auto insurance practices and the need for customer remediation;

16              (e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance

17  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

18              (f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants

19  disclosed during the Class Period.  The Company was in frequent communication before and during

20  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

21  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

22  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

23  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

24  massive loss of public trust, additional significant regulatory actions, fines and litigation.

25              74.     Defendants' January 13, 2017, statements and omissions were materially false and

26  misleading for the additional reason that defendants, both leading up to and during the Class Period,

27  promised investors that their primary objective was restoring customers' trust and that they were

28  being more transparent than ever, including conducting an exhaustive review of the Company's

1  culture and sales practices.   That context underscores the misleading impression of affairs

2  defendants' actionable misstatements and omissions gave investors.

3       75.   As defendants continued to tell the market the Company was not only putting the fake

4  account scandal behind it, but that no other issues had been discovered during its Company-wide

5  review, analysts bought in.   A January 17, 2017, research note from The Buckingham Research

6  Group commented, "it appears that [Wells Fargo] is beginning to turn the corner on its 'fake

7  account' scandal," and that "[a]s the scandal recedes and [Wells Fargo] ups its marketing spend, we

8  would expect retail trends to continue to 'normalize' over the coming quarters."   Likewise, a January

9  17, 2017, research note from Argus Research Company noted that "WFC shares have more than

10  recovered from their September 2016 selloff," and that the "company has taken a number of steps to

11  restore customer trust."

12  **January Retail Banking Customer Activity Report Call**

13       76.   On February 17, 2017, defendants Shrewsberry and Mack presented on the

14  Company's January 2017 Retail Banking Customer Activity Report Call.   Shrewsberry opened by

15  telling investors "we are very committed to maintaining transparency."   Mack echoed that statement,

16  representing that the Company was making "progress . . . in rebuilding trust with our customers and

17  our team members and getting things right for the long term."

18       77.   Defendants' February 17, 2017, statements set forth in ¶76 were materially false and

19  misleading when made in that they misrepresented and/or omitted material facts necessary to make

20  the statements made not misleading.   The facts, which were known to or disregarded by each of the

21  defendants, were:

22           (a)   The Company had engaged in illegal auto insurance practices for at least a

23  decade, including the forced-placement of automobile insurance policies on at least 800,000

24  borrowers despite those borrowers having the required insurance, and the unlawful withholding of

25  insurance premiums after a customer's automobile loan had been paid off;

26           (b)   These practices occurred within the Company's Community Banking

27  Division, the same division where the recently disclosed fake account scandal had occurred, and

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                                    - 27 -

1   similarly involved secretly harming customers by charging them for products the customers did not

2   need or want;

3                    (c)     By July 2016, an internal review had put the Company on notice of the illegal

4   insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

5   Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

6   the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

7   Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

8   Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

9   27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

10  insurance practices;

11                   (d)     By September 2016, the Company's illegal auto insurance practices had been

12  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

13  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

14  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

15  auto insurance practices and the need for customer remediation;

16                   (e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance

17  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

18                   (f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants

19  disclosed during the Class Period.  The Company was in frequent communication before and during

20  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

21  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

22  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

23  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

24  massive loss of public trust, additional significant regulatory actions, fines and litigation.

25          78.     Defendants' February 17, 2017 statements and omissions were materially false and

26  misleading for the additional reason that defendants, both leading up to and during the Class Period,

27  promised investors that their primary objective was restoring customers' trust and that they were

28  being more transparent than ever, including conducting an exhaustive review of the Company's

1  culture and sales practices.  That context underscores the misleading impression of the state of

2  affairs defendants' actionable misstatements and omissions gave investors.  For example, the

3  Company's new practice of holding monthly conference calls to purportedly update investors on

4  trends in the retail bank, including the February 17, 2017, call, was meant to bolster the misleading

5  impression that defendants were being completely transparent, especially with regard to the retail

6  banking division.

7       79.     Analysts continued to buy in.  On February 17, 2017, Morningstar published a

8  research note titled "Sales Scandal's Impact Continues to Fade in January," which noted that "we

9  think the damage to the Wells Fargo brand will fade with time, and most indicators are moving in the

10  right direction."

11      80.     On February 21, 2017, the Company announced the "for cause" departures of four

12  Community Banking Division executives, including Claudia Russ Anderson, Community Bank

13  Chief Risk Officer, and Matthew Raphaelson, the head of Community Bank Strategy and Initiatives.

14  Wells Fargo terminated their employment based on the Board of Directors' internal investigation

15  "into the Company's retail banking sales practices and related matters."

16  **2016 Annual Report on Form 10-K & 2017 Proxy Statement**

17      81.     On March 1, 2017, Wells Fargo filed with the SEC its 2016 annual report to

18  shareholders on Form 10-K and exhibits thereto (the "2016 10-K").  The Company's 2016 10-K

19  represented that "[o]ur current top priority is rebuilding trust through a comprehensive action plan

20  that includes making things right for our customers."

21      82.     Also on March 1, 2017, the Company posted to its website a slideshow titled

22  "Highlights of Board and Company Actions in Response to Sales Practices."  The March 1, 2017

23  slideshow represented that "Our Board is Committed to Public Disclosure of Findings from its

24  Investigation."

25      83.     The Company filed its 2017 Proxy Statement on March 15, 2017.  The 2017 Proxy

26  Statement included a Letter to Our Stockholders from our Chairman and our Chief Executive

27  Officer, signed by Sanger and Sloan.  The letter continued defendants' false and misleading mantra:

28

1    Restoring your trust and the trust of all key stakeholders is our top priority and, while
     we have more work to do, we firmly believe we are on the right path.  We have taken
2    decisive actions, many of which are discussed in this proxy statement, to make things
     right for our customers and team members, and are fixing problems at their root
3    cause and building a better Wells Fargo for the future.

4         84.    The 2017 Proxy Statement told investors that the Company's "top priority" was

5    "rebuilding trust" and, to that end, defendants stated they had "[e]ngaged external consultants to

6    review sales practices across our Company" and that they were "[b]eing more transparent in our

7    disclosures to our investors."  The 2017 Proxy Statement devoted considerable space to updating

8    investors on the Company's internal investigation into its retail banking practices, including by

9    stating that with regard to the Board's internal investigation into sales practices issues, the "Board is

10   Committed to Public Disclosure of Findings from its Investigation."

11        85.    The 2017 Proxy Statement also included a section titled "Retail Banking Sales

12   Practices – Our Path Forward," which stated, in part:

13        **Our action plan is focused on rebuilding trust in Wells Fargo**.

14                               *        *        *

15        **Our Board's Independent Investigation**.

16        Our Board's independent directors launched a comprehensive independent
     investigation into our Company's retail banking sales practices and related matters.
17   The investigation covers a broad range of topics so that it addresses questions and
     concerns raised by our stockholders, customers, team members, regulators, and other
18   government officials, including the actions of our Board, senior management, the
     Community Bank, and key corporate functions.
19
                                    *        *        *
20
          **Our Board and Company Are Taking Decisive Actions**.  Since September
21   2016, our Board and our Company have taken decisive and comprehensive actions to
     address retail banking sales practices issues, work to restore the trust of our many
22   stakeholders, and build a better Wells Fargo for the future.  Wells Fargo has not
     waited for the completion of our Board's independent investigation, and has already
23   taken actions to enhance our compensation and performance management programs,
     risk management organization and practices, and the ways we reinforce our culture.
24
                                    *        *        *
25
          We have engaged external consultants to review sales practices across our
26   Company.

27                                  *        *        *

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                          - 30 -

**Being More Transparent**

Part of our action plan to lead our Company forward is focused on outreach to our customers, team members, investors, regulators, elected officials, and the communities in which we do business.  Our action plan includes being more transparent in our communications.

- We launched a new webpage at www.wellsfargo.com/commitment to keep our customers and other stakeholders updated on the latest developments.

- We are providing monthly updates on the impact of the sales practices matter on customer activity in our retail bank.

- We are enhancing disclosures on our website, including on a broad range of environmental, social, and governance matters in response to feedback from our investors and other stakeholders.

\*       \*       \*

We formed a new **Rebuilding Trust Office** in early 2017, which organizes and accelerates our efforts to rebuild trust in Wells Fargo through one integrated program and oversees our Company's compliance with the requirements under our sales practices consent orders with our regulators.  The head of the Rebuilding Trust Office also reports to our Chief Risk Officer.

86.     Defendants' March 1 and 15, 2017, statements set forth in ¶¶81-85 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)     These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and similarly involved secretly harming customers by charging them for products the customers did not need or want;

(c)     By July 2016, an internal review had put the Company on notice of the illegal insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto insurance practices;

(d)     By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class Period, defendants were in frequent discussion with the Company's regulators regarding its illegal auto insurance practices and the need for customer remediation;

(e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

(f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants disclosed during the Class Period.  The Company was in frequent communication before and during the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal nature of the practices, the fact they occurred in the same Community Banking Division as the fake account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions taken against the Company, the undisclosed auto insurance practices exposed the Company to a massive loss of public trust, additional significant regulatory actions, fines and litigation.

87.     Defendants' March 1 and 15, 2017, misstatements and omissions were materially false and misleading for the additional reason that defendants, both leading up to and during the Class Period, promised investors that their primary objective was restoring customers' trust and that they were being more transparent than ever, including conducting an exhaustive review of the Company's culture and sales practices.  That context underscores the misleading impression of the state of affairs defendants' Class Period misstatements and material omissions gave investors.

88.     Following publication of the Company's 2016 10-K, Barclays issued a research note on March 2, 2017.  In a prescient analysis, the Barclays report commented that a potential "[d]ownside case" for the Company's stock would be if "the fallout from the sales practices issues

1    were to deepen."  On the other side of that point, a March 2, 2017, research note commented that

2    "share price outperformance" could come from "conclusion/resolution of the inquiries and

3    investigations into the bank's sales practices."  As a March 9, 2017, research note from Morningstar

4    observed, "banking is a business of trust.  Damage to the Wells Fargo brand could result in

5    permanent loss of customers . . . ." and that a "loss of customer trust would be the biggest potential

6    threat to Wells Fargo's competitive advantage."  Indeed, once the concealed truth about defendants'

7    forced insurance policies and the impact those practices had on consumers' lives came to light, the

8    increased regulatory scrutiny and loss of customers' trust (again) devastated the Company's stock

9    price.

10   **February 2017 Retail Banking Customer Activity Report Call**

11       89.    On March 20, 2017, defendants Shrewsberry and Mack presented on the Company's

12   February 2017 Retail Banking Customer Activity Report Call.  Shrewsberry again hailed "greater

13   transparency":  "It's been 6 months since we announced the sales practices settlements and we

14   remain committed to greater transparency, including these monthly updates on customer activity in

15   retail banking."

16       90.    In response to an analyst's question about the ongoing regulatory investigations into

17   Wells Fargo, Shrewsberry again highlighted the Company's all-encompassing internal review and

18   stated that the Company was not at risk of increased regulatory actions, giving investors the

19   impression that defendants had disclosed any untoward sales practices issues they had discovered:

20   "We've voluntarily commissioned reviews of really the rest of Wells Fargo.  Our regulatory

21   interactions reflect that and they're very comprehensive and because of all that we're doing with

22   them, it's hard to imagine them expanding it even further; it's very transparent."

23       91.    And when asked for an update on the Company's internal investigation, including

24   whether additional executive departures were coming, Shrewsberry told investors there was nothing

25   new to disclose, directing them to a website that omitted to disclose anything about the illicit

26   insurance sales practices that defendants had discovered:

27           You should take a peek at this document that's on the Web Site that ***describes
            everything to date***.  In that document [the Board] make[s] it clear that as they've
28

come across things in their investigation that they've acted on it at that time.  So I don't think there's any pent up activity that hasn't been acted upon yet.

92.     Defendants' March 20, 2017, statements set forth in ¶¶89-91 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

(a)     The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)     These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and similarly involved secretly harming customers by charging them for products the customers did not need or want;

(c)     By July 2016, an internal review had put the Company on notice of the illegal insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto insurance practices;

(d)     By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class Period, defendants were in frequent discussion with the Company's regulators regarding its illegal auto insurance practices and the need for customer remediation;

1        (e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance

2  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

3        (f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants

4  disclosed during the Class Period.  The Company was in frequent communication before and during

5  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

6  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

7  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

8  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

9  massive loss of public trust, additional significant regulatory actions, fines and litigation.

10      93.    Defendants' March 20, 2017, misstatements and omissions were materially false and

11  misleading for the additional reason that defendants, both leading up to and during the Class Period,

12  promised investors that their primary objective was restoring customers' trust and that they were

13  being more transparent than ever, including conducting an exhaustive review of the Company's

14  culture and sales practices.  That context underscores the misleading impression of the state of

15  affairs defendants' actionable misstatements and omissions gave investors.  For example, the

16  Company's new practice of holding monthly conference calls to purportedly update investors on

17  trends in the retail bank, including the March 20, 2017, call, was meant to bolster the misleading

18  impression that defendants were being completely transparent, especially with regard to the retail

19  banking division.

20  **Board of Directors' Internal Investigation Report**
**& 1Q17 Earnings Release and Conference Call**

21

22      94.    On April 10, 2017, the Company's Board of Directors issued a press release

23  announcing the results of the Board's internal investigation into the Company's Community Banking

24  Division and releasing the Board's report.  In the press release, Chairman of the Board Sanger stated

25  that "'[t]his *exhaustive investigation* identified serious issues related to Wells Fargo's decentralized

26  structure and the sales culture of the Community Bank, all of which the Board and management have

27  been working diligently to rectify.'"

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD     - 35 -

95.     The 110-page report claimed that "[t]he investigation has been extensive."  The investigators conducted "100 interviews of current and former employees, members of Wells Fargo's Board of Directors and other relevant parties," and "searched across more than 35 million documents, including communications and other materials of more than 300 custodians."  They also hired "a forensic consulting and data analytics firm, which had direct and unrestricted access to relevant Wells Fargo account, investigations and human resources systems and databases."

96.     The forensic consultants analyzed Wells Fargo Internal Investigation Group's database of allegations internally categorized as "Customer Consent," "Inappropriate Account Opening," "Unnecessary Accounts" and "Other."  Wells Fargo defined "Customer Consent" as "'allegations of *the booking or sale of any banking product without the knowledge or official direct consent* of the primary customer and/or point account/product holder.'"  The report documented minutia such as a single customer complaint "alleging that a Prudential simplified term life insurance policy had been purchased for a Wells Fargo Community Bank customer without the customer's consent."  The report did not, however, report the illegal auto insurance charged to 800,000 of Wells Fargo's auto loan customers without their consent or the improper withholding of excess premiums.

97.     Sanger assured Wells Fargo investors in the Board of Directors' April 10, 2017, announcement that:

> "[T]he trust customers, employees and investors place in Wells Fargo is paramount – and our work to rebuild and strengthen those relationships continues in earnest. The Board has total confidence in management, and *while this investigation has concluded, our oversight of the Company and commitment to accountability are stronger than ever*."

98.     During an April 10, 2017, conference call with reporters following the issuance of the Board's investigation report, Sanger and Sloan touted the thoroughness of the Board's investigation. Sanger stated that the Board's findings showed that the Board "'took appropriate actions with the information they had, when they had it.'"  On that same call Sloan reassured investors and the public that, "'[t]here is not another large shoe to drop.'"

99.     In a separate April 10, 2017, press release discussing the Board's investigation report, Sloan claimed that "the Board's *comprehensive findings* provide another important opportunity to

1   learn from our mistakes and take action to improve the way we operate."   Defendants'

2   characterization of the Board's investigation and report led investors to believe that defendants had

3   disclosed the complete extent of Wells Fargo's misdeeds known to management.

4        100.   On April 13, 2017, Wells Fargo issued a press release announcing its financial results

5   for the period ended March 31, 2017 ("1Q17").   The earnings release quoted defendant Sloan:

6   "'Wells Fargo continued to make meaningful progress in the first quarter in rebuilding trust with

7   customers and other important stakeholders.'"

8        101.   During the conference call that same day, Sloan discussed the Board's report on its

9   internal investigation, released a few days prior, stating: "The issuance of the board's report, which

10   was appropriately thorough, was an important step in rebuilding trust."

11        102.   In response to an analyst's question about costs in the retail segment, Sloan heralded

12   the Company-wide review of sales practices, telling investors "there are no other issues that we need

13   to deal with":

14        And we've invited third parties to look at our practices and our culture across the
     company.  So I would say that [costs are] elevated right now.  And once we are – we

15        comply with the consent orders and we make sure that there are no other issues that
     we need to deal with, then you can imagine those going down over time.  But right

16        now, the most important job at this company is rebuilding trust.

17        103.   Another analyst inquired as to whether the bad press that was plaguing the

18   Company's financial results was finally behind them:

19        [Analyst:] Okay.  And just Tim, one final question for you.  The board report
     and the news of the clawbacks, et cetera, et cetera, was all very dramatic.  In your

20        view, does that sort of represent – does this report and the events around it sort of
     represent the high watermark I guess of headline risk to the company as you get

21        better from here, I guess, is what I'm asking?

22        [Sloan:] Nancy, the short answer is, I hope so.

23        104.   Defendants' April 10 and 13, 2017, statements set forth in ¶¶94-103 were materially

24   false and misleading when made in that they misrepresented and/or omitted material facts necessary

25   to make the statements made not misleading.   The facts, which were known to or disregarded by

26   each of the defendants, were:

27        (a)   The Company had engaged in illegal auto insurance practices for at least a

28   decade, including the forced-placement of automobile insurance policies on at least 800,000

1  borrowers despite those borrowers having the required insurance, and the unlawful withholding of

2  insurance premiums after a customer's automobile loan had been paid off;

3              (b)    These practices occurred within the Company's Community Banking

4  Division, the same division where the recently disclosed fake account scandal had occurred, and

5  similarly involved secretly harming customers by charging them for products the customers did not

6  need or want;

7               (c)    By July 2016, an internal review had put the Company on notice of the illegal

8  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

9  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

10  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

11  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

12  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

13  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

14  insurance practices;

15              (d)    By September 2016, the Company's illegal auto insurance practices had been

16  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

17  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

18  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

19  auto insurance practices and the need for customer remediation;

20              (e)    Wells Fargo did not have internal controls to prevent the illegal auto insurance

21  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

22              (f)    Wells Fargo's regulatory and litigation exposure far exceeded what defendants

23  disclosed during the Class Period.  The Company was in frequent communication before and during

24  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

25  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

26  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

27  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

28  massive loss of public trust, additional significant regulatory actions, fines and litigation.

1    105.    Defendants' April 10 and 13, 2017, statements and omissions were materially false

2 and misleading for the additional reason that defendants, both leading up to and during the Class

3 Period, promised investors that their primary objective was restoring customers' trust and that they

4 were being more transparent than ever, including conducting an exhaustive review of the Company's

5 culture and sales practices.    That context underscores the misleading impression of affairs

6 defendants' Class Period misstatements and material omissions gave investors.

7    106.    An April 10, 2017, research report from Sandler O'Neil + Partners noted relief that

8 "the [Board's] report does not contain any new 'bombshells' that bring to light new issues" and that

9 "at least fears about new problems or previously unknown issues from this disclosure seem

10 unfounded."

11    107.    The Sandler O'Neil report concluded further that, based on defendants'

12 representations, "with the report out, at least we can check this off the list of pending disclosures that

13 could impact the stock or are cause for concern," and "[w]e were glad that there were no new large-

14 scale problems that have come to light in the report."

15    108.    Likewise, an April 10, 2017, research report from Evercore ISI commented that the

16 "conclusion [of the Board's investigation] removes a degree of overhang on [Wells Fargo's] shares."

17 **2017 Annual Shareholders Meeting**

18    109.    On April 25, 2017, Wells Fargo held its Annual Shareholders Meeting in Ponte Vedra

19 Beach, Florida.   As he did throughout the Class Period, Sloan claimed the Company had taken

20 "decisive actions to fix the problems" and "assure[d] [investors] that [Wells Fargo is] facing these

21 problems head on":

22    ***And as I stand before you today, I can assure you that we are facing these
        problems head on*** and that Wells Fargo is emerging a much stronger company.
23    We're focused on rebuilding the trust of all of our stakeholders.  And while we still
        have work to do, ***we are making strong progress in addressing the root causes of***
24    ***the problems***, making things right and building a better Wells Fargo.  So let me talk
        to you about a few steps that we're taking on our journey.

25
        Since we announced our initial legal and regulatory settlements on September
26    8 of last year, ***we've taken decisive actions to fix the problems that led to improper***
        ***sales practices***, including many of the issues that were identified in the board report.
27    It is critically important that we fix these issues and move forward to rebuild trust.

28

1    110.    Defendants' April 25, 2017, statements set forth in ¶109 were materially false and

2  misleading when made in that they misrepresented and/or omitted material facts necessary to make

3  the statements made not misleading.  The facts, which were known to or disregarded by each of the

4  defendants, were:

5          (a)    The Company had engaged in illegal auto insurance practices for at least a

6  decade, including the forced-placement of automobile insurance policies on at least 800,000

7  borrowers despite those borrowers having the required insurance, and the unlawful withholding of

8  insurance premiums after a customer's automobile loan had been paid off;

9          (b)    These practices occurred within the Company's Community Banking

10  Division, the same division where the recently disclosed fake account scandal had occurred, and

11  similarly involved secretly harming customers by charging them for products the customers did not

12  need or want;

13          (c)    By July 2016, an internal review had put the Company on notice of the illegal

14  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

15  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

16  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

17  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

18  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

19  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

20  insurance practices;

21          (d)    By September 2016, the Company's illegal auto insurance practices had been

22  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

23  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

24  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

25  auto insurance practices and the need for customer remediation;

26          (e)    Wells Fargo did not have internal controls to prevent the illegal auto insurance

27  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                                    - 40 -

1    (f)    Wells Fargo's regulatory and litigation exposure far exceeded what defendants

2    disclosed during the Class Period.  The Company was in frequent communication before and during

3    the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

4    nature of the practices, the fact they occurred in the same Community Banking Division as the fake

5    account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

6    taken against the Company, the undisclosed auto insurance practices exposed the Company to a

7    massive loss of public trust, additional significant regulatory actions, fines and litigation.

8    111.    Defendants' April 25, 2017, misstatements and omissions were materially false and

9    misleading for the additional reason that defendants, both leading up to and during the Class Period,

10   promised investors that their primary objective was restoring customers' trust and that they were

11   being more transparent than ever, including conducting an exhaustive review of the Company's

12   culture and sales practices.  That context underscores the misleading impression of affairs

13   defendants' actionable misstatements and omissions gave investors.

14   **1Q17 10-Q & Wells Fargo 2017 Investor Day**

15   112.    On May 5, 2017, Wells Fargo filed its 1Q17 quarterly report on Form 10-Q with the

16   SEC ("1Q17 10-Q").  The Company's 1Q17 10-Q provided an update on the internal investigation

17   into sales practices across the Company, particularly within the Community Banking Division.  In a

18   section titled "Sales Practices Matters," defendants led the market to believe the Company had come

19   clean on practices it discovered that were adverse to customers' interests and was doing all it could

20   to restore customers' trust:

21       **Sales Practices Matters**

22       As we have previously reported, on September 8, 2016, we announced
         settlements with the Consumer Financial Protection Bureau (CFPB), the Office of the
23       Comptroller of the Currency (OCC) and the Office of the Los Angeles City Attorney
         regarding allegations that some of our retail customers received products and
24       services they did not request.  As a result, rebuilding trust through a comprehensive
         action plan that includes making things right for our customers, team members, and
25       other stakeholders, and building a better Company for the future remains our current
         top priority.  The job of rebuilding trust in Wells Fargo is a long-term effort – one
26       requiring our commitment, patience and perseverance.

27   113.    On May 11, 2017, Wells Fargo hosted its 2017 Investor Day.  As analysts noted,

28   hosting an investor day in 2017 was a break from Wells Fargo's typical practice.  The Company had

hosted an investor day in 2016, and its practice had been for investor days to come every other year. The off-cycle investor day was intended to further allay investor concern about the state of the Company and rebuild trust.

114.    Sloan opened his remarks by emphasizing that Wells Fargo was then "emerging from the challenges associated with inappropriate retail sales practices," stating further:

> We have an unwavering commitment to fix everything that went wrong, ***continue to look across the company to fix anything else that's broken*** and strengthen how we serve our customers and how we lead our team members. . . .

> \*       \*       \*

> We've strengthened ethics and risk management.  We've centralized key enterprise control functions such as risk management and human resources.  We've created a new Office of Ethics, Oversight and Integrity.  And then we've invested in additional monitoring and controls, including an enhanced mystery shopping program in our Retail Bank.

> \*       \*       \*

> I firmly believe that we're on the right path and will ***continue to be as transparent with you as we can as we move forward***. . . .

115.    Mack echoed Sloan's remarks about transparency, stating:  "If you think about our stakeholders, external parties, we've increased transparency."

116.    Sloan closed the 2017 Investor Day with the most important issue on investors' minds – consumer trust – representing that "[w]e continue to make progress on rebuilding trust."

117.    Defendants' May 5 and 11, 2017, statements set forth in ¶¶112-116 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

(a)    The Company had engaged in illegal auto insurance practices for at least a decade, including the forced-placement of automobile insurance policies on at least 800,000 borrowers despite those borrowers having the required insurance, and the unlawful withholding of insurance premiums after a customer's automobile loan had been paid off;

(b)    These practices occurred within the Company's Community Banking Division, the same division where the recently disclosed fake account scandal had occurred, and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD                                                                                                      - 42 -

1  similarly involved secretly harming customers by charging them for products the customers did not

2  need or want;

3          (c)      By July 2016, an internal review had put the Company on notice of the illegal

4  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

5  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

6  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

7  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

8  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

9  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

10  insurance practices;

11          (d)      By September 2016, the Company's illegal auto insurance practices had been

12  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

13  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

14  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

15  auto insurance practices and the need for customer remediation;

16          (e)      Wells Fargo did not have internal controls to prevent the illegal auto insurance

17  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

18          (f)      Wells Fargo's regulatory and litigation exposure far exceeded what defendants

19  disclosed during the Class Period.  The Company was in frequent communication before and during

20  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

21  nature of the practices, the fact they occurred in the same Community Banking Division as the fake

22  account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

23  taken against the Company, the undisclosed auto insurance practices exposed the Company to a

24  massive loss of public trust, additional significant regulatory actions, fines and litigation.

25        118.     Defendants' May 5 and 11, 2017, misstatements and omissions were materially false

26  and misleading for the additional reason that defendants, both leading up to and during the Class

27  Period, promised investors that their primary objective was restoring customers' trust and that they

28  were being more transparent than ever, including conducting an exhaustive review of the Company's

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD        - 43 -

1   culture and sales practices.   That context underscores the misleading impression of affairs

2   defendants' actionable misstatements and omissions gave investors.

3       119.   A May 7, 2017 research report from Credit Suisse highlighted two issues at the

4   forefront of investors' minds: "all things related to the bank's sales practice issues [and] regulatory

5   and litigation updates ([reasonably possible litigation losses] range higher again)."   The report noted

6   that the Company's "[r]ange of [r]easonably [p]ossible [l]oss [i]ncreased [a]gain," this time to $2

7   billion from $1.8 billion at the end of 4Q16.

8       120.   As was intended, the off-cycle investor day and defendants' statements that day

9   "highlights how Wells [Fargo] is moving past fraud," according to a May 11, 2017, research note

10   from UBS.  Similarly, a May 12, 2017, research report from Credit Suisse commented, "Wells Fargo

11   hosted an Investor Day yesterday intending on taking another step forward in the process of

12   rebuilding confidence in the strength of the Wells Fargo franchise."   A May 12, 2017, research

13   report from Sandler O'Neil + Partners noted that "[w]hile [Sloan]'s opening remarks touched on the

14   seriousness of last year's scandal and its being the motivation for yesterday's off-cycle day, the goal

15   seemed to be to showcase the myriad ways in which [Wells Fargo] has changed in response."   The

16   Sandler O'Neil report continued: "Hopefully when the dust has settled, we can look back on

17   yesterday as the beginning of the end for the unfortunate chapter that has overwhelmed for the past

18   year [Wells Fargo]'s otherwise excellent long-term narrative."   Unfortunately for Class Period

19   investors, that was not the case.

20   **Morgan Stanley Financials Conference**

21       121.   On June 13, 2017, defendant Mack presented at the Morgan Stanley Financials

22   Conference.  In response to a question about regulatory matters, Mack again spoke of transparency:

23   "So we clearly have the opportunity to rebuild trust with a number of our stakeholders, with our

24   team members across our customer base and certainly, the regulators.  So we are working very hard

25   to ensure that we're as transparent as possible . . . ."

26       122.   Defendants' June 13, 2017, statements set forth in ¶121 were materially false and

27   misleading when made in that they misrepresented and/or omitted material facts necessary to make

28

1   the statements made not misleading.  The facts, which were known to or disregarded by each of the

2   defendants, were:

3           (a)   The Company had engaged in illegal auto insurance practices for at least a

4   decade, including the forced-placement of automobile insurance policies on at least 800,000

5   borrowers despite those borrowers having the required insurance, and the unlawful withholding of

6   insurance premiums after a customer's automobile loan had been paid off;

7           (b)   These practices occurred within the Company's Community Banking

8   Division, the same division where the recently disclosed fake account scandal had occurred, and

9   similarly involved secretly harming customers by charging them for products the customers did not

10  need or want;

11          (c)   By July 2016, an internal review had put the Company on notice of the illegal

12  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

13  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

14  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

15  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

16  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

17  27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

18  insurance practices;

19          (d)   By September 2016, the Company's illegal auto insurance practices had been

20  escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

21  – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

22  Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

23  auto insurance practices and the need for customer remediation;

24          (e)   Wells Fargo did not have internal controls to prevent the illegal auto insurance

25  practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

26          (f)   Wells Fargo's regulatory and litigation exposure far exceeded what defendants

27  disclosed during the Class Period.  The Company was in frequent communication before and during

28  the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

1   nature of the practices, the fact they occurred in the same Community Banking Division as the fake

2   account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

3   taken against the Company, the undisclosed auto insurance practices exposed the Company to a

4   massive loss of public trust, additional significant regulatory actions, fines and litigation.

5        123.   Defendants' June 13, 2017, misstatements and omissions were materially false and

6   misleading for the additional reason that defendants, both leading up to and during the Class Period,

7   promised investors that their primary objective was restoring customers' trust and that they were

8   being more transparent than ever, including conducting an exhaustive review of the Company's

9   culture and sales practices.   That context underscores the misleading impression of affairs

10   defendants' Class Period misstatements and material omissions gave investors.

11   **2Q17 Earnings Release and Conference Call**

12        124.   On July 14, 2017, Wells Fargo issued a press release announcing its financial results

13   for the quarter ended June 30, 2017 ("2Q17").  The release quoted defendant Sloan:

> "We *continued to make progress this quarter in our efforts to rebuild trust* and
> build a better Wells Fargo and, while there is still more work ahead of us, *we are on
> the right track* and I am confident about our future."

16        125.   On the same day, July 14, 2017, Wells Fargo held a conference call during which

17   Sloan repeated his claim about progress towards rebuilding trust:  "Importantly, during the second

18   quarter, *we continued to make progress on rebuilding trust, which remains our top priority*."

19        126.   During the question and answer portion of the call, Sloan had the following exchange

20   with an analyst:

> [Analyst:]  Yes, a couple of questions back to the sales practices issue.  I
> think you mentioned that you had preliminary court approval for the $142 million
> settlement.  Could you just summarize for us what other suits, issues, et cetera that
> have been publicly disclosed that are out there?  *Is there anything major that's still
> outstanding at this point*?

> [Sloan:]  Well, the $142 million settlement that was preliminarily approved
> by the court, we believe, addresses the other class action suits that are sales practices
> related, I think there are about 10 that are out there.  So we have high expectations
> that ultimately that preliminary approval will become final approval after we execute
> on what we're being – we agreed to do, which of course, we're going to do that.  In
> terms of other activities out there, we have a – we have consent orders and plans that
> were – for both the OCC and the CFPB that we need to comply with, and we're
> working very hard to be able to do that.  And as has been discussed, there's been –
> there's an investigation that's still going on by the Justice Department.  And we'll

1   continue to provide more disclosures and the disclosure of that in the 10-Q and the
    10-K.  But ***there is nothing really new that's different in the 10-Q as it relates to***
2   ***other legal matters for sales practices*** with the exception of the announcement of
    this preliminary approval from the court on the settlement.
3
4   127.   Defendants' July 14, 2017, statements set forth in ¶¶124-126 were materially false

    and misleading when made in that they misrepresented and/or omitted material facts necessary to

    make the statements made not misleading.  The facts, which were known to or disregarded by each

    of the defendants, were:

            (a)    The Company had engaged in illegal auto insurance practices for at least a

    decade, including the forced-placement of automobile insurance policies on at least 800,000

    borrowers despite those borrowers having the required insurance, and the unlawful withholding of

    insurance premiums after a customer's automobile loan had been paid off;

            (b)    These practices occurred within the Company's Community Banking

    Division, the same division where the recently disclosed fake account scandal had occurred, and

    similarly involved secretly harming customers by charging them for products the customers did not

    need or want;

            (c)    By July 2016, an internal review had put the Company on notice of the illegal

    insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

    Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

    the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

    Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

    Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

    27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

    insurance practices;

            (d)    By September 2016, the Company's illegal auto insurance practices had been

    escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

    – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

    Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

    auto insurance practices and the need for customer remediation;

1    (e)    Wells Fargo did not have internal controls to prevent the illegal auto insurance

2    practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

3    (f)    Wells Fargo's regulatory and litigation exposure far exceeded what defendants

4    disclosed during the Class Period.  The Company was in frequent communication before and during

5    the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

6    nature of the practices, the fact they occurred in the same Community Banking Division as the fake

7    account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

8    taken against the Company, the undisclosed auto insurance practices exposed the Company to a

9    massive loss of public trust, additional significant regulatory actions, fines and litigation.

10    128.    Defendants' July 14, 2017, misstatements and omissions were materially false and

11    misleading for the additional reason that defendants, both leading up to and during the Class Period,

12    promised investors that their primary objective was restoring customers' trust and that they were

13    being more transparent than ever, including conducting an exhaustive review of the Company's

14    culture and sales practices.  That context underscores the misleading impression of affairs

15    defendants' Class Period misstatements and material omissions gave investors.

16    **VI.    ADDITIONAL FALSE AND MISLEADING STATEMENTS**
      **AND MATERIAL OMISSIONS IN WELLS FARGO'S**

17    **CLASS PERIOD SEC FILINGS**

18    129.    Throughout the Class Period, defendants filed false and misleading reports with the

19    SEC.  In addition to the misstatements and omissions alleged above (¶¶44-128), defendants' Class

20    Period SEC filings, including the 3Q16 10-Q, 2016 Form 10-K, and 1Q17 10-Q, omitted any

21    discussion of the Company's illegal auto insurance practices, the exposure of which would shatter

22    customer trust, increase regulatory scrutiny and subject the Company to significant regulatory fines

23    and litigation exposure.  Only after *The New York Times* revealed these practices on July 27, 2017,

24    did Wells Fargo disclose these issues as "Auto Lending Matters," despite knowing about these

25    practices prior to and throughout the Class Period.

26    **3Q16 Form 10-Q**

27    130.    On November 3, 2016, the start of the Class Period, Wells Fargo filed its quarterly

28    report on Form 10-Q for the third quarter of 2016 ("3Q16 10-Q").  The 3Q16 10-Q, which was

signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Sloan and Shrewsberry, stated that the "[t]he Company's management evaluated the effectiveness, as of September 30, 2016, of the Company's disclosure controls and procedures," that the "Company's chief executive officer and chief financial officer participated in the evaluation," and that "[b]ased on this evaluation, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective as of September 30, 2016."  In the 3Q16 10-Q, Sloan and Shrewsberry further stated:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

131.    In a section of the 3Q16 10-Q titled "Sales Practices Matters," defendants provided an update on the internal investigation into sales practices within the Community Banking Division, but omitted any disclosure of the illegal auto insurance practices or the fact the Company had reported the problem to regulators:

> **Sales Practices Matters**
>
> On September 8, 2016, we announced settlements with the Consumer Financial Protection Bureau (CFPB), the Office of the Comptroller of the Currency (OCC) and the Office of the Los Angeles City Attorney regarding allegations that some of our retail customers received products and services they did not request. The amount of the settlements, which was fully accrued for as of June 30, 2016, totaled $185 million, plus $5 million in customer remediation. . . .

132.    Instead of revealing the failures in internal controls defendants had known about no later than September 2016, the 3Q16 10-Q couched internal control failures as a potential risk to operations:  "Operational risk is the risk of loss resulting from inadequate or failed internal controls and processes, people and systems, or resulting from external events."  Likewise, the 3Q16 10-Q listed the following potential risk factors:

> • reputational damage from negative publicity, protests, fines, penalties and other negative consequences from regulatory violations and legal actions.
>
> *       *       *
>
> **Risks Related to Sales Practices**.  Various government entities and offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau,

the Office of the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016.  In addition to imposing monetary penalties and other sanctions, regulatory authorities may require admissions of wrongdoing and compliance with other conditions in connection with such matters, which can lead to restrictions on our ability to engage in certain business activities or offer certain products or services, limitations on our ability to access capital markets, limitations on capital distributions, the loss of customers, and/or other direct and indirect adverse consequences.  A number of lawsuits have also been filed by non-governmental parties seeking damages or other remedies related to these sales practices.  The ultimate resolution of any of these pending legal proceedings or government investigations, depending on the sanctions and remedy sought and granted, could materially adversely affect our results of operations and financial condition.  We may also incur additional costs and expenses in order to address and defend these pending legal proceedings and government investigations, and we may have increased compliance and other costs related to these matters. Furthermore, negative publicity or public opinion resulting from these matters may increase the risk of reputational harm to our business, which can impact our ability to keep and attract customers, our ability to attract and retain qualified team members, result in the loss of revenue, or have other material adverse effects on our results of operations and financial condition.

133.    The Company's 3Q16 10-Q included a section titled "Legal Actions," which included the following statement regarding investigations concerning "Sales Practices Matters," as well as an update on potential litigation losses.  No mention was made of the Company's increased exposure to regulatory fines and litigation expenses as a result of the Company's illegal auto insurance practices:

Federal, state and local government agencies, including the United States Department of Justice and the United States Securities and Exchange Commission, and state attorneys general and prosecutors' offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016.  The Company has responded, and continues to respond, to requests from a number of the foregoing seeking information regarding these sales practices and the circumstances of the settlements and related matters. A number of lawsuits have also been filed by non-governmental parties seeking damages or other remedies related to these sales practices.

. . . The high end of the range of reasonably possible potential litigation losses in excess of the Company's liability for probable and estimable losses was approximately $1.7 billion as of September 30, 2016.  The change in the high end of the range from June 30, 2016 related to a number of matters. . . .

134.    Defendants' statements in the Company's November 3, 2016, Form 10-Q, set forth in ¶¶130-133 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

1          (a)     The Company had engaged in illegal auto insurance practices for at least a

2 decade, including the forced-placement of automobile insurance policies on at least 800,000

3 borrowers despite those borrowers having the required insurance, and the unlawful withholding of

4 insurance premiums after a customer's automobile loan had been paid off;

5          (b)     These practices occurred within the Company's Community Banking

6 Division, the same division where the recently disclosed fake account scandal had occurred, and

7 similarly involved secretly harming customers by charging them for products the customers did not

8 need or want;

9          (c)     By July 2016, an internal review had put the Company on notice of the illegal

10 insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

11 Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

12 the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

13 Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

14 Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

15 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

16 insurance practices;

17         (d)     By September 2016, the Company's illegal auto insurance practices had been

18 escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

19 – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

20 Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

21 auto insurance practices and the need for customer remediation;

22         (e)     Wells Fargo did not have internal controls to prevent the illegal auto insurance

23 practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

24         (f)     Wells Fargo's regulatory and litigation exposure far exceeded what defendants

25 disclosed during the Class Period.  The Company was in frequent communication before and during

26 the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

27 nature of the practices, the fact they occurred in the same Community Banking Division as the fake

28 account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                                     - 51

1    taken against the Company, the undisclosed auto insurance practices exposed the Company to a

2    massive loss of public trust, additional significant regulatory actions, fines and litigation.

3         135.    The material facts omitted from the Company's November 3, 2016, Form 10-Q were

4    eventually disclosed in the Company's 2Q17 10-Q filed on August 4, 2017.  The only change in

5    circumstances from the time of the Company's November 3, 2016, Form 10-Q to the 2Q17 10-Q

6    was *The New York Times* July 27, 2017, exposé.  As defendants have admitted, the omitted facts

7    were known to, or disregarded by, defendants throughout the Class Period.  That defendants chose to

8    omit them from the Company's SEC filings until after *The New York Times* exposé demonstrates

9    both the misleading nature of the Company's Class Period SEC filings and defendants' fraudulent

10   intent.   In addition, the fact that defendants did ultimately disclose the omitted facts in the

11   Company's 2Q17 10-Q, after *The New York Times* exposé, demonstrates the materiality of the

12   omitted facts.

13   **2016 Annual Report on Form 10-K**

14        136.    On March 1, 2017, Wells Fargo filed with the SEC its 2016 10-K.  The 2016 10-K,

15   which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Sloan and

16   Shrewsberry, stated in pertinent part that the "[t]he Company's management evaluated the

17   effectiveness, as of December 31, 2016, of the Company's disclosure controls and procedures," that

18   the "Company's chief executive officer and chief financial officer participated in the evaluation,"

19   and that "[b]ased on this evaluation, the Company's chief executive officer and chief financial

20   officer concluded that the Company's disclosure controls and procedures were effective as of

21   December 31, 2016."  In the 2016 10-K, Sloan and Shrewsberry further stated:

22              Based on my knowledge, this report does not contain any untrue statement of
          a material fact or omit to state a material fact necessary to make the statements made,
23        in light of the circumstances under which such statements were made, not misleading
          with respect to the period covered by this report.

24        137.    The 2016 10-K stated:  "appropriate controls are in place to reduce risks to [Wells

25   Fargo] customers, maintain and increase our competitive market position, ***and protect Wells Fargo's***

26   ***long-term*** safety, soundness and ***reputation***."

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                        - 52 -

138.    The 2016 10-K also stated that Wells Fargo adequately "maintain[ed] systems and procedures designed to ensure that we comply with applicable laws and regulations" and that the Company had "policies and procedures in place intended to detect and prevent conduct by team members and third party service providers that could potentially harm customers or our reputation."

139.    In a section titled "Sales Practices Matters," defendants provided an update on the internal investigation into sales practices within the Community Banking Division.  The section, and the 2016 10-K, entirely omitted any reference to the Company's illegal auto insurance practices or the fact that the Company had reported the problems to regulators and was in frequent communication with regulators about the practices:

> **Sales Practices Matters**
>
> On September 8, 2016, we announced settlements with the Consumer Financial Protection Bureau (CFPB), the Office of the Comptroller of the Currency (OCC) and the Office of the Los Angeles City Attorney regarding allegations that some of our retail customers received products and services they did not request. Our current top priority is rebuilding trust through a comprehensive action plan that includes making things right for our customers and team members and building a better Company for the future.  The job of rebuilding trust in Wells Fargo will be a long-term effort – one requiring our commitment, patience and perseverance. . . .

140.    The 2016 10-K again falsely led investors to believe that the Company faced only the potential risk to operations from failed internal controls: "Operational risk is the ***risk*** of loss resulting from inadequate or failed internal controls and processes . . . ."

141.    The 2016 10-K also listed the following potential risk factor:

- reputational damage from negative publicity, protests, fines, penalties and other negative consequences from regulatory violations and legal actions.

142.    The 2016 10-K included "Risk Factors" related to "Risks Related to Sales Practices," among others:

> **Risks Related to Sales Practices**.  Various government entities and offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016. In addition to imposing monetary penalties and other sanctions, regulatory authorities may require admissions of wrongdoing and compliance with other conditions in connection with such matters, which can lead to restrictions on our ability to engage in certain business activities or offer certain products or services, limitations on our ability to access capital markets, limitations on capital distributions, the loss of customers,

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD
- 53

and/or other direct and indirect adverse consequences.  A number of lawsuits have also been filed by non-governmental parties seeking damages or other remedies related to these sales practices.  The ultimate resolution of any of these pending legal proceedings or government investigations, depending on the sanctions and remedy sought and granted, could materially adversely affect our results of operations and financial condition.  We may also incur additional costs and expenses in order to address and defend these pending legal proceedings and government investigations, and we may have increased compliance and other costs related to these matters.  Furthermore, negative publicity or public opinion resulting from these matters may increase the risk of reputational harm to our business, which can impact our ability to keep and attract customers, our ability to attract and retain qualified team members, result in the loss of revenue, or have other material adverse effects on our results of operations and financial condition.  In addition, we have expanded the time period of our review and our data analysis efforts related to sales practices matters remain ongoing, including our review and validation of the identification of potentially unauthorized accounts by a third party consulting firm.  The ultimate results and conclusions of this work as well as the ongoing internal investigation by the independent directors of our Board are still pending and could lead to an increase in the identified number of potentially impacted customers, additional legal or regulatory proceedings, compliance and other costs, reputational damage, the identification of issues in our practices or methodologies that were used to identify, prevent or remediate sales practices related matters, the loss of additional team members, or further changes in policies and procedures that may impact our business.

For more information, refer to Note 15 (Legal Actions) to Financial Statements in this report.

***We may incur fines, penalties and other negative consequences from regulatory violations, possibly even inadvertent or unintentional violations, or from any failure to meet regulatory standards or expectations***.  We maintain systems and procedures designed to ensure that we comply with applicable laws and regulations.  However, we are subject to heightened compliance and regulatory oversight and expectations, particularly due to the evolving and increasing regulatory landscape we operate in.  In addition, some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there was in place at the time systems and procedures designed to ensure compliance.  For example, we are subject to regulations issued by the Office of Foreign Assets Control (OFAC) that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries.  OFAC may impose penalties or restrictions on certain activities for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations.   Any violation of these or other applicable laws or regulatory requirements, even if inadvertent or unintentional, or any failure to meet regulatory standards or expectations could result in fees, penalties, restrictions on our ability to engage in certain business activities, reputational harm, loss of customers or other negative consequences.

***Negative publicity, including as a result of our actual or alleged conduct or public opinion of the financial services industry generally, could damage our reputation and business***.  Reputation risk, or the risk to our business, earnings and capital from negative public opinion, is inherent in our business and has increased substantially because of the financial crisis, our size and profile in the financial services industry, and sales practices related matters.  The reputation of the financial

services industry in general has been damaged as a result of the financial crisis and other matters affecting the financial services industry, and negative public opinion about the financial services industry generally or Wells Fargo specifically could adversely affect our ability to keep and attract customers.  Negative public opinion could result from our actual or alleged conduct in any number of activities, including sales practices, mortgage lending practices, servicing and foreclosure activities, lending or other business relationships, corporate governance, regulatory compliance, mergers and acquisitions, and disclosure, sharing or inadequate protection of customer information, and from actions taken by government regulators and community or other organizations in response to that conduct. . . .

*          *          *

**Risks Relating to Legal Proceedings**.  Wells Fargo and some of its subsidiaries are involved in judicial, regulatory and arbitration proceedings or investigations concerning matters arising from our business activities.  Although we believe we have a meritorious defense in all significant litigation pending against us, there can be no assurance as to the ultimate outcome.  We establish reserves for legal claims when payments associated with the claims become probable and the costs can be reasonably estimated.  We may still incur legal costs for a matter even if we have not established a reserve.  In addition, the actual cost of resolving a legal claim may be substantially higher than any amounts reserved for that matter.  The ultimate resolution of a pending legal proceeding or investigation, depending on the remedy sought and granted, could materially adversely affect our results of operations and financial condition.

As noted above, we are subject to heightened regulatory oversight and scrutiny, which may lead to regulatory investigations, proceedings or enforcement actions.  In addition to imposing monetary penalties and other sanctions, regulatory authorities may require admissions of wrongdoing and compliance with other conditions in connection with settling such matters, which can lead to reputational harm, loss of customers, restrictions on the ability to access capital markets, limitations on capital distributions, the inability to engage in certain business activities or offer certain products or services, and/or other direct and indirect adverse effects.

143.    The 2016 10-K also included a section titled "Legal Actions."  Within that section was the following subsection, among others:

**SALES PRACTICES MATTERS** Federal, state and local government agencies, including the United States Department of Justice, the United States Securities and Exchange Commission and the United States Department of Labor, and state attorneys general and prosecutors' offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016.  The Company has responded, and continues to respond, to requests from a number of the foregoing seeking information regarding these sales practices and the circumstances of the settlements and related matters.  A number of lawsuits have also been filed by non-governmental parties seeking damages or other remedies related to these sales practices.  These include consumer class action cases, a securities fraud class action, shareholder

1   derivative demands, a lawsuit brought under the Employee Retirement Income
2   Security Act, and wrongful termination/demotion and wage and hour class actions.

3   144.   The "Legal Actions" section also provided an update on litigation liability, stating:

4   The high end of the range of reasonably possible potential litigation losses in excess
    of the Company's liability for potential losses in excess of the Company's liability
5   for probable and estimable losses was approximately $1.8 billion as of December 31,
    2016.

6   145.   The 2016 10-K's "Legal Actions" section made no mention of the fact that defendants

7   discovered in July 2016 that the Company was illegally placing auto insurance policies on hundreds

8   of thousands of consumers, or the Company's reporting of those illegal practices to regulators in the

9   summer of 2016.

10  146.   Defendants' statements in the Company's March 1, 2017, Form 10-K, set forth in

11  ¶¶136-145 were materially false and misleading when made in that they misrepresented and/or

12  omitted material facts necessary to make the statements made not misleading.  The facts, which were

13  known to or disregarded by each of the defendants, were:

14  (a)   The Company had engaged in illegal auto insurance practices for at least a

15  decade, including the forced-placement of automobile insurance policies on at least 800,000

16  borrowers despite those borrowers having the required insurance, and the unlawful withholding of

17  insurance premiums after a customer's automobile loan had been paid off;

18  (b)   These practices occurred within the Company's Community Banking

19  Division, the same division where the recently disclosed fake account scandal had occurred, and

20  similarly involved secretly harming customers by charging them for products the customers did not

21  need or want;

22  (c)   By July 2016, an internal review had put the Company on notice of the illegal

23  insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

24  Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

25  the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

26  Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

27  Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                    - 56 -

1    27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

2    insurance practices;

3              (d)    By September 2016, the Company's illegal auto insurance practices had been

4    escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

5    – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

6    Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

7    auto insurance practices and the need for customer remediation;

8              (e)    Wells Fargo did not have internal controls to prevent the illegal auto insurance

9    practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

10             (f)    Wells Fargo's regulatory and litigation exposure far exceeded what defendants

11   disclosed during the Class Period.  The Company was in frequent communication before and during

12   the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

13   nature of the practices, the fact they occurred in the same Community Banking Division as the fake

14   account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

15   taken against the Company, the undisclosed auto insurance practices exposed the Company to a

16   massive loss of public trust, additional significant regulatory actions, fines and litigation.

17       147.    The material facts omitted from the Company's March 1, 2017, Form 10-K were

18   eventually disclosed in the Company's 2Q17 10-Q filed on August 4, 2017.  The only change in

19   circumstances from the time of the Company's March 1, 2017, Form 10-K to the 2Q17 10-Q was

20   *The New York Times* July 27, 2017, exposé.  As defendants have admitted, the omitted facts were

21   known to, or disregarded by, defendants throughout the Class Period.  That defendants chose to omit

22   them from the Company's SEC filings until after *The New York Times* exposé demonstrates both the

23   misleading nature of the Company's Class Period SEC filings and defendants' fraudulent intent.  In

24   addition, the fact that defendants did ultimately disclose the omitted facts in the Company's 2Q17

25   10-Q, only after *The New York Times* exposé, demonstrates the materiality of the omitted facts.

26   **1Q17 Form 10-Q**

27       148.    On May 5, 2017, Wells Fargo filed with the SEC its 1Q17 10-Q, signed and certified

28   pursuant to the Sarbanes-Oxley Act of 2002 by Sloan and Shrewsberry.  The 1Q17 10-Q stated that

"[t]he Company's management [had] evaluated the effectiveness, as of March 31, 2017, of the Company's disclosure controls and procedures," that the "Company's chief executive officer and chief financial officer participated in the evaluation," and that "[b]ased on this evaluation, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective as of March 31, 2017." In the 1Q17 10-Q Sloan and Shrewsberry further stated:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

149. Instead of revealing the failures in internal controls defendants had discovered months prior, the 1Q17 10-Q couched internal control failures as a potential risk to operations: "Operational risk is the risk of loss resulting from inadequate or failed internal controls and processes, people and systems, or resulting from external events." Likewise, the 1Q17 10-Q listed the following potential risk factor:

- reputational damage from negative publicity, protests, fines, penalties and other negative consequences from regulatory violations and legal actions.

150. The Company's 1Q17 10-Q also included a section titled "Risk Factors." Although it referred the reader to its 2016 10-K, discussed above, it made no mention of the risk of regulatory action and financial penalties that defendants knew had materialized due to the Company's ongoing discussions with regulators concerning Wells Fargo's illegal auto insurance practices. Defendants knew, but failed to disclose, that significant penalties would be levied. Indeed, in April 2018, the CFPB and OCC fined Wells Fargo $500 million.

151. The Company's 1Q17 10-Q also included a section titled "Legal Actions," which again listed included the following statement regarding investigations concerning "Sales Practices Matters":

> **SALES PRACTICES MATTERS** Federal, state and local government agencies, including the United States Department of Justice, the United States Securities and Exchange Commission and the United States Department of Labor, and state attorneys general and prosecutors' offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau, the Office of

the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016.  The Company has responded, and continues to respond, to requests from a number of the foregoing seeking information regarding these sales practices and the circumstances of the settlements and related matters.

In addition, a number of lawsuits have also been filed by nongovernmental parties seeking damages or other remedies related to these sales practices.  First, various class plaintiffs purporting to represent consumers who allege that they received products or services without their authorization or consent have brought eleven separate putative class action lawsuits against the Company in the United States District Court for the Northern District of California and various other jurisdictions.  In April 2017, the Company entered into a settlement agreement in the first-filed action, *Jabbari v. Wells Fargo Bank, N.A.*, to resolve any claims regarding products or services provided without authorization or consent for the time period May 1, 2002 to April 20, 2017.  Pursuant to the settlement, we will pay $142 million or remediation, attorneys' fees, and settlement fund claims administration.  The settlement is subject to approval by the District Court.  Second, Wells Fargo shareholders are pursuing a consolidated securities fraud class action in the United States District Court for the Northern District of California alleging certain misstatements and omissions in the Company's disclosures related to sales practices matters.  Third, Wells Fargo shareholders have brought numerous shareholder derivative lawsuits asserting breach of fiduciary claims, among others, against current and former directors and officers for their alleged failure to detect and prevent sales practices issues, which lawsuits are consolidated into two separate actions in the United States District Court for the Northern District of California and California state court, as well as a third in Delaware state court.  Fourth, a range of employment litigation has been brought against Wells Fargo, including an Employee Retirement Income Security Act class action in the United States District Court for the District of Minnesota brought on behalf of 401(k) plan participants; class actions brought in the United States District Court for the Northern District of California and New York state court on behalf of employees who allege they protested sales practice misconduct and/or were terminated for not meeting sales goals; various wage and hour class actions brought in federal and state court in California, New Jersey, and Pennsylvania on behalf of nonexempt branch based employees alleging sales pressure resulted in uncompensated overtime; and multiple single plaintiff Sarbanes-Oxley Act complaints and state law whistleblower actions filed with the Department of Labor or in various state courts alleging adverse employment action for raising sales practice misconduct issues.

152.    The 1Q17 10-Q provided an update on potential litigation losses:  "The high end of the range of reasonably possible potential litigation losses in excess of the Company's liability for probable and estimable losses was approximately $2.0 billion as of March 31, 2017."

153.    Defendants' statements in the Company's May 5, 2017, Form 10-Q, set forth in ¶¶148-152 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made not misleading.  The facts, which were known to or disregarded by each of the defendants, were:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD                                                                                                          - 59 -

1    (a)  The Company had engaged in illegal auto insurance practices for at least a

2 decade, including the forced-placement of automobile insurance policies on at least 800,000

3 borrowers despite those borrowers having the required insurance, and the unlawful withholding of

4 insurance premiums after a customer's automobile loan had been paid off;

5    (b)  These practices occurred within the Company's Community Banking

6 Division, the same division where the recently disclosed fake account scandal had occurred, and

7 similarly involved secretly harming customers by charging them for products the customers did not

8 need or want;

9    (c)  By July 2016, an internal review had put the Company on notice of the illegal

10 insurance practices and the Company commissioned consultancy firm Oliver Wyman to review the

11 Company's practices.  Oliver Wyman issued a 60-page report for Wells Fargo executives detailing

12 the illegal auto insurance practices and their negative impact on Wells Fargo customers.  The

13 Company's review and Oliver Wyman Report identified hundreds of thousands of impacted Wells

14 Fargo customers, including wrongfully imposed fees, account delinquencies, and approximately

15 27,000 customers whose cars were wrongfully repossessed as a result of Wells Fargo's illegal auto

16 insurance practices;

17    (d)  By September 2016, the Company's illegal auto insurance practices had been

18 escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators

19 – the OCC, the CFPB and the Federal Reserve.  From that time and continuing through the Class

20 Period, defendants were in frequent discussion with the Company's regulators regarding its illegal

21 auto insurance practices and the need for customer remediation;

22    (e)  Wells Fargo did not have internal controls to prevent the illegal auto insurance

23 practices, as defendants admitted after the July 27, 2017, *The New York Times* exposé; and

24    (f)  Wells Fargo's regulatory and litigation exposure far exceeded what defendants

25 disclosed during the Class Period.  The Company was in frequent communication before and during

26 the Class Period with regulators concerning the illegal auto insurance practices.  In light of the illegal

27 nature of the practices, the fact they occurred in the same Community Banking Division as the fake

28 account scandal, their disastrous effect on Wells Fargo customers, and the recent regulatory actions

taken against the Company, the undisclosed auto insurance practices exposed the Company to a massive loss of public trust, additional significant regulatory actions, fines and litigation.

154.    The material facts omitted from the Company's May 5, 2017, Form 10-Q were eventually disclosed in the Company's 2Q17 10-Q filed on August 4, 2017.  The only change in circumstances from the time of the Company's May 5, 2017, Form 10-Q to the 2Q17 10-Q was *The New York Times* July 27, 2017, exposé.  As defendants have admitted, the omitted facts were known to, or disregarded by, defendants throughout the Class Period.  That defendants chose to omit them from the Company's SEC filings until after *The New York Times* exposé demonstrates both the misleading nature of the Company's Class Period SEC filings and defendants' fraudulent intent.  In addition, the fact that defendants did ultimately disclose the omitted facts in the Company's 2Q17 10-Q, only after *The New York Times* exposé, demonstrates the materiality of the omitted facts.

### VII.    THE TRUE FACTS REGARDING WELLS FARGO'S ILLEGAL INSURANCE SCHEME BEGIN TO BE DISCLOSED

***The New York Times* Exposé Forces Wells Fargo to Admit to Its Illegal Charging of Customers for Automobile Insurance They Did Not Need or Want**

155.    On the evening of July 27, 2017, *The New York Times* published an article titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers."  The article described an undisclosed multi-year course of business in which Wells Fargo imposed lender-placed auto insurance on borrowers who did not need or want the insurance.  Hundreds of thousands of borrowers were nevertheless saddled with the insurance and the premiums were automatically deducted from their bank accounts, resulting in unlawful fees, delinquencies and improper repossessions.  *The New York Times* article noted that Wells Fargo had admitted that the insurance had been improperly imposed on borrowers and that it had known about the issue for more than a year, but had not disclosed it:

**Wells Fargo Forced Unwanted Auto Insurance on Borrowers**

More than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need, and some of them are still paying for it, according to an internal report prepared for the bank's executives.

***The expense of the unneeded insurance, which covered collision damage, pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in***

*almost 25,000 wrongful vehicle repossessions*, according to the 60-page report, which was obtained by The New York Times. . . .

\*       \*       \*

*Wells Fargo officials confirmed that the improper insurance practices took place* and said the bank was determined to make customers whole.

\*       \*       \*

The report, which was prepared by the consulting firm Oliver Wyman, looked at insurance policies sold to Wells customers from January 2012 through July 2016. The insurance, which the bank required, was more expensive than auto insurance that customers often already had obtained on their own.

National General Insurance underwrote the policies for Wells Fargo, which began to require the insurance on auto loans as early as 2006. The practice continued until the end of September.

\*       \*       \*

*For borrowers, delinquencies arose quickly because of the way the bank charged for the insurance*. Say, for example, that a customer agreed to a monthly payment of $275 in principal and interest on her car loan, and arranged for the amount to be deducted from her bank account automatically. If she were not advised about the insurance and it increased her monthly payment to, say, $325, her account could become overdrawn as soon as Wells Fargo added the coverage.

*The report tried to determine how many Wells Fargo customers were hurt and how much they should be compensated. It estimated that the bank owed $73 million to wronged customers*.

State insurance regulations required Wells Fargo to notify customers of the insurance before it was imposed. But the bank did not always do so, the report said. And *almost 100,000 of the policies violated the disclosure requirements of five states – Arkansas, Michigan, Mississippi, Tennessee and Washington*.

\*       \*       \*

*Wells Fargo borrowers sustained financial damages beyond the costs of the insurance, the report said. The harm also included repossession costs, late fees, charges for insufficient funds and damage to consumers' credit reports*.

156.    Approximately two hours after the July 27, 2017, *The New York Times* article was released, Wells Fargo issued a press release disclosing the massive auto insurance scheme and that it had identified 570,000 customers that may have been impacted. The Company also stated that it had knowledge of the problem from its review of the CPI program in July of 2016. The Company further disclosed that it had previously identified defects in its internal controls. The press release stated, in part:

Wells Fargo reviewed policies placed between 2012 and 2017 and identified approximately 570,000 customers who may have been impacted and will receive refunds and other payments as compensation. *In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in remediation*. Starting in August 2017, Wells Fargo will proactively reach out to impacted customers with letters and refund checks.

\*       \*       \*

*In response to customer concerns, in July 2016 Wells Fargo initiated a review of the CPI program and related third-party vendor practices. Based on the initial findings, the company discontinued its CPI program in September 2016.* Since then, the company has gone through a comprehensive review using independent consultants to ensure the remediation plan it develops addresses customers' situations in a thorough and thoughtful way.

*Wells Fargo's review determined that certain external vendor processes and internal controls were inadequate. As a result, customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.*

"*We take full responsibility for our failure to appropriately manage the CPI program* and are extremely sorry for any harm this caused our customers, who expect and deserve better from us," said Codel. . . .

Wells Fargo already has been providing CPI-related refunds to some customers and, beginning in August, will send letters and refund checks to customers who are due additional payments. The process is expected to be complete by the end of the year and is as follows:

- *Approximately 490,000 customers had CPI placed for some or all of the time they had adequate vehicle insurance coverage of their own*. We refunded the premium and interest for the duplicative coverage at the time the customer made us aware of their other insurance. These customers will receive additional refunds of certain fees and some additional interest. Refunds for this group total approximately $25 million.

- *In five states that have specific notification and disclosure requirements, approximately 60,000 customers did not receive complete disclosures from our vendor as required prior to CPI placement*. In these cases, even if CPI was required, customers will receive a refund including premiums, fees and interest. Refunds for this group total approximately $39 million.

- *For approximately 20,000 customers, the additional costs of the CPI could have contributed to a default that resulted in the repossession of their vehicle*. Those customers will receive additional payments as compensation for the loss of their vehicle. The payment amount will depend on each customer's situation and also will include payment above and beyond the actual financial harm as an expression of our regret for the situation. Refunds for this group total approximately $16 million.

For each of these categories, Wells Fargo will also work with the credit bureaus to correct customers' credit records, if applicable. ***Also as an outcome of this review, Wells Fargo has taken additional steps to tighten oversight of third-party vendors in Dealer Services. This is consistent with a broader effort to strengthen how the Dealer Services business manages risk and serves customers, which has included other recently announced actions to centralize operational functions and provide more consistency for customers, tighten credit standards, and implement a new structure***.

**Analysts and the Public Are Shocked by the New Disclosures of Wells Fargo's Conduct**

157.   Financial analysts were shocked by the revelations about Wells Fargo's insurance fraud, even issuing reports just to discuss the issue. The next day, on July 28, 2017, Piper Jaffray issued a report, titled "Here We Go Again?" reiterating the revelation in *The New York Times* exposé that at least a year earlier, in July 2016, Wells Fargo had learned about, but had not disclosed, that hundreds of thousands of its auto loan customers were wrongfully enrolled in CPI policies, which in many instances resulted in improper delinquencies and repossessions. The Piper Jaffray report questioned why Wells Fargo had failed to disclose these issues for more than a year, stating, in part:

> Last evening, the NY Times reported an internal WFC report that identified roughly 800K auto loan customers that were sold insurance they didn't need from '12-'16 which ultimately resulted in ~300K customers being delinquent on their loans and ~25K cars wrongfully repossessed. WFC initiated the review of the auto insurance program in July '16 after customer complaints and ultimately discontinued the program two months later after the bank determined the program's internal processes and controls were inadequate. WFC announced that ~$64M of cash remediation will be sent to impacted customers in coming months along with $16M of account adjustments for a total hit of ~$80M. While the dollar amount is negligible, we believe the full cost may be significantly higher and weigh on the risk premium the market will place on shares.

> • What questions do we have? (1) ***Issue was identified in July '16*** and discontinued in September '16, around the time when the original account scandal was disclosed and already being addressed by the company. ***Why didn't the company address these issues publicly while they were already dealing with the account scandal rather than address them now?***; and (2) WFC has reported they have wrongly re-possessed approximately ~25K vehicles and paid refunds of $16M to this group. What other collateral damage may have been caused by the re-possession of these cars on peoples' lives?

158.   On July 28, 2017, Piper Jaffray analyst Kevin Barker again decried the Company's lack of transparency, stating: "We were surprised that this wasn't disclosed when the original sales

1    practices were disclosed . . . .  ***Given the scope of the issues out there, it seems like the cost of the***

2    ***insurance would be bigger than the $80 million of remediation already in place***."

3         159.    Evercore ISI issued a report on July 28, 2017, titled "And the Hits Just Keep on

4    Coming – Initial Take on Auto Issues," discussing the July 27, 2017 revelations.  The Evercore

5    report, in addition to detailing the improper forced-placement of insurance on unsuspecting

6    customers, confirmed that these issues were "new," had not been disclosed before, and were

7    unrelated to the unlawful sales practices disclosed in September 2016, stating, in part:

8              **And the Hits Just Keep on Coming – Initial Take on Auto Issues**

9              **Yet another issue . . . this time it's auto**.  Wells Fargo announced last night
       plans to remediate auto loan customers impacted by erroneously underwritten force-
10     placed auto insurance coverage (Collateral Protection Insurance; CPI). . . .  We note
       that per yesterday's NYT article, ***Wells has been requiring such insurance on its***
11     ***auto loans since 2006, and therefore risk exists that the review could expand*** –
       something mgmt did not rule out in our follow-up call. . . .
12
               **This is new news**.  In our follow-up call with mgmt, ***we confirmed that the***
13     ***auto insurance issue is new news, and not related to the sales practice issues***.  To
       this end, we note that there was no mention of auto, dealer services, or CPI policies
14     in the BOD's Sales Practices Investigation Report published in April 2017.  ***Mgmt***
       ***noted in our follow-up call that Wells Fargo has had discussions with the***
15     ***regulators re: this issue***.

16                              *        *        *

17             **Issue to have legs**.  Given this issue is fresh off the block, it's likely to be
       around for a while.  While WFC has already announced remediation efforts, the
18     nature of the issue (misrepresentation of consumer data, auto repossessions, impact
       to related consumer credit profiles, lack of internal controls to catch the issue) is
19     likely to draw flies quickly.  Such could come in the form of new government
       investigations, civil & criminal suits, fines, and regulatory actions.
20
               **Another hit to management's credibility**. . . .
21
            160.    The market's reaction to this information was swift.  As a result of the July 27, 2017,
22
     disclosures, the market price of Wells Fargo common stock declined from a close of $54.71 per
23
     share on July 27, 2017, to trade as low as $53.18 per share in intraday trading on July 28, 2017,
24
     before closing at $53.30 per share – down $1.41 per share on unusually high trading volume of more
25
     than 32.5 million shares.
26
            161.    A July 28, 2017, *Reuters* article, titled "Wells Fargo faces angry questions after new
27
     sales abuses uncovered," noted the stock price decline as a result of the disclosures:
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                            - 65 -

> *The latest news that 800,000 Wells Fargo auto borrowers were improperly charged for insurance rattled investors yet again, and sent its stock down 2.6 percent on Friday.*
>
> Shareholders, analysts, lawmakers and consumer advocates demanded answers about how the situation manifested, and why Wells Fargo did not disclose the problems sooner, given existing turmoil over phony deposit and credit card accounts opened in customers' names without their permission.
>
> "This is a full-blown scandal – again," said New York City Comptroller Scott Stringer, who oversees public pension funds that hold roughly 11.6 million Wells Fargo shares. "It's unbelievable, outrageous, sad, and yet quintessential Wells Fargo. This isn't just a corporate debacle.  It's caused real human harm."
>
> Stringer called on the bank to install a new independent chair and "immediately" disclose more information.
>
> Wells Fargo first became aware of potential problems a year ago, when the auto lending business began receiving an unusually high number of complaints, Franklin Codel, head of consumer lending, said in an interview.
>
> The auto insurance program was quickly suspended, and the problem *escalated to senior management, the board and regulators* . . . .

162.    In the *Reuters* article, Codel also commented on the April 2017 departures of Dealer Services head Dawn Martin Harp and her deputy Bill Katafias, who both oversaw the auto insurance scam.  Although their departures appeared benign at the time they were announced, Codel confirmed that Martin Harp and Katafias "were held accountable for their actions."

163.    On July 28, 2017, the *Las Cruces Sun News* published an article titled "Wells Fargo Stumbles Again as Unwanted Auto Insurance Revealed."  The article quoted Codel, who admitted:

> "*We knew there was going to be a day where we were talking about this in the public domain*."

164.    On July 31, 2017, J.P. Morgan issued a report titled "Another Scandal – Auto Finance, 570,000 Customers; No Disclosure Again; Fines/Legal Chgs, Clawbacks?"  The J.P. Morgan report detailed the forced-placement scandal and expressed surprise that Wells Fargo had not changed its disclosure practices in light of the fake account scandal disclosed in September 2016, and that in this case the Company appeared to only disclose the matter because it had learned that *The New York Times* was publishing an article that would expose the misconduct, stating, in part:

> **Another Scandal – Auto Finance, 570,000 Customers; No Disclosure Again; Fines/Legal Chgs, Clawbacks?**

*Wells Fargo has a new scandal – fraudulent auto insurance sales to about 570,000 customers from 2012 to 2016 and it estimates total costs of $80 mil that it has to pay to customers to remedy the damages caused*. This issue is in addition to several other issues related to retail bank, small business, and merchant processing customers. Total number of retail customers impacted is now likely over 3mil (retail bank and auto finance scandals) as we would expect limited overlap between retail bank and indirect auto customers who come through auto dealers. Key implications: 1) Legal penalties and fines likely to follow, which add further to expenses; 2) Large reputational hit and further scrutiny – this will also increase expenses; 3) Unclear to us what, if any, liability may arise for any insurance sales prior to 2012. *Wells shut the practice down in Sept 2016 as it received complaints and began a review, reserved for $80mil estimated payments in 2Q earnings as it received the report of the review but failed to disclose the issue even though it involved a large group, 570,000, of customers*. Despite three other scandals, it is very surprising that Wells Fargo has not changed the opaqueness in its disclosure and only disclosed this late on Thursday night when it realized a news story was about to break the next morning. This raises the question about what other changes Wells Fargo needs in its culture. There has been no change to the Board despite all the scandals, which has been frustrating some shareholders.

165.    As reported by *CNBC* on July 31, 2017, "[m]ultiple Wall Street firms expressed their disappointment with Wells Fargo's disclosure practices and its corporate culture since the news was revealed." The *CNBC* article also noted that "*Wells Fargo shares fell 2.6 percent Friday after The New York Times first reported the news.*"

**August 4, 2017 Reports and Wells Fargo's 2Q17 10-Q Disclose the Full Scope of the Company's Illegal and Secretive Automobile Insurance Practices**

166.    On August 4, 2017, *The Wall Street Journal* published an article titled "Wells Fargo Might Face More Regulatory Sanctions." The article cited confidential sources, stating, among other things, that the OCC had been notified by Wells Fargo of the Company's illicit auto insurance practices during the summer of 2016. The article stated, in part:

Bank executives are in touch with officials from the Office of the Comptroller of the Currency over the problems, which Wells Fargo has said affected as many as 570,000 auto-loan customers. . . .

\*        \*        \*

Now, the OCC is considering taking further action in light of the new, insurance revelations, the people familiar said. Although it isn't clear yet what form that could take, the OCC has broad power to restrict acquisitions and other banking activities.

A September OCC order related to the sales-practice scandal stipulated, among other things, that Wells Fargo's board "achieves and maintains an enterprisewide risk-management program designed to prevent and detect unsafe or unsound sales practices."

A Wells Fargo spokeswoman said the bank has "worked diligently to fully identify what went wrong and to make things right for our customers" since it identified the insurance problem in mid-2016.

**The OCC became aware of the insurance issue when Wells Fargo executives identified and reported it to them last summer**. This spring it made a request to the bank for more information on specific auto-insurance practices, one of the people familiar with the matter said.

\*        \*        \*

Wells Fargo realized there was a problem with this insurance while working on broader fair-lending reviews in mid-2016 and spotting problems in the collections process, among other factors, people familiar with the reviews said.

**Wells Fargo reported the insurance problems to the OCC in summer 2016 and provided the regulator with an internal report from consultants Oliver Wyman that detailed issues in this area**. In late July 2017, the New York Times reported the improper insurance charges and internal report.

**New York Attorney General Eric Schneiderman has sent a subpoena to Oliver Wyman asking for the report, which is deemed "confidential supervisory information**."

167.    *The Wall Street Journal* article further revealed that the Company had discovered the forced-placement auto insurance scheme as part of a 2016 investigation it had been forced to undertake into unlawful repossessions, and that, unbeknownst to investors, the reorganization of Wells Fargo's auto finance division during 2017, which included Martin Harp and Katafias leaving the Company, had actually been carried out as a result of Wells Fargo's discovery in 2016 of the forced-placement insurance scheme.  The article stated, in part:

Wells Fargo's auto-loan business had previously run into problems.  In September 2016, Wells Fargo settled for $24 million with the Justice Department and the OCC over the process by which it repossessed military member's cars, including collections.

It became clear then that problems related to repossessions and collections weren't limited to service members.  That prompted the bank to look at other issues within the business, which had become subject to a rising number of consumer complaints.  That led to the discovery of the auto insurance-related issues with vendor National General Insurance.

Earlier this year, Wells Fargo named a new head of the auto business.  In May, it centralized collections operations to improve the customer experience, boost consistency and minimize risk to the business, according to an internal memo reviewed by The Wall Street Journal.  In late July, the bank made additional management changes within the unit, according to another internal memo reviewed by The Wall Street Journal.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD

168.   Also on August 4, 2017, Wells Fargo filed with the SEC its 2Q17 10-Q.  Following the fake-accounts scandal regulatory settlements in September 2016, Wells Fargo had summarized its public trust issues in the "Financial Review Overview" section at the beginning of its financial statements.  The "Financial Review Overview" section of the 2Q17 10-Q once again contained an update on the "Sales Practices Matters," but *for the first time*, made a specific disclosure regarding Wells Fargo's auto insurance fraud, titled "Additional Efforts to Rebuild Trust," which disclosed:

> Our priority of rebuilding trust has also included an effort to identify other areas or instances where customers may have experienced financial harm.  We are working with our regulatory agencies in this effort.  As part of this effort, we are focused on the following key areas:

- Practices concerning the origination, servicing, and/or collection of indirect consumer auto loans, including related insurance products.  For example:

  - The Company recently announced a plan to remediate customers who may have been financially harmed due to issues related to automobile collateral protection insurance (CPI) policies purchased through a third-party vendor on their behalf (based on an understanding by the vendor that the borrowers' insurance had lapsed).  The plan currently consists of approximately $64 million in cash remediation and $16 million in account adjustments.  The Company discontinued the CPI placement program in September 2016.

  - The Company has identified certain issues related to the unused portion of guaranteed automobile protection waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states.

169.   Although Wells Fargo confirmed that defendants learned about the CPI issue no later than September 2016 in the "Additional Efforts to Rebuild Trust" section, it was the first time Wells Fargo mentioned the "Auto Lending Matters" related to the CPI and GAP insurance issues in its quarterly SEC filings.

170.   In addition, throughout the Class Period, Wells Fargo disclosed legal matters in a "Legal Actions" section of its quarterly filings.  But it never discussed the legal ramifications from its wrongful imposition of CPI or its improper withholding of GAP insurance refunds in this section until after *The New York Times* exposé on July 27, 2017.  Only then did Wells Fargo disclose these issues in its August 4, 2017, Form 10-Q.

171.    In the "Note 11: Legal Actions" section of the 2Q17 10-Q, Wells Fargo again provided an update on the "Sales Practices Matters," and for the first time, Wells Fargo included an additional subsection titled "Auto Lending Matters" to the "Legal Actions" section of the 2Q17 10-Q:

> As the Company centralizes operations in its dealer services business and tightens controls and oversight of third-party risk management, the Company anticipates it will identify and remediate issues related to historical practices concerning the origination, servicing, and/or collection of indirect consumer auto loans, including related insurance products.  For example, in July 2017, the Company announced a plan to remediate customers who may have been financially harmed due to issues related to automobile collateral protection insurance (CPI) policies purchased through a third-party vendor on their behalf (based on an understanding by the vendor that the borrowers' insurance had lapsed).  The Company determined that certain external vendor processes and operational controls were inadequate, and, as a result, customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.  The Company discontinued the CPI program in September 2016.  Multiple putative class action cases alleging, among other things, unfair and deceptive practices relating to these CPI policies, have been filed against the Company in United States federal courts, including in the United States District Courts for the Northern District of California and Southern District of New York.  In addition, the Company has identified certain issues related to the unused portion of guaranteed auto protection waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states.  These and other issues related to the origination, servicing and/or collection of indirect consumer auto loans, including related insurance products, may subject the Company to formal or informal inquiries, investigations or examinations from federal, state and/ or local government agencies, and may also subject the Company to litigation.

172.    Wells Fargo also disclosed that it was increasing "[t]he high end of the range of reasonably possible potential losses in excess of the Company's accrual for probable and estimable losses."  On November 3, 2016, the start of the Class Period, defendants represented this important figure as $1.7 billion.  Now, alongside the disclosure of the Company's illicit auto insurance practices which defendants knew about since July 2016, defendants disclosed this figure had ballooned to $3.3 billion.

173.    Analysts responded negatively to the August 4, 2017, revelations, with UBS issuing a report titled "A tough end to a tough week; the price of transparency – stock sells off on 10Q filing," which stated that "[r]eputational damage adds to revenue headwinds" for Wells Fargo and that "we continue to worry that reputational damage could impair the value of Wells' retail and even commercial banking franchises."  UBS also noted that "on the back of last week's disclosures about

1   the unauthorized charging of premiums for collision protection insurance" Wells Fargo's "stock has

2   declined 3.4% since [the] July 27 close."

3        174.   As a result of the August 4, 2017, disclosures, the price of Wells Fargo common stock

4   fell further, trading as low as $51.91 per share in intraday trading, before closing at $52.84 per share

5   on August 4, 2017 – again on unusually high trading volume of more than 44.6 million shares.

## VIII.   POST-CLASS PERIOD EVENTS AND ADMISSIONS

7        175.   On August 7, 2017, *The New York Times* published an article titled "Wells Fargo,

8   Awash in Scandal, Faces Violations Over Car Insurance Refunds."  The article stated, in part:

> Wells Fargo, the scandal-plagued bank, is facing new regulatory scrutiny for not refunding insurance money owed to people who paid off their car loans early, according to people briefed on the inquiry.

> Just last month Wells Fargo was found to have forced unneeded collision insurance on consumers who financed their car purchases.  That practice, first disclosed by The New York Times, affected 800,000 customers according to an analysis commissioned by the bank.  Some 274,000 people were pushed into delinquency as a result, and 25,000 cars were wrongly repossessed.

> The latest inquiry, by officials at the Federal Reserve Bank of San Francisco, where the bank has its headquarters, involves a different, specialized type of insurance that is sold to consumers when they buy a car.  Called guaranteed auto protection insurance, or GAP, it is intended to protect a lender against the fact that a car – the collateral for its loan – loses significant value the moment it is driven off the lot.

> GAP insurance, also known as guaranteed asset protection, makes up that difference for a lender if, for instance, a car is stolen before the loan is paid off.  Regular car insurance typically covers only the current market value.

> Because Wells Fargo is a large auto lender, tens of thousands of customers may have been affected by the bank's actions on GAP insurance.

> It is not mandatory for car buyers to carry GAP insurance, which typically costs $400 to $600.  But car dealers push the insurance, and lenders like it because of the protection it provides.  ***When borrowers pay off the loans early, they are entitled to a refund of some of the GAP insurance premium because the coverage they paid for is no longer needed***.

> ***Laws in nine states require that customers get unused insurance money back.  They are Alabama, Colorado, Indiana, Iowa, Maryland, Massachusetts, Oklahoma, Oregon and South Carolina***.

> ***Jennifer A. Temple, a Wells Fargo spokeswoman, provided a statement saying: "During an internal review, we discovered issues related to a lack of oversight and controls surrounding the administration of Guaranteed Asset Protection products.  We are reviewing our practices and actively working with our***

*dealers and have already begun making improvements to the GAP refund process. If we find customer impacts, we will make customers whole.*"

Ms. Temple declined to say when the problem began.  She said the bank was trying to assess how many customers had been affected.  ***Wells Fargo improved controls on the refund process in 2014, she said***.  The unit of the bank that makes car loans is called Wells Fargo Dealer Services.

Asked about the regulatory inquiry into GAP insurance at Wells Fargo, Darren Gersh, a spokesman for the Federal Reserve Board in Washington said, "We are focused on ensuring that the root causes of a firm's compliance and controls breakdowns are understood and addressed."  He declined to comment on the specifics, adding that "the Federal Reserve Board will take any regulatory and supervisory steps we feel are necessary to ensure the firm's attention to compliance."

***A failure to refund the insurance money harmed borrowers whose cars were repossessed by increasing what they owed, a figure that the bank reports to consumer credit bureaus.  All 50 states require that the amount of unused insurance be credited to those borrowers' accounts, reducing the amount owed***.

The bank alluded to the new problem briefly in its quarterly financial statement issued Friday.  "The company has identified certain issues related to the unused portion of guaranteed auto protection waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states," Wells Fargo said in the filing.

"These and other issues related to the origination, servicing and/or collection of indirect consumer auto loans, including related insurance products, may subject the company to formal or informal inquiries, investigations or examinations from federal, state and/or local government agencies, and may also subject the company to litigation."

GAP coverage is similar to home mortgage insurance, which shields lenders against a default if a borrower loses his or her job and cannot make the payments.

Car buyers who finance their purchases typically add the cost of the GAP coverage to the amount of the loan.  The interest that borrowers pay on the coverage goes to the bank that made the loan.

"Dealer Services is on a journey to strengthen its business, fix problems and help build a better Wells Fargo," Ms. Temple said.  "We've taken huge proactive steps to improve the customer experience."

***The new problem raises questions about Wells Fargo's internal controls and its board's oversight of company operations***.

176.   On August 8, 2017, *Reuters* published an article titled "California insurance regulator to probe Wells Fargo over auto policies."  The *Reuters* article stated, in part:

California will investigate whether Wells Fargo & Co and an insurance company harmed hundreds of thousands of residents by selling them insurance they did not need, the state's insurance regulator said on Tuesday.

California Insurance Commissioner Dave Jones said in a statement his department will look into so-called "force-placed" or "lender-placed" auto insurance underwritten by National General Insurance Co for customers with auto loans from Wells Fargo.

177.     Also in the wake of Wells Fargo's disclosure of its auto insurance fraud, *The Wall Street Journal* reported that Wells Fargo was "hint[ing] in [its 2Q17 10-Q] that board changes may be coming more quickly than previously signaled."  In that 10-Q, the first quarterly report to disclose the auto insurance scandal, Wells Fargo announced "in response to feedback received at our annual stockholders meeting in April 2017, the Board is engaging in an ongoing comprehensive review of its structure, composition and practices.  This review is expected to result in actions in third quarter 2017."  The Board originally indicated that long-standing directors would retire as they reached the mandatory retirement age, and prior to the April 25, 2017, annual stockholders' meeting, urged shareholders to disregard widespread calls to vote against the majority of Wells Fargo's directors because of the "active engagement of the Board and the substantial actions it has already taken to strengthen oversight and increase accountability at all levels of Wells Fargo."  But on August 15, 2017, less than two weeks after the auto insurance scandal was fully revealed, the Company announced that Sanger would resign his position as a director and Chairman of the Board of Directors of Wells Fargo.  Among other Board changes, Board members Cynthia Milligan and Susan Swenson, both of whom had served since the 1990s, would also resign their directorships at the end of the year.

178.     On October 3, 2017, Sloan was called before the U.S. Senate Committee on Banking, Housing, and Urban Affairs to testify on Wells Fargo's ongoing and newly disclosed breaches of public trust.  Sloan confirmed "as it relates to the Collateral Protection, or CPI, issue, when that got escalated in the third quarter [of 2016], we reported it to our regulators on a real-time basis, and we have been working with them . . . to keep them apprised of those issues."

179.     But the senators were angered that Wells Fargo did not report the CPI issues to the public when defendants discovered them in July 2016.  Senator Brown accused Wells Fargo of lying to the committee a year earlier when it assured them that there were no other issues beyond the sales practices disclosed in September 2016:

[Senator Brown:]  In my opening, Mr. Sloan, I talked about Mr. Stumpf's testimony last year that this activity was limited to the Community Banking Division.  ***The company, pure and simple, lied to this Committee and lied to the public***.  The company recently disclosed it knew in July 2016 that customers had auto insurance policies added to their auto loans without their consent – about 800,000 customers, roughly the size of the State that Senator Rounds represents.

    ***Every day since you have become the head of Wells Fargo for the last 11 months, every day you have made a decision to not disclose this information to the public. Your company knew about the auto insurance policy when former CEO Mr. Stumpf testified***. . . .

180.    Senator Brown then asked Sloan to confirm when he personally knew about the CPI issue.  Sloan confirmed he learned about it in late August to early September 2016.

[Senator Brown:]  When did you first become aware of the force-placed auto insurance policy problem?  And why did you think it was OK to continue covering it up?

    Mr. Sloan[:]  Well, I do not think it was OK to cover it up, Senator Brown. In fact, when the issue was escalated to me in 2016, in late August, early September, I talked to our team about it, and we decided at that point in time to end and tell our vendor to quit providing that insurance to our customers.  And that was effective at the end of September.

    We then created an internal group made up of business line experts, legal experts, our auditing function to look at the matter.  We brought in an independent law firm and an independent consulting firm to help us do a comprehensive and third-party review of the remediation.  We got the results of their report in the first quarter of last year.  We began to put together the remediation plan, and we disclosed that remediation plan in August. And we highlighted that – we disclosed the issue in August.  We have described what our remediation plan is as it relates to those 570,000 customers.  Those checks have begun to go out, and we reported that in our second quarter 10-Q.  So we have not been covering it up.

    Senator Brown[:]  Well, you did not cover it up. . .

    Mr. Sloan[:]  I am sorry, Senator.  Could I make one other point?  We disclosed that to our regulators in the third quarter of last year also.

    Senator Brown[:]  But that it took you, you the company – you personally 8 months, you the company 13 months to disclose such a violation of the public trust just makes me incredulous.

181.    On April 20, 2018, the CFPB and OCC announced $500 million in fines against Wells Fargo for its decade-long illegal auto insurance practices.  Wells Fargo entered into Consent Orders with each.  The agencies' findings confirmed that defendants knew, but concealed, before and during the Class Period that Wells Fargo's CPI practices were illegal and had impacted hundreds

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD

of thousands of Wells Fargo customers, including the wrongful repossession of 27,000 vehicles.  The

CFPB findings included, in part:

Since 2005, [Wells Fargo] forcibly placed insurance for the vehicles of about 2 million borrowers who secured auto loans with the bank.  ***According to [Wells Fargo]'s own analyses, it forcibly placed duplicative or unnecessary insurance on hundreds of thousands of those borrowers' vehicles.  In addition, for some borrowers, after appropriately placing Force-Placed Insurance policies, [Wells Fargo] improperly maintained Force-Placed Insurance policies on the borrowers' accounts after the borrowers had obtained adequate insurance on their vehicles and after adequate proof of insurance had been provided.  If borrowers failed to pay the amounts [Wells Fargo] charged them for the Force-Placed Insurance, they faced additional fees and, in some instances, experienced delinquency, loan default, and even repossession***.

If the borrower provided evidence that insurance coverage had been in effect, [Wells Fargo] had a process to cancel the Force-Placed Insurance and to refund premiums.  But [Wells Fargo] did not sufficiently monitor its vendor and internal processes, resulting in control and execution weaknesses, such as within the insurance-verification and cancellation processes and the protocols for processing refunds.  Additionally, [Wells Fargo] failed to provide data and information to its vendor that could have allowed its vendor to more effectively execute its obligations to [Wells Fargo] and borrowers.  Finally, [Wells Fargo] did not maintain a process to evaluate whether fees should have been refunded and failed to appropriately address and assess customer complaints.

***Through quarterly reports from its vendor and its own daily reports, [Wells Fargo] was aware of high rates of Force-Placed Insurance cancellations, and [Wells Fargo] received briefings on the root causes of the cancellations.  The high rates of cancellation were also apparent within [Wells Fargo]'s own system of record because it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that refund information back to the vendor***.

***The vendor regularly presented to [Wells Fargo]'s management on the Force-Placed Insurance program's performance.  These presentations included cancellation rates of Force-Placed Insurance for borrowers who never had a lapse in required insurance coverage, known as "flat cancels," and borrowers who had the required insurance for part of the Force-Placed Insurance policy term, known as "partial cancels***."

[Wells Fargo] was informed by its vendor that, since 2005, roughly 28% of Respondent's Force-Placed Insurance policies were canceled because they were duplicative of insurance maintained by borrowers for the entire term of the Force-Placed Insurance policy.  The number of cancellations should have raised concerns that [Wells Fargo]'s and its vendor's processes for determining insurance coverage before and after placement of Force-Placed Insurance were insufficient.

From 2011 to 2016, [Wells Fargo] caused hundreds of thousands of consumers to be charged substantial premiums – typically just over $1,000 a policy – for unnecessary or duplicative Force-Placed Insurance.  Although [Wells Fargo] caused the premiums to be refunded after receiving proof of adequate insurance during the coverage period, the refunds covered all of the interest charged for only flat cancels.  And, in many cases, [Wells Fargo] did not refund other fees or related charges, such as repossession fees, late fees, deferral fees, and NSF fees.

From 2011 to 2016, [Wells Fargo] acknowledges that for at least 27,000 customers, the additional costs of the Force-Placed Insurance could have contributed to a default that resulted in the repossession of their vehicle.

The OCC made similar findings, in part:

*[P]rior to June 2012, and continuing through October 2016, the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and charged premiums, interest, and other fees on borrowers' accounts where the borrowers had demonstrated adequate insurance under the terms of their automobile loan note/contract*. The Bank, after appropriately placing CPI policies on some borrowers' accounts, improperly maintained CPI policies on borrowers' accounts after the borrowers had demonstrated that they had obtained adequate insurance on their vehicles.

As a result of the Bank's improper CPI placement practices, borrowers were improperly charged CPI premiums, interest, and fees, and suffered loan delinquencies due to increased loan payment amounts. In some cases, the Bank improperly repossessed vehicles from borrowers who had defaulted on their loans due to improperly placed or maintained CPI policies.

## IX.   LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

182.    During the Class Period, as detailed herein, defendants made false and misleading statements and omissions. Defendants' misrepresentations and material omissions caused Wells Fargo common stock to trade at artificially inflated prices and operated as a fraud or deceit on Class Period purchasers of Wells Fargo common stock. Later, as the true facts were revealed, the price of Wells Fargo common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Wells Fargo common stock during the Class Period, Lead Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

183.    On the evening of July 27, 2017, *The New York Times* released an exposé based upon a leaked copy of the Oliver Wyman Report that disclosed, for the first time, Wells Fargo's unlawful practice of forcing unwanted and unneeded automotive insurance on its customers, that its practice had resulted in "[m]ore than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need" and "pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions," and that defendants had known about the practice for over a year. In response to *The New York Times* exposé, Wells Fargo

1   issued a press release on July 27, 2017, confirming much of the information in the exposé, including

2   that Wells Fargo had been aware of the practice since at least July 2016.

3        184.    As a direct result of the disclosures on July 27, 2017, Wells Fargo's common stock

4   price suffered a significant decline.  On July 28, 2017, the price of Wells Fargo common stock

5   declined from a close of $54.71 per share on July 27, 2017, to trade as low as $53.18 per share in

6   intraday trading on July 28, 2017, before closing at $53.30 per share – down $1.41 per share on

7   unusually high trading volume of more than 32.5 million shares.  Commentators confirmed that this

8   information was "new news" and linked that stock price decline directly to investors' concern about

9   Wells Fargo's loss of customers' trust, management's credibility, and the risk of additional

10   regulatory fines and litigation.

11        185.    Wells Fargo's common stock price remained artificially inflated, however, because

12   defendants continued to conceal additional information regarding Wells Fargo's unlawful practice of

13   defrauding its automobile loan customers, including its reserves for regulatory and litigation costs

14   and issues related to the unused portion of GAP waiver or insurance agreements and that refunds

15   were likely owed to affected customers.

16        186.    On August 4, 2017, the Company issued its 2Q17 10-Q, defendants revealed that its

17   reserve for legal and regulatory costs could reach upwards of $3.3 billion, an increase from $1.7

18   billion at the start of the Class Period.  The Company also disclosed for the first time new issues

19   related to the unused portion of GAP waiver or insurance agreements and that refunds were likely

20   owed to affected customers.  Also on August 4, 2017, *The Wall Street Journal* reported that the OCC

21   had become aware of the insurance issues when Wells Fargo executives identified and reported the

22   issues to the regulator in summer of 2016, and that the Company was facing additional sanctions "in

23   light of the new insurance revelations."

24        187.    The disclosures on August 4, 2017, substantially caused the price of Wells Fargo

25   common stock to fall even further, trading as low as $51.91 per share on August 4, 2017, before

26   closing at $52.84 per share – again on unusually high trading volume of more than 44.6 million

27   shares.

28

188.   The declines of Wells Fargo's common stock price on July 28, 2017, and August 4, 2017, were a direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to investors and the market.  The timing and magnitude of Wells Fargo's common stock price declines negates any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific factors unrelated to defendants' misrepresentations and omissions.

189.   The economic losses suffered by Lead Plaintiff and other members of the Class were a direct result of defendants' misrepresentations and omissions that inflated Wells Fargo's common stock price and subsequent decline in the value of that stock when defendants' prior misrepresentations and omissions were revealed.

## X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE

190.   Lead Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Wells Fargo common stock and without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other members of the Class purchased or acquired Wells Fargo common stock between the time defendants misrepresented and failed to disclose material facts about their business operations and financial prospects, and the time the true facts were disclosed.  Accordingly, Lead Plaintiff and the other members of the Class relied, and were entitled to have relied, upon the integrity of the market for Wells Fargo common stock, and are entitled to a presumption of reliance on defendants' materially false and misleading statements during the Class Period.

191.   At all relevant times, the market for Wells Fargo common stock was efficient for the following reasons, among others:

(a)     Wells Fargo common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, Wells Fargo filed periodic public reports with the SEC; and

(c)     Wells Fargo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

192.    Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## XI.     THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

193.    The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") statutory Safe Harbor for forward-looking statements because: (a) they are not forward-looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, defendants cannot meet the requirements for invoking the protection, *i.e.*, identifying the statements as forward-looking and demonstrating that the statements were accompanied by meaningful cautionary language.  Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

194.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary statements."   15 U.S.C. §78u-5(c)(1)(A)(i).   An oral forward-looking statement must be accompanied by an oral cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such factors; and (b) the referenced written documents must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

195.    The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted

1   Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-

2   5(b)(2)(A).

3       196.    Statements of historical fact, current condition or a mixture thereof are not "forward

4   looking" and thus not protected by the Safe Harbor.

5       197.    To the extent any of the statements were identified as forward-looking statements,

6   they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful

7   cautionary statements identifying important factors that could cause actual results to differ materially

8   from those in the purportedly forward-looking statements.  A warning that identifies a potential risk,

9   but implies that such risk had not materialized, *i.e.*, states that something might occur but does not

10  state that something actually has already occurred, is not meaningful and does not fall within the

11  protections of the Safe Harbor.

12      198.    Meaningful risk disclosures must also be substantive and tailored to the forward-

13  looking statement they accompany.  Many of defendants' purported risk disclosures remained

14  unchanged over the course of the Class Period, despite the fact that such risks had in fact

15  materialized, which change in circumstance was material to the reasonable investor.  Defendants'

16  risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of

17  the Safe Harbor.

18      199.    Nor were the historic or present-tense statements made by defendants assumptions

19  underlying or relating to any plan, projection or statement of future economic performance, as they

20  were not stated to be such assumptions when made, nor were any of the projections or forecasts

21  made by defendants expressly related to or stated to be dependent on those historic or present-tense

22  statements when made.

23      200.    Defendants' forward-looking statements also do not fall within the protections of the

24  Safe Harbor because they had no reasonable basis.  Defendants are liable for those false

25  forward-looking statements because, at the time each of those forward-looking statements was made,

26  the particular speaker knew that the particular forward-looking statement was false or misleading

27  and/or the forward-looking statement was authorized and/or approved by an executive officer of

28  Wells Fargo, who knew that those statements were false or misleading when made.

## XII.   CLASS ACTION ALLEGATIONS

201.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Wells Fargo common stock during the Class Period (the "Class").  Excluded from the Class are defendants; members of the immediate families of the Individual Defendants; Wells Fargo's subsidiaries and affiliates; any person who was an officer or director of Wells Fargo during the Class Period; any entity in which any defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

202.   The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE and as of July 26, 2017, the Company had approximately five billion shares issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Wells Fargo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

203.   Common questions of law and fact predominate and include: (i) whether defendants violated the Exchange Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; (iv) whether defendants' statements and/or omissions artificially inflated the price of Wells Fargo common stock; and (v) the extent and appropriate measure of damages.

204.   Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

205.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

206.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

207.    Lead Plaintiff incorporates ¶¶1-206 by reference.

208.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Wells Fargo common stock during the Class Period.

210.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wells Fargo common stock.  Lead Plaintiff and the Class would not have purchased Wells Fargo common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

211.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Wells Fargo common stock during the Class Period.

## XIV.   COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

212.    Lead Plaintiff incorporates ¶¶1-206 by reference.

1    213.    During the Class Period, the Individual Defendants acted as controlling persons of

2 Wells Fargo within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and

3 their power to control public statements about Wells Fargo, the Individual Defendants had the power

4 and ability to control the actions of Wells Fargo and its employees.  Wells Fargo controlled the

5 Individual Defendants and its other officers and employees.  By reason of such conduct, defendants

6 are liable pursuant to §20(a) of the Exchange Act.

7                              **XV.    PRAYER FOR RELIEF**

8          WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

9          A.    Determining that this action is a proper class action and certifying Lead Plaintiff as a

10 Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's

11 counsel as Lead Counsel;

12         B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

13

14         C.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees; and

15         D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

16 proper.

17                              **XVI.   JURY DEMAND**

18         Lead Plaintiff demands a trial by jury.

19 DATED:  August 31, 2018                    ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
20                                             LUCAS F. OLTS
                                               AUSTIN P. BRANE
21                                             KEVIN S. SCIARANI

22                                                  s/ LUCAS F. OLTS
23                                               LUCAS F. OLTS

24                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
25                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-
cv-03948-JD                                                                        - 83 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Lead Plaintiff

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:18-cv-03948-JD

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Bucks County Employees Retirement Fund v. Newell Brands Inc., et al.*, No. 2:18-cv-10878 (D.N.J.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

WELLS FARGO

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of August, 2018.

CONSTRUCTION LABORERS PENSION
TRUST FOR SOUTHERN CALIFORNIA

By: _____

Robert O. Glaza, Administrator

- 2 -

WELLS FARGO

### SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 12/22/2016 | 6,433 | $55.72 |
| 01/19/2017 | 20,213 | $54.64 |
| 02/23/2017 | 25,417 | $58.37 |

**Sales**

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 12/23/2016 | 939 | $55.85 |
| 04/24/2017 | 3,107 | $53.73 |
| 06/28/2017 | 21,162 | $54.31 |

*Opening position of 32,337 shares.

1

## CERTIFICATE OF SERVICE

2          I hereby certify under penalty of perjury that on August 31, 2018, I authorized the electronic

3   filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5   hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6   non-CM/ECF participants indicated on the attached Manual Notice List.

7                                                   s/ LUCAS F. OLTS
                                                    LUCAS F. OLTS
8
                                                    ROBBINS GELLER RUDMAN
9                                                     & DOWD LLP
                                                    655 West Broadway, Suite 1900
10                                                  San Diego, CA  92101-8498
                                                    Telephone:  619/231-1058
11                                                  619/231-7423 (fax)

12                                                  E-mail:  lolts@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1465291_1

# Mailing Information for a Case 3:18-cv-03948-JD Purple Mountain Trust v. Wells Fargo & Company et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Austin P. Brane**
  abrane@rgrdlaw.com

- **Nanci L. Clarence**
  nclarence@clarencedyer.com,achin@clarencedyer.com

- **Josh Alan Cohen**
  jcohen@clarencedyer.com,achin@clarencedyer.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,viapianoc@sullcrom.com,s&cmanagingclerk@sullcrom.com,brendan-cullen-5099@ecf.pacerpro.com,loevinsohnd@sullcrom.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com,samuel@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sverker K. Hogberg**
  hogbergs@sullcrom.com

- **Katharine Ann Kates**
  katharine@ramsey-ehrlich.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Lucas F. Olts**
  Lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

- **Lesley Frank Portnoy**
  lfportnoy@pomlaw.com

- **Ismail Jomo Ramsey**
  izzy@ramsey-ehrlich.com,samuel@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Kevin Shen Sciarani**
  ksciarani@rgrdlaw.com,3827167420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Adam F. Shearer**
  ashearer@clarencedyer.com,achin@clarencedyer.com

- **Christopher Michael Viapiano**
  viapianoc@sullcrom.com,s&cmanagingclerk@sullcrom.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Peretz          Bronstein
Bronstein Gewirtz & Grossman, LLC
60 East 42nd Street, Suite 4600
New York, NY 10154
```