Richard H. Klapper (*pro hac vice*)
(klapperr@sullcrom.com)
Nicolas Bourtin (*pro hac vice*)
(bourtinn@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:     (650) 461-5600
Facsimile:      (650) 461-5700

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone:     (202) 956-7500
Facsimile:      (202) 956-7056

*Counsel for Defendant Wells Fargo & Company*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURPLE MOUNTAIN TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO & COMPANY, TIMOTHY J. SLOAN, JOHN R. SHREWSBERRY, STEPHEN SANGER, and MARY MACK,<br><br>Defendants. | Case No. 3:18-cv-03948-JD<br><br>**WELLS FARGO & COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>Hearing: February 28, 2019<br>Time: 10:00 a.m.<br>Courtroom: 11<br>The Honorable James Donato |

1

**NOTICE OF MOTION AND MOTION**

2

TO PLAINTIFF AND ITS ATTORNEY OF RECORD:

3

PLEASE TAKE NOTICE that on February 28, 2019 at 10:00 a.m., or as soon thereafter

4  as counsel may be heard in Courtroom 11 of the United States District Court for the Northern District of

5  California, located at 450 Golden Gate Avenue, San Francisco, California 94102, defendant Wells Fargo

6  & Company ("Wells Fargo") will and hereby does move this Court to dismiss the Consolidated

7  Complaint for Violation of the Federal Securities Laws (ECF No. 46) filed by lead plaintiff Construction

8  Laborers Pension Trust for Southern California on the ground that it fails to state a claim upon which

9  relief can be granted.

10

This Motion is made pursuant to the Private Securities Litigation Reform Act of 1995,

11  15 U.S.C. § 78u-4(a) *et seq.*, and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and is

12  based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, all pleadings

13  and papers filed herein, oral argument of counsel, and any matter that may be submitted at the hearing.

14

Dated:   November 2, 2018

15

16
/s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)

17
Sverker K. Hogberg (SBN 244640)
SULLIVAN & CROMWELL LLP

18
1870 Embarcadero Road

19
Palo Alto, California 94303
Telephone: (650) 461-5600

20
Facsimile: (650) 461-5700

21
Richard H. Klapper (*pro hac vice*)
(klapperr@sullcrom.com)

22
Nicolas Bourtin (*pro hac vice*)
(bourtinn@sullcrom.com)

23
SULLIVAN & CROMWELL LLP
125 Broad Street

24
New York, New York 10004

25
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

26

27
Christopher M. Viapiano (*pro hac vice*)
SULLIVAN & CROMWELL LLP

28
1700 New York Avenue, N.W., Suite 700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 956-7056

*Counsel for Defendant Wells Fargo & Company*

SULLIVAN
&
CROMWELL LLP

WELLS FARGO & COMPANY'S MOTION TO DISMISS THE CONSOLIDATED COMPLAINT
CASE NO. 3:18-CV-03948-JD

# TABLE OF CONTENTS

**Page**

ISSUES TO BE DECIDED ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

SUMMARY OF ARGUMENT ................................................................................. 1

STATEMENT OF FACTS AND ALLEGATIONS ................................................... 5

ARGUMENT ........................................................................................................... 8

I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5 ............................. 8

    A.  Plaintiff Fails to Plead an Omission Based on a Duty to Disclose the CPI Issue. .............. 9

    B.  Plaintiff Fails to Plead an Actionable Misrepresentation. ................................. 10

    C.  Plaintiff Fails to Plead Scienter Adequately. .................................................. 20

    D.  Plaintiff Fails to Plead Loss Causation Adequately ........................................ 25

II.    PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(A). ................. 26

CONCLUSION ........................................................................................................ 27

SULLIVAN & CROMWELL LLP

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Apple Computer, Inc. Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...................................................................23

*Basic, Inc.* v. *Levinson*,
  485 U.S. 224 (1988).............................................................................................2, 9, 11

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)......................................................................................................8

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ...................................................................................16

*In re BofI Holding, Inc. Sec. Litig.*,
  302 F. Supp. 3d 1128 (S.D. Cal. 2018)........................................................................15

*Brody* v. *Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ......................................................................................10

*Burgess* v. *Premier Corp.*,
  727 F.2d 826 (9th Cir. 1984) ......................................................................................27

*In re Calpine Corp. Sec. Litig.*,
  288 F. Supp. 2d 1054 (N.D. Cal. 2003) .........................................................................5

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)........................................................................................19

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr.* v. *Citigroup,
  Inc.*, 165 F. App'x 928 (2d Cir. 2006) ...........................................................................9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ................................................................................17, 18

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014).....................................................................................3, 9

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) .................................................................16, 24

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ....................................................................................11

SULLIVAN & CROMWELL LLP

*Desaigoudar* v. *Meyercord*,
223 F.3d 1020 (9th Cir. 2000) ...................................................................................8

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
No. Civ. 3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom.*, *Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ....................15

*Dura Pharm., Inc.* v. *Broudo*,
544 U.S. 336 (2005)....................................................................................................8

*In re Energy Recovery Inc. Sec. Litig.*,
No. 15-cv-00265-EMC, 2016 WL 324150 (N.D. Cal. Jan. 27, 2016)...............................26

*Glazer Capital Mgmt., LP* v. *Magistri*,
549 F.3d 736 (9th Cir. 2008) ...................................................................4, 10, 20

*Glen Holly Entm't, Inc.* v. *Tektronix, Inc.*,
100 F. Supp. 2d 1086 (C.D. Cal. 1999) ...............................................................17

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...............................................................23

*Hefler* v. *Wells Fargo & Co. et al.*,
No. 16-CV-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)...............................26

*Howard* v. *Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ...................................................................................27

*Howard* v. *Hui*,
2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) ...................................................................26

*Irving Firemen's Relief & Ret. Fund* v. *Uber Techs.*,
No. 17-CV-05558-HSG, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)...............................16

*John Doe Co. No. 1* v. *CFPB*,
195 F. Supp. 3d 9 (D.D.C. 2016) ...................................................................................9

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...................................................................................26

*Lopez* v. *CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)...............................................................................17

*Markman* v. *Whole Foods Mkt., Inc.*,
No. 1:15-CV-681-LY, 2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)...............................16

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)...................................................................................................9

SULLIVAN
&
CROMWELL LLP

*Menkes* v. *Stolt-Nielsen S.A.*,
   2005 WL 3050970 (D. Conn. Nov. 10, 2005) ....................................................................9

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..............................................................10, 11, 20, 25

*Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) .........................................................................25

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) .........................................................................23

*In re Oak Tech. Sec. Litig.*,
   No. 96–20552 SW, 1997 WL 4461688 (N.D. Cal. Aug. 1, 1997).....................................27

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ...........................................................................25

*Paracor Financiale, Inc.* v. *General Electric Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ...........................................................................27

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .........................................................................16

*Rok* v. *Identiv, Inc.*,
   No. 15-CV-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom.*
   *Cunningham* v. *Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) .....................................15

*Ronconi* v. *Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...........................................................................23

*Sanders* v. *Brown*,
   504 F.3d 903 (9th Cir. 2007) .............................................................................8

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .......................................................................21, 23

*South Ferry LP No. 2* v. *Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005).............................................................16

*South Ferry LP No. 2* v. *Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...........................................................................16

*In re Teledyne Def. Contracting Deriv. Litig.*,
   849 F. Supp. 1369 (C.D. Cal. 1993) ................................................................2, 9

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................21, 24

SULLIVAN
&
CROMWELL LLP

*In re VeriFone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) ...........................11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability. Litig.*,
  MDL No. 2672, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ........................................ *passim*

*W. Mining Council* v. *Watt*,
  643 F.2d 618 (9th Cir. 1981) ...............................................................................................8

*Zucco Partners, LLC* v. *Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ....................................................................................21, 26

**Statutes**

17 C.F.R. §§ 240.13a-15(e), 240.15d-15(e)....................................................................3, 18, 19

15 U.S.C. § 78t(a) .............................................................................................................26

15 U.S.C. § 78u-4(b)(2)(A)........................................................................................ *passim*

Securities Exchange Act of 1934 Section 10(b) ............................................................. *passim*

**Other Authorities**

Rule 8 ...............................................................................................................................27

Rule 9(b) ......................................................................................................................8, 26, 27

Rule 10b-5............................................................................................................... *passim*

Rule 12(b)(6)...............................................................................................................8, 20

SULLIVAN
&
CROMWELL LLP

**ISSUES TO BE DECIDED**

1. Has Plaintiff adequately pleaded claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 where it failed to allege particularized facts to establish (i) that any alleged misstatement or omission was actually false, material, or misleading; (ii) a strong inference of scienter as to any Defendant for any alleged misstatement or omission; or (iii) that Lead Plaintiff's alleged losses were caused by "revealing the truth" about any of the alleged misstatements or omissions.

2. Has Plaintiff adequately pleaded claims under Section 20(a) for control person liability where it failed to allege (i) any primary violation of the securities laws under Section 10(b) or (ii) specific facts to show any Defendant's actual control over the alleged violators.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Wells Fargo & Company respectfully submits this Memorandum of Points and Authorities in support of its Motion to Dismiss the Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint" or "Compl.") (ECF No. 46).

## SUMMARY OF ARGUMENT

Plaintiff contends that Defendants committed securities fraud by doing what companies should do before making a public announcement of an error in an internal process that has potentially resulted in customer harm — investigate the problem to determine its causes and scope, figure out how to fix the problem, and come up with a plan to remediate the harm.  According to the Complaint, Wells Fargo determined sometime in late August or early September 2016 that a third-party vendor may have erroneously acquired unnecessary collateral protection insurance ("CPI") for certain Wells Fargo auto loan borrowers.  (Compl. ¶ 8.)  This error allegedly was the result of a mistaken "understanding by the vendor that the borrowers' insurance had lapsed" (*id*. ¶ 171) and the failure of Wells Fargo's "vendor processes and internal controls" to catch the mistake (*id*. ¶ 156).  Once Wells Fargo was alerted to these issues in August or September 2016, it immediately suspended the placement of CPI for its auto loan borrowers, notified its regulators (the Office of the Comptroller of the Currency ("OCC") and the Consumer Financial Protection Bureau ("CFPB")), and set out to investigate the underlying causes of the error and determine how to make borrowers whole.  (*Id*. ¶ 52.)  Plaintiff does not take issue with any of these actions, only that Wells Fargo did not disclose its ongoing investigation into the CPI issue to the public until July 27, 2017, shortly after the New York Times reported on the issue.  (*Id*. ¶ 28.)

Whether or not Plaintiff agrees with Wells Fargo's decision to fully investigate before disclosing, it emphatically is not securities fraud.  Because Wells Fargo had no duty to disclose the CPI issue or its investigation unless it made statements that would be false and misleading if they omitted mention of the CPI issue, Plaintiff tries to plead fraud by arguing that Defendants' statements about Wells Fargo's efforts at "transparency" and "rebuilding trust" were false and misleading because Wells Fargo had not yet disclosed the ongoing CPI investigation.  Plaintiff also takes Defendants' statements about the progress of Wells Fargo's investigation into and remediation of an *entirely different matter* — the well-publicized "sales practices" issues, which involved retail bank employees who opened customer

accounts without authorization in response to aggressive sales incentives and targets — and contends, implausibly, that those statements were false because Wells Fargo had not yet disclosed the unrelated CPI issue.  Plaintiff's attempt to plead securities fraud based on these and other statements fails as a matter of law in multiple ways.

**Plaintiff fails to plead any duty to disclose the CPI issue.**  Plaintiff cannot make out a fraud claim simply by asserting that Wells Fargo should have disclosed the CPI issue earlier than it did.  Silence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988), and a securities fraud omission claim cannot be premised on the failure to disclose uncharged, un-adjudicated wrongdoing.  *In re Teledyne Def. Contracting Deriv. Litig.*, 849 F. Supp. 1369, 1382-83 (C.D. Cal. 1993).  Plaintiff has pleaded no facts to establish that any of the Defendants had a duty to disclose the CPI issue before they did so.  Plaintiff also asserts that Wells Fargo's failure to disclose the ongoing CPI investigation, and the potential regulatory fines that might result, in the Risk Factors section of its Forms 10-Q and 10-K was false or misleading.  (Compl. ¶ 150)  But Plaintiff has not alleged that any Defendant was aware during the class period that Wells Fargo would be fined by the CFPB or OCC, let alone how much the fine would be.  To the contrary, as Plaintiff alleges, the CFPB and OCC did not conclude their own investigations into CPI or fine Wells Fargo until April 20, 2018 — nine months *after* the end of the class period.  (*Id.* ¶ 34.)

**Plaintiff pleads no actionable misstatements.**  The purported misstatements in the Complaint fall into three categories, none of which supports a fraud claim.  *First*, Plaintiff contends that Defendants' statements concerning the status of Wells Fargo's efforts to fix the sales practices issues — including statements that Wells Fargo was not aware of other undisclosed *sales practices* issues (*id.* ¶ 44) — were false or misleading because they failed to disclose the CPI investigation.  Plaintiff conflates two distinct and unrelated matters:  on the one hand, the *sales practices* conduct by employees in Wells Fargo's retail bank branches who intentionally opened unauthorized customer accounts as a means to meet sales goals and increase their compensation; and, on the other hand, the *CPI issue*, where Wells Fargo's "external vendor processes and internal controls" failed to identify instances where CPI was placed (and borrowers paid for) insurance that they did not need.  Indeed, the distinction between these matters is apparent even from the Complaint, which quotes an analyst "confirm[ing] that the auto

insurance issue is *new news, and not related to the sales practice issues*."  (*Id.* ¶ 159.)  Plaintiff cannot state a claim for fraud by twisting Defendants' statements that the *sales practices* issues were being resolved into statements purportedly denying that *any* other issues — including the unrelated CPI issue — existed anywhere at Wells Fargo.

*Second*, Plaintiff contends that statements that Wells Fargo was "trying to be more transparent" and working to "restore trust" (*id.* ¶ 53) were false or misleading because Wells Fargo did not disclose the ongoing CPI investigation before it was complete.  These statements are paradigmatic examples of non-actionable corporate puffery on which no reasonable investor could rely.  *See City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009))).  Even if these statements were actionable, Plaintiff cannot show that they were false.  Plaintiff *nowhere* alleges that the Company was not committed to increasing transparency or regaining customers' trust; that Defendants did not intend to disclose the CPI issue once Wells Fargo's investigation was complete; or that waiting to disclose the CPI issue until after the Company had finished its investigation somehow makes these statements false.  Any such contentions would be implausible given Wells Fargo's immediate disclosure of the CPI issue to the OCC and CFPB.  In the end, Plaintiff has little more than the unfounded argument that Wells Fargo could not be committed to transparency or regaining customers' trust unless it prematurely disclosed its then in-progress investigation into the CPI issue at some arbitrary date prior to July 27, 2017.  That is not the law.

*Finally*, Plaintiff contends that certain statements in Wells Fargo's Forms 10-Q and 10-K concerning the adequacy and effectiveness of the Company's "disclosure controls and procedures" were false or misleading because the Company failed to disclose the CPI issue.  (Compl. ¶ 130.)  Plaintiff misconstrues these statements, which concern controls and procedures used to ensure that information required to be disclosed in the Company's financial statements is communicated to management, *see* 17 C.F.R. §§ 240.13a-15(e), 240.15d-15(e) (defining "disclosure controls and procedures") — not its "external vendor processes and internal controls" with respect to CPI placement (*id.* ¶ 156) or "internal

controls to prevent the illegal auto insurance practices" (*id*. ¶ 73(e)), as Plaintiff alleges.  Plaintiff alleges no facts that suggest that the CPI issue was not immediately reported to the CEO and then the regulators. Plaintiff, in fact, *repeatedly* alleges exactly the opposite.  (*E.g.*, Compl. ¶¶ 8, 52(d).)  Plaintiff's fraud claims concerning Wells Fargo's disclosures in its Forms 10-Q and 10-K are unfounded.

**Plaintiff fails to plead facts giving rise to a strong inference of scienter.**  The PSLRA requires Plaintiff to allege particularized facts giving rise to a "strong inference" that the person who made or was responsible for a misstatement either intentionally made it or acted with deliberate recklessness as to its truth.  *Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). As a threshold matter, Plaintiff cannot plead scienter because none of the challenged statements was false or misleading.  Plaintiff fails to allege that any of the purported misstatements about the status of the sales practices issues, the Company's commitment to transparency and restoring trust, and the adequacy of the Company's disclosure controls and litigation cost accruals were in any way misleading because Wells Fargo chose to wait until it completed its investigation of the CPI issue before announcing it publicly.

Even if knowledge of the CPI issue could suffice to plead intent to defraud, Plaintiff has not come close to satisfying the scienter requirement as to any Defendant.  For three of the Defendants — John Shrewsberry, Stephen Sanger, and Mary Mack — Plaintiff alleges no facts (much less with particularity) about *what* they knew concerning the CPI issue, *when* they knew it, or *how* they knew it. Plaintiff alleges that a former Senior Vice President of Consumer Lending "admitted the Company knew of the practices in July 2016 and quickly escalated them to senior management and the Company's Board of Directors" (Compl. ¶ 8), but such an allegation regarding "senior management" — even if true — does not plead with particularity even the most rudimentary facts about what Shrewsberry, Sanger, and Mack knew, when, or how.

Plaintiff's scienter allegations as to Sloan are no better.  The Complaint cites to Sloan's testimony that the CPI issue "was escalated to me in 2016, in late August, early September" and that, after informing Wells Fargo's regulators, he "brought in an independent law firm and an independent consulting firm to help us do a comprehensive and third-party review of the remediation" and that "[w]e got the results of their report in the first quarter of [2017]."  (*Id*. ¶ 180 (testimony before Senate Banking

Committee.)  Immediate disclosure to regulators is the precise opposite of any intent to defraud, and nothing in this or any other allegation in the Complaint shows that Sloan was aware of sales practices issues requiring disclosure or did not intend for Wells Fargo to increase transparency, rebuild trust, and disclose the CPI issue when the investigation was complete.

**Plaintiff fails to plead loss causation.**  Although Plaintiff alleges that Wells Fargo's stock price fell on July 27, 2017 after Wells Fargo disclosed the CPI issue (*see id.* ¶¶ 160-174), it fails to plead facts to show that Defendants' alleged misstatements caused its losses.  At best, the Complaint pleads only that the market reacted negatively to the "new news" regarding the existence of the CPI issue (*id.* ¶ 159) — not that the stock drop was caused by "revealing the truth" about alleged misstatements concerning, *inter alia*, efforts to increase transparency and regain customers' trust.

**Plaintiff's claims under Section 20(a) also fail.**  Because Plaintiff has failed to plead a primary violation of Section 10(b) or the requisite control, it cannot plead a Section 20(a) claim either.

## STATEMENT OF FACTS AND ALLEGATIONS

This action arises out of a July 27, 2017 New York Times article, and Wells Fargo's press release later the same day, disclosing that between 2012 and 2016, Wells Fargo and a third-party vendor mistakenly procured CPI for approximately 570,000 auto loan borrowers who already had adequate insurance.  (Compl. ¶ 156.)  As the CFPB explained in its April 20, 2018 Consent Order:

> [W]hen [Wells Fargo's] borrowers obtained an auto-secured loan, the borrower signed an agreement that required the borrower to maintain insurance that would cover physical damage to the vehicle, which served as collateral for the loan. [Wells Fargo] used a vendor to monitor borrowers' insurance coverage.  If a borrower did not procure or maintain physical-damage insurance for the vehicle, [Wells Fargo] could protect its interest in the collateral by acquiring Force-Placed Insurance on the borrower's behalf and charging the borrower for the insurance premium paid, in whole or in part, by [Wells Fargo] to the insurer, plus interest.

(CFPB Consent Order, Declaration of Brendan P. Cullen ("Cullen Decl.") Ex. A ¶ 27; *see also* Compl. ¶ 34.)[1]  The New York Times added that, "[w]hen customers financed cars with Wells Fargo, the buyers' information would go to National General" — a third-party vendor — "which was supposed to check a database to see if the owner had insurance coverage."  (*Id.* ¶ 31.)  If the customer did not have

---

[1]    The Court may take judicial notice of the CFPB and OCC Consent Orders that Plaintiff cites in its Complaint.  *See In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1075 (N.D. Cal. 2003) (taking judicial notice of documents that "Plaintiffs expressly cite and quote from . . . in the [complaint]"); (*see* Compl. ¶¶ 181 (citing CFPB and OCC Consent Orders)).

insurance, "the insurer would automatically impose coverage on the customers' accounts." (*Id.*)  But

National General mistakenly imposed CPI on some borrowers who did not need it based on a mistaken

"understanding . . . that the borrowers' insurance had lapsed." (*Id.* ¶ 171.)  In certain instances, the error

was not corrected because "many customers appear not to have notified Wells Fargo of the redundant

insurance." (*Id.* ¶ 31.)  "If the borrower provided evidence that insurance coverage had been in effect,

[Wells Fargo] had a process to cancel the [CPI] and to refund premiums." (Cullen Decl. Ex. A ¶ 30.)

According to the CFPB, Wells Fargo "did not sufficiently monitor its vendor and internal processes,

resulting in control and execution weaknesses, such as within the insurance-verification and cancellation

processes and the protocols for processing refunds." (*Id.*)

In its July 27, 2017 press release, Wells Fargo addressed the background and timing of its

review of the CPI issue:  "In response to customer concerns, in July 2016 Wells Fargo initiated a review

of the CPI program and related third-party vendor practices" and "[b]ased on the initial findings, the

company discontinued its CPI program in September 2016." (Compl. ¶ 156.)  Wells Fargo also

determined that it needed to conduct "a comprehensive review using independent consultants to ensure

the remediation plan it develops addresses customers' situations in a thorough and thoughtful way,"

(*id.*), and engaged Oliver Wyman, a third-party consultant, to assist. (*Id.* ¶¶ 28, 156.)  Wells Fargo kept

its regulators apprised of the status of both its review and remediation efforts. (*Id.* ¶ 178.)  As Sloan

testified before the Senate Committee on Banking, Housing, and Urban Affairs, over the next several

months Wells Fargo "began to put together the remediation plan," which was publicly disclosed in

August 2017. (*Id.* ¶ 180.)

In the Complaint, Plaintiff attempts to link the CPI issue to Wells Fargo's sales practices

misconduct that was the subject of settlements announced in September 2016.  The facts do not bear that

out.  As Plaintiff's own allegations and the documents cited in the Complaint make clear — including

the New York Times article, the CFPB and OCC Consent Orders, and Wells Fargo's public filings (*e.g.*,

Compl. ¶¶ 31, 33, 181; Cullen Decl. Ex. A) — the CPI issue involves inadvertent mistakes resulting

from inadequate monitoring and process controls with respect to Wells Fargo's use of third-party

insurance vendors. (Cullen Decl. Ex. A ¶ 30.)  By contrast, the sales practices issues involved

intentional conduct by employees at Wells Fargo's retail bank branches who opened unauthorized

accounts to meet sales goals or increase incentive compensation.  (Compl. ¶¶ 40, 151.)  Indeed, the Complaint quotes an analyst report issued the day after the July 27, 2017 announcement that "*confirmed that the auto insurance issue is new news, and not related to the sales practice issues*."  (*Id.* ¶ 159.)

Plaintiff also asserts that Wells Fargo failed to disclose alleged issues regarding the failure to refund guaranteed automobile protection ("GAP") insurance premiums to its auto loan borrowers who paid off their loans early.  (Compl. ¶¶ 27, 32-33.)  Plaintiff alleges that Wells Fargo disclosed in its 2017 Q2 Form 10-Q that it "has identified certain issues related to the unused portion of guaranteed automobile protection waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states."  (*Id.* ¶ 168.)  Plaintiff, however, has not alleged a single fact regarding (i) when the GAP issue was discovered, or (ii) whether or when any Defendant knew about this issue during the class period.  Notably, Plaintiff does not allege that the GAP issue was related in any way to the CPI issue or that it was the subject of the Oliver Wyman report.  Plaintiff also nowhere alleges that the GAP issue was the subject of either the CFPB or OCC Consent Orders that were issued on April 20, 2018 or that Wells Fargo has faced any regulatory penalty in connection with the GAP insurance issue.  (*See id.* ¶ 181.)

Plaintiff alleges that the "truth" about the alleged misstatements during the class period was revealed on two dates:  (1) July 27, 2017, when the New York Times published its article on the CPI issue and Wells Fargo issued its press release (*id.* ¶¶ 182-184); and (2) August 4, 2017, when (i) Wells Fargo issued its Form 10-Q for the second quarter of 2017, which increased the Company's reserve for legal and regulatory costs to $3.3 billion "due to a variety of matters, including the Company's existing mortgage related regulatory investigations" and disclosed "certain issues related to the unused portion of guaranteed automobile protection [GAP] waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states"; and (ii) the Wall Street Journal published a report stating that Wells Fargo was facing additional sanctions in light of these issues (*id.* ¶ 186; Wells Fargo 2017 Q2 Form 10-Q, Cullen Decl. Ex. B, at 4, 124, 126).

Plaintiff brings claims pursuant to Section 10(b) and Rule 10b-5 against Wells Fargo, Timothy Sloan (CEO), Stephen Sanger (former director), John Shrewsberry (CFO), and Mary Mack

SULLIVAN
&
CROMWELL LLP

(Senior Vice President).  Plaintiff avers that Defendants made misstatements in (1) Wells Fargo's Annual Reports and SEC filings; (2) Wells Fargo's press releases issued in connection with SEC filings; (3) conference calls with analysts and investors in connection with those SEC filings; (4) presentations made by certain defendants at various conferences; and (5) in Sloan's testimony before the Senate Banking Committee.  Plaintiff also contends that each individual Defendant was a Section 20(a) control person as to Wells Fargo and that Wells Fargo, in turn, was a Section 20(a) control person as to each individual Defendant.  (Compl. ¶ 213.)

## ARGUMENT

A complaint must be dismissed pursuant to Rule 12(b)(6) if the plaintiff fails to plead sufficient grounds to entitle him or her to relief.  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007).  Although well-pleaded factual allegations are taken as true and construed in the light most favorable to plaintiff, *Desaigoudar* v. *Meyercord*, 223 F.3d 1020, 1021 (9th Cir. 2000), legal conclusions need not be taken as true "merely because they are cast in the form of factual allegations." *W. Mining Council* v. *Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  "Conclusory allegations and unreasonable inferences . . . are insufficient to defeat a motion to dismiss."  *Sanders* v. *Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  Securities fraud claims also must meet the heightened pleading requirements of Rule 9(b), which requires that a complaint allege the circumstances constituting fraud "*with particularity*" (emphasis added).  The PSLRA also requires a plaintiff to specify each statement alleged to have been misleading and the reasons why, and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2)(A).

## I.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead (i) a material misrepresentation or omission of fact, (ii) made with scienter, (iii) on which plaintiff relied, and that (iv) proximately caused plaintiff's economic loss in connection with the purchase or sale of securities. *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).  Plaintiff fails to plead facts sufficient to make out these elements, thus requiring dismissal of the Complaint.

A.    **Plaintiff Fails to Plead an Omission Based on a Duty to Disclose the CPI Issue.**

As an initial matter, Plaintiff fails to plead an actionable omission based on Wells Fargo's decision to complete its investigation before disclosing the CPI issue because Plaintiff has failed to identify any duty to disclose.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17.  "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 45 (2011).  There also is no freestanding duty under U.S. law "to disclose uncharged, unadjudicated wrongdoing." *In re Teledyne*, 849 F. Supp. at 1382 (quoting *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992)); *see also City of Pontiac*, 752 F.3d at 184 ("[d]isclosure is not a rite of confession" (alteration in original) (internal quotation marks omitted)); *John Doe Co. No. 1* v. *CFPB*, 195 F. Supp. 3d 9, 19 (D.D.C. 2016) ("[N]othing in the securities laws — standing alone — requires affirmative disclosure of an inchoate government investigation." (emphasis omitted)).  Rather, "[c]ourts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have required a connection between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line." *Menkes* v. *Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005) (compiling cases).  Here, as set forth below, Plaintiff has not come close to pleading any such facts.

Plaintiff similarly fails to plead an actionable omission based on its allegation that Wells Fargo failed to disclose liabilities and litigation accruals for CPI.  (Compl. ¶¶ 11, 150, 152, 172.)  Wells Fargo had no legal duty to disclose uncertain risks or predict future litigation risks — especially as to uncharged, unadjudicated wrongdoing.  *See*, *e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (defendant "was not required to make disclosures predicting . . . litigation"), *aff'd sub nom. Albert Fadem Tr.* v. *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); *In re Teledyne*, 849 F. Supp. at 1382 ("Directors and officers simply need not confess guilt to involvement in criminal conduct and breaches of fiduciary duties of care when such charges have not yet been brought, let alone proven." (citing *Ciresi*, 782 F. Supp. at 823 for proposition that "the law does not impose a duty to disclose

SULLIVAN
&
CROMWELL LLP

uncharged, unadjudicated wrongdoing or mismanagement")).  Moreover, Plaintiff's assertion that "Defendants knew, but failed to disclose, that significant penalties would be levied" (Compl. ¶ 150) is entirely conclusory.  As Plaintiff acknowledges, the CFPB and OCC did not fine Wells Fargo in connection with CPI until April 20, 2018 — nearly *nine months after* the public disclosure of the CPI issue on July 27, 2017.  (*Id.*)

Absent an affirmative duty to disclose, which Plaintiff has failed to plead, an omission is actionable only if the statement "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody* v. *Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A plaintiff "must specify the reason or reasons why the statements made . . . were misleading or untrue, not simply why the statements were incomplete."  *See id.* (Rule 10b-5 prohibits "*only* misleading and untrue statements, not statements that are incomplete." (emphasis in original)).  As set forth in greater detail below, however, Plaintiff has failed to plead that any affirmative statement made by Defendants was rendered either misleading or untrue as a result of Wells Fargo waiting to disclose the CPI issue until after its review and remediation determinations had been completed.

### B.  Plaintiff Fails to Plead an Actionable Misrepresentation.

To plead falsity, a plaintiff must "'specify each statement alleged to have been misleading' and provide 'the reason or reasons why the statement is misleading.'"  *Glazer*, 549 F.3d at 742 (quoting 15 U.S.C. § 78u-4(b)(1)).  This requirement "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful."  *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

As an initial matter, Plaintiff pleads the alleged false or misleading statements that supposedly underlie its claims by excerpting lengthy sections of conference call transcripts, written Senate testimony, press releases, and Wells Fargo SEC filings and then highlighting certain short phrases and sentences in bold and italics.  (*See* Compl. ¶¶ 44-154.)  Plaintiff does not, however, plead the requisite "*specific facts* indicating why those statements were false."  *Metzler*, 540 F.3d at 1070 (emphasis added).  Instead, Plaintiff merely repeats identical, copy-pasted, and conclusory language that does not come close to identifying any "specific facts" that show that the bolded and italicized excerpts

1    quoted in the Complaint were either false or misleading.  (*See*, *e.g.*, Compl. ¶¶ 52, 60, 66, 73, 77, 86, 92,

2    104, 110, 117, 122, 127, 134, 146, 153 (repeating verbatim six identical paragraphs).)

3                      For example, in Paragraph 51 of the Complaint, Plaintiff selectively quotes from Mack's

4    remarks at a banking conference on November 3, 2016, parts of which are further bolded and italicized:

5    "We eliminated product sales goals, as you all well know, in retail banking as of October 1 to make sure

6    that ***nothing gets in the way of doing what is right for our customers***" and "***the vast majority of our***

7    ***team members did the right thing and still do the right thing every day on behalf of customers***."

8    (Compl. ¶ 51.)  Plaintiff, however, nowhere pleads any specific facts to show how these statements

9    about the sales practices issues — *not* the CPI issue — were false or misleading.  Rather, Plaintiff

10   regurgitates the same conclusory set of allegations that are copy-pasted throughout the Complaint:  that

11   "[t]he Company had engaged in illegal auto insurance practices for at least a decade, including the

12   forced-placement of automobile insurance policies on at least 800,000 borrowers despite those

13   borrowers having the required insurance"; and that "[t]hese practices occurred within the Company's

14   Community Banking Division, the same division where the recently disclosed fake account scandal had

15   occurred, and similarly involved secretly harming customers by charging them for products the

16   customers did not need or want."  (*Id*. ¶ 52.)  These rote and conclusory allegations, however, do not

17   come close to the required "*particularized explanation* stating *why* the defendant's alleged statements or

18   omissions are deceitful."  *Metzler*, 540 F.3d at 1061 (emphasis added).  Even if these conclusory

19   allegations were accepted as particularized facts, they in no way explain how statements such as "[w]e

20   eliminated product sales goals" and "the vast majority of our team members did the right thing" were

21   false or misleading.  Plaintiff's failure to adequately plead falsity as to any of the alleged misstatements

22   in the Complaint is sufficient to warrant dismissal.

23                      Plaintiff also fails to plead materiality.  A misstatement or omission is material only if a

24   reasonable investor would deem it significant in light of the "total mix" of available information.  *Basic*,

25   485 U.S. at 232.  In particular, the Ninth Circuit has held that general, "feel good monikers," the type of

26   "vague statements of optimism" made by all public companies, constitute "non-actionable puffing."  *In*

27   *re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  "Professional investors, and most amateur

28   investors as well, know how to devalue the optimism of corporate executives . . . ."  *In re VeriFone Sec.*

SULLIVAN
&
CROMWELL LLP

*Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).  These types of vague, optimistic statements comprise the vast majority of Plaintiff's alleged misstatements.

            ***Statements Regarding Sales Practices Issues.***  The majority of the supposedly false or misleading statements in the Complaint are optimistic statements that Defendants made about Wells Fargo's investigation and remediation of the well-publicized sales practices issues that had been the subject of extensive public scrutiny and litigation long before the disclosure of the CPI issue in July 2017.  "Sales practices" means the intentional misconduct by Wells Fargo employees at its retail bank branches who "secretly" opened "fake" banking, checking, and credit card accounts for customers without authorization.  (Compl. ¶¶ 36, 37.)  As the CFPB explained, sales practices misconduct specifically refers to "Wells Fargo employees *secretly open[ing] unauthorized accounts to hit sales targets and receive bonuses*."  (*Id*. ¶ 37 (emphasis added).)  This misconduct was the subject of settlements with the CFPB and the OCC announced on September 8, 2016.  (*Id*.)  On September 13, 2016, "Wells Fargo announced it would eliminate the product sales goals that, along with a high-pressure culture, led to the years of unauthorized account openings."  (*Id*. ¶ 40.)  On September 27, 2016 Wells Fargo publicly undertook to investigate "the Company's retail banking sales practices and related matters*,*" including the sales incentives and goals that had led to the intentional misconduct by retail bank branch employees.  (*Id*. ¶ 41.)

            It is abundantly clear from these facts that the sales practices issues referenced throughout the Complaint have nothing to do with the CPI issue that actually underlies Plaintiff's claims.  Plaintiff, in fact, quotes an analyst report issued the day after the CPI issue was publicly disclosed that confirmed that the CPI issue is "*not related to the sales practice issues*."  (Compl. ¶ 159.)  Unlike sales practices, the CPI issue does not involve retail bank employees; "product sales goals"; "sales incentives"; "high-pressure culture"; "unauthorized account openings"; nor, indeed, *any intentional misconduct whatsoever*.  Nor does the CPI issue involve "secret" or "unauthorized" accounts.[2]  Rather, as the documents cited in the Complaint demonstrate, the CPI issue relates solely to

---

[2]     As the CFPB explained, "when [Wells Fargo's] borrowers obtained an auto-secured loan, the borrower signed an agreement that required the borrower to maintain insurance that would cover physical damage to the vehicle" and "[i]f a borrower did not procure or maintain physical-damage insurance for the vehicle, [Wells Fargo] could protect its interest in the collateral by acquiring [CPI] on

1    deficiencies in Wells Fargo's monitoring and internal processes for its third-party insurance vendors that

2    resulted in *inadvertent* and *mistaken* placement of CPI on certain auto loan customers.  As the CFPB

3    explained, Wells Fargo "did not sufficiently monitor its vendor and internal processes, resulting in

4    control and execution weaknesses, such as within the insurance-verification and cancellation processes

5    and the protocols for processing refunds." (Compl. ¶ 181, CFPB Consent Order, Cullen Decl. Ex. A

6    ¶ 30.)  Though unquestionably a serious matter, this deficiency did not implicate or involve any of the

7    sales practices that were the focus for both Wells Fargo and the public during the class period.  Nor is it

8    even a "sales practice" in a broader sense; rather, the placement of CPI was part of processes to protect

9    the collateral backing loans, which, if carried out properly, would not have resulted in CPI being placed

10   if the borrower had other insurance.[3]

11           This distinction has not stopped Plaintiff from using Defendants' public statements about

12   the sales practices issues to try to plead a fraud claim based on CPI.  The vast bulk of the purportedly

13   false statements in the Complaint involve the many instances where Defendants expressed optimism

14   about the progress that Wells Fargo had made in identifying and resolving its sales practices issues in

15   the ongoing Board investigation into "the Company's *retail banking sales practices and related*

16   *matters*" that Wells Fargo announced on September 27, 2016.  (Compl. ¶ 41 (emphasis added).)  For

17   example, Plaintiff identifies the following statements about Wells Fargo's sales practices investigation

18   and remediation as somehow being allegedly false or misleading in light of the undisclosed CPI issue:

19   - Sloan's statement at a banking conference on November 3, 2016:  "We are going to engage a
20     separate firm to look at *sales practices* across the rest of the Company. We are going to leave
      no stone unturned.  I am not aware of any issues . . . ."  (Compl. ¶ 47 (emphasis altered).)

21   - Portions of Sloan's written response to questions from the Senate Banking Committee on
22     November 18, 2016:  (i) in response to the question "are you confident that *this type of
      fraudulent activity* does not exist in other Wells business lines," Sloan wrote that "We
23     believe that the activity at issue here was limited to certain team members within the
      Community Banking Division;" and (ii) in response to questions about the number of retail
      banking employees who had been reported to law enforcement in connection with the *sales
24     practices issues*, Sloan wrote that Wells Fargo "has policies, procedures, and internal

─────────────────────────────

25   the borrower's behalf and charging the borrower for the insurance premium paid."  (CFPB Consent
     Order, Cullen Decl. Ex. A ¶ 27.)
26   [3]     The same holds true for the purported GAP issue. Plaintiff nowhere alleges in the Complaint that
     the GAP issue had anything to do with the sales practices issues; that it had anything to do with sales
27   incentives or goals; or that it was the result of intentional conduct, rather than inadvertent error or
     mistake.  Plaintiff, in fact, pleads no details whatsoever regarding the alleged failure to return GAP
28   premiums.  (*See* Compl. ¶¶ 27, 32-33, 175.)

SULLIVAN
&
CROMWELL LLP

controls that are reasonably designed to comply with its legal obligations to monitor, detect, and report suspicious activities." (*Id.* ¶¶ 57-58 (emphasis altered).)

- Sloan's statement at a banking conference on December 6, 2016: "[W]e are going to look at *sales practices* in every business of this Company. Even though I am not aware of any issues, but I don't want there ever to be a concern *about sales practices* in Wells Fargo." (*Id.* ¶ 62 (emphasis altered).)

- Sloan's statement during an earnings call on January 13, 2017: "[W]e have brought in a separate consultant to look at *sales practice* across other businesses within the Company. . . . And if we find something that's important, we'll communicate that." (*Id.* ¶ 72 (emphasis altered).)

- A "*Retail Banking Customer Activity* Report Call" held on March 20, 2017, during which Shrewsberry (i) responded to an analyst's question concerning another bank's announcement of an "investigation into their *sales practices*" by stating: "Our regulatory interactions . . . [are] very comprehensive and because of all that we're doing with them, it's hard to imagine them expanding it even further; it's very transparent;" and (ii) responded to an analyst's request for "an update on the board investigation" (of sales practices) by stating: "You should take a peek at this document that's on the Web Site that describes everything to date. In that document [the Board] make[s] it clear that as they've come across things in their investigation that they've acted on it at that time. So I don't think there's any pent up activity that hasn't been acted upon yet." (*Id.* ¶¶ 90-91 (emphasis altered); Transcript, March 20, 2017, Cullen Decl. Ex. C, at 3.)

- Sanger's statement in a press release issued on April 10, 2017, which announced the results of the Board's investigation into *sales practices*: "This exhaustive investigation identified serious issues related to Wells Fargo's decentralized structure and the *sales culture of the Community Bank*, all of which the Board and management have been working diligently to rectify." (*Id.* ¶ 94 (emphasis altered).)

- Sloan's statement during an analyst conference call on April 10, 2017, which was held in connection with the release of the Board's report on its investigation into the *sales practices* issues: with the termination of several employees involved in the *sales practices misconduct*, "[t]here is not another large shoe to drop." (*Id.* ¶ 98 (alteration in original).)

- Sloan's statement during Wells Fargo's annual shareholder meeting on April 25, 2017: "Since we announced our initial legal regulatory settlements on September 8 of last year, we've taken decisive actions to fix the problems that led to *improper sales practices* . . . ." (*Id.* ¶ 109 (emphasis altered).)

- Sloan's response to an analyst's question concerning "the sales practices issue" about whether "there [is] anything major that's still outstanding at this point?" during a July 14, 2017 earnings call: "[T]here is nothing really new that's different in the 10-Q as it relates to other legal matters *for sales practices*." (*Id.* ¶ 126 (emphasis altered).)

All of these statements unambiguously refer to Wells Fargo's ongoing investigation and remediation efforts concerning *sales practices*. This is fatal to Plaintiff's attempt to plead falsity here. Plaintiff does not — and cannot — allege that any of these statements about sales practices were inaccurate or that Wells Fargo identified any sales practices issues that it failed to disclose. Plaintiff cannot twist these

SULLIVAN
&
CROMWELL LLP

statements about sales practices into purported denials of other possible issues at Wells Fargo, including CPI.[4]

It is well settled that a statement discussing one internal issue is not misleading merely because it fails to disclose another, different issue. *See Rok* v. *Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham* v. *Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) (granting motion to dismiss where plaintiff alleged that company made misrepresentations by disclosing a weakness in internal financial controls without disclosing internal control failures over expense reimbursements); *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147–48 (S.D. Cal. 2018) (statement that there was "nothing ongoing" in an OCC investigation was not false or misleading merely because there was also an active undisclosed SEC investigation). Plaintiff cannot plead fraud merely by pointing to the fact that Wells Fargo did not disclose the CPI issue at the same time it was discussing the sales practices issues. The contrary assertion would mean that a company could never discuss one potential issue unless every other possible issue was also disclosed. That is not the law. *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *6 (S.D.N.Y. June 28, 2017), *aff'd sub nom.*, *Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (in the wake of scandal, comments about what company has done to improve internal controls were not misleading because such statements may be true despite there being another, yet undisclosed scandal). In short, Plaintiff has failed to show that any statements about the status and progress of the *sales practices* investigation and remediation were false or misleading by virtue of not also disclosing the CPI issue.

***Statements Regarding Transparency and Regaining Customers' Trust.*** The second category of statements that Plaintiff contends are false or misleading concern Wells Fargo's efforts at greater transparency and regaining customers' trust. Plaintiff claims the following statements were false or misleading because Wells Fargo had not disclosed its then-ongoing investigation into the CPI issue:

---

[4]     Plaintiff's attempt to blur and confuse the distinction between the sales practices issues and the unrelated CPI issue is also refuted by Wells Fargo's disclosure of the CPI issue in its Form 10-Q on August 4, 2017. (Compl. ¶¶ 129, 145.) When the CPI issue was described in the Form 10-Q, it was not included in the "Sales Practices Matters" disclosure section but rather in a completely different section concerning "Auto Lending Matters." (*Id.* ¶¶ 129, 171.)

SULLIVAN
&
CROMWELL LLP

- Sloan's statement at a banking conference on November 3, 2016: "I am fully committed . . . to fixing these issues and taking the necessary steps to restore our customers' trust." (Compl. ¶ 46, 50.) (emphasis omitted)

- Sloan's statement during an earnings call on January 13, 2017: "It's been only four months since we signed the sales practices consent orders but we've already made progress in restoring customers' . . . trust, and we've remained committed to being transparent with investors." (*Id.* ¶ 70, 71.) (emphasis omitted)

- Shrewsberry's statement during a "*Retail Banking Customer Activity* Report Call" held on February 17, 2017: "we are very committed to maintaining transparency." And Mack's statement during that same call:  Wells Fargo is making "progress . . . in rebuilding trust with our customers." (*Id.* ¶ 76.)

- Wells Fargo's 2017 Proxy Statement — where Sanger and Sloan state that "Restoring your trust and the trust of all key stakeholders is our top priority and, while we have more work to do, we firmly believe we are on the right path." (*Id.* ¶ 83.)

These statements cannot form the basis of a securities fraud claim because they are "so vague or amorphous that no reasonable investor could rely on them," *South Ferry LP No. 2* v. *Killinger*, 399 F. Supp. 2d 1121, 1129, (W.D. Wash. 2005) (internal quotation marks and citation omitted) *rev'd on other grounds*, 542 F.3d 776 (9th Cir. 2008), and amount to non-actionable corporate puffery, *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005).  Courts routinely hold that statements concerning a company's commitment to "transparency" and building "trust" are not actionable as a matter of law.  *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co*., 845 F.3d 1268, 1276 (9th Cir. 2017) (statements that "[w]e want to be a company known for its ethical leadership" and exhorting company's commitment "to build trust in everything we do by living our values and conducting business consistent with the high ethical standards within our [Standards of Business Conduct]" are non-actionable puffery even though CEO resigned due to sexual harassment allegations against him); *id.* at 1278 ("[P]romotion of ethical conduct at [company] did not reasonably suggest that there would be no violations of the [code of conduct] by the CEO or anyone else."); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (statements that a code of practices and procedures "underscores our own dedication towards transparent . . . decision-making process" are non-actionable puffery); *Irving Firemen's Relief & Ret. Fund* v. *Uber Techs*., No. 17-CV-05558-HSG, 2018 WL 4181954, at *8 (N.D. Cal. Aug. 31, 2018) (CEO's statements calling company "honest and authentic" and "trustworthy" were non-actionable); *Markman* v. *Whole Foods Mkt., Inc*., No. 1:15-CV-681-LY, 2016 WL 10567194, at *6 (W.D. Tex.

Aug. 19, 2016) (CEO's statements that company was "continuing to raise the bar even higher on our standards of transparency" are "little more than corporate cheerleading" and "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important" despite complaint alleging that company was engaged in a "pervasive" practice of mislabeling and mispricing prepackaged foods (internal quotation marks and citations omitted); *Lopez* v. *CTPartners Exec. Search Inc*., 173 F. Supp. 3d 12, 26, 28 (S.D.N.Y. 2016) (press release touting a "renewed commitment to accountability and transparency in the marketplace" is non-actionable puffery).

Even if these puffery statements were somehow actionable (they are not), Plaintiff fails to show that they were false. None of Plaintiff's allegations remotely suggest that Wells Fargo was not committed to greater transparency and rebuilding trust. Plaintiff's sole basis for suggesting falsity is its unfounded contention that Wells Fargo could not be committed to transparency and rebuilding trust unless it disclosed its ongoing investigation into the CPI issue sooner than it did. But "a plaintiff does not satisfy the falsity requirement by merely asserting that a company's later revelation of bad news means that earlier, cheerier statements must have been false." *Glen Holly Entm't, Inc*. v. *Tektronix, Inc*., 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999) (internal quotation marks omitted). Plaintiff's quarrel with the timing of Wells Fargo's disclosure does not suffice to state a claim for fraud — especially in light of Plaintiff's acknowledgment that Wells Fargo always intended to disclose the CPI issue publicly once the bank's investigation was complete. (Compl. ¶¶ 8, 163 (quoting Wells Fargo's Senior Vice President of Consumer Lending's public statement, in a July 28, 2017 press release, that Wells Fargo "knew there was going to be a day where we were talking about this in the public domain.").)

Moreover, many of these statements are opinions as to which Plaintiff faces a heightened pleading burden that it has not met. Opinions are actionable only if a plaintiff pleads facts showing that the speaker did not believe the statement when made, was "aware of undisclosed facts tending seriously to undermine the statement's accuracy," or omitted material facts the omission of which makes the statement misleading "to a reasonable person reading it fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys*. v. *Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (internal quotation marks and citation omitted). Plaintiff has not pled any such facts for several

opinion statements. For example, Sloan's statement that "I think given our desire to be very transparent, we'll probably err on the side of overcommunicating as opposed to undercommunicating" (Compl. ¶ 44) — in addition to being non-actionable puffery — is a clear statement of opinion ("I think . . . probably" we will "err on the side of").[5]  Plaintiff's allegations do not show either that Sloan did not believe his opinion or that the omission of the CPI issue made this opinion misleading when the statement was read fairly and in context. *See Align Tech.*, 856 F.3d at 616 ("[L]iability is not necessarily established by demonstrating that 'an issuer knows, but fails to disclose, some fact cutting the other way,' because '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts.'" (quoting *Omnicare, Inc.* v. *Laborers Dist Council Construction Industry.. Pension Fund*, 135 S.Ct. 1318, 1329 (2015))).

**Reporting on Disclosure Controls and Litigation Risks and Cost Accruals.**  Plaintiff also fails to allege actionable misstatements in Wells Fargo's Forms 10-K and 10-Q during the class period regarding the Company's disclosure controls or litigation risks. *First*, Plaintiff points to the statements in the Sarbanes-Oxley certifications attached to the Forms 10-Q and 10-K in 2016 and 2017 and signed by Sloan and Shrewsberry, that "[t]he Company's management evaluated the effectiveness . . . of the Company's disclosure controls and procedures" and that "[b]ased on this evaluation . . . concluded that the Company's disclosure controls and procedures were effective." (Compl. ¶¶ 130, 136, 148.)  These statements expressly refer to the "disclosure controls and procedures" that are defined at 17 C.F.R. §§ 240.13a-15(e) and 240.15d-15(e). (*See* Sarbanes Oxley Certifications, dated November 3, 2016, Cullen Decl. Ex. D, at 1-2 (defining "disclosure controls and procedures" as "defined in Exchange Act Rules 13a-15(e) and 15d-15(e)").)  These Exchange Act rules, in turn, define "disclosure controls and procedures" as "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act . . . is recorded, processed, summarized and reported, within the time periods specified in the

---

[5]      Other clear examples of opinion statements include Sloan and Sanger's statement that "[r]estoring your trust and the trust of all key stakeholders is our top priority and, while we have more work to do, *we firmly believe we are on the right path*" (*id*. ¶ 83) (emphasis added); Shrewsberry's statement that "*I don't think* there's any pent up activity that hasn't been acted upon yet" (*id*. ¶ 91) (emphasis added); and Sloan's statement that "*I firmly believe* that we're on the right path and will continue to be as transparent with you as we can as we move forward" (*id*. ¶ 114) (emphasis added and original emphasis omitted).

Commission's rules and forms."  17 C.F.R. §§ 240.13a-15(e) and 240.15d-15(e).  Plaintiff cannot plead fraud simply by misconstruing statements about Wells Fargo's disclosure controls and procedures to somehow refer to the unrelated "external vendor processes and internal controls" that Wells Fargo put in place for its CPI program (Compl. ¶¶10, 156, 171) or the Company's "internal controls to prevent the illegal auto insurance practices" (*id.* ¶ 73(e)).  *Cf. Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (statements that "minimum control requirements had been established" at a bank were not actionable because they did not indicate anything false or misleading about specific controls at issue).  Notably, Plaintiff nowhere alleges that the CPI issue was not immediately reported to Sloan and passed on to regulators as soon as it was discovered — which is the only fact that would be relevant to the adequacy of the Company's "disclosure controls and procedures" identified in the Forms 10-K and 10-Q and in Sloan and Shrewsberry's Sarbanes-Oxley certifications.  Plaintiff, in fact, repeatedly alleges exactly the opposite. (*See, e.g.*, Compl. ¶ 8 ("Wells Fargo's former Senior Vice President of Consumer Lending . . . has likewise admitted the Company knew of the practices in July 2016 and quickly escalated them to senior management and the Company's Board of Directors."); *id.* ¶ 52(d) ("By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve.").)

Plaintiff also repeatedly suggests that Wells Fargo's statements in its Forms 10-K and 10-Q concerning the "Sales Practices Matters" (*id.* ¶¶ 131, 132, 133, 139, 143, 151) were false or misleading because they did not mention the CPI issue.  For the reason set forth above, however, Plaintiff's attempt to conflate the sales practices issues with the CPI issue is a non-starter.

Plaintiff's omission claims are premised entirely on the improper attempt to confuse and conflate the sales practices issues — which concern the intentional sales practices misconduct by Wells Fargo retail bank branch employees resulting from a broken sales culture and ill-conceived incentives — with the unrelated CPI issue, which was the result of inadvertent error and deficiencies in internal processes for checking insurance coverage.  Plaintiff has not explained how any of the statements about the "Sales Practices Matters" implicate in any way the unrelated CPI issue, such that there was a duty to disclose the latter.  (Compl. ¶¶ 112, 131, 139 (quoting sections of Wells Fargo's Forms 10-K and 10-Q

SULLIVAN
&
CROMWELL LLP

1  discussing "Sales Practices Matters").)

2  Plaintiff also claims that various other statements in Wells Fargo's financial reports,

3  which have nothing to do with CPI, are false or misleading because of the non-disclosure of the ongoing

4  CPI investigation and remediation efforts.  In particular, Plaintiff cites (i) Wells Fargo's forward-looking

5  statements disclosures, in which Wells Fargo stated that the risks that could affect its forward-looking

6  statements included "reputational damage from negative publicity, protests, fines, penalties and other

7  negative consequences from regulatory violations and legal actions" (*id.* ¶¶ 132, 141, 149); (ii) Wells

8  Fargo's risk factor disclosures concerning "Risks Related to Sales Practices" (*id.* ¶¶ 132, 142, 150); and

9  (iii) Wells Fargo's definition of "[o]perational risk:"  "the risk resulting from inadequate or failed

10  internal controls and processes, people and systems, or resulting from external events" (*id.* ¶¶ 132, 140,

11  149).

12  Plaintiff asserts that all of these statements are false or misleading — despite being

13  disclosures or definitions that do not refer to CPI, do not deny the existence of a CPI issue, and in

14  general have nothing to do with CPI.  The Complaint, in fact, makes no serious effort to explain what

15  about these statements could possibly be false or misleading.  For example, Plaintiff repeatedly quotes

16  the definition of "[o]perational risk" in Wells Fargo's Forms 10-K and 10-Q as "the risk of loss resulting

17  from inadequate or failed internal controls and processes" (*id.* ¶¶ 132, 140, 149), but nowhere

18  "provide[s] 'the reason or reasons why the statement is misleading.'"  *Glazer*, 549 F.3d at 742 (quoting

19  15 U.S.C. § 78u-4(b)(1)).  Such vague and inscrutable pleading of falsity does not come close to

20  meeting Plaintiff's burden.  In short, Plaintiff has failed adequately to plead the reasons why Wells

21  Fargo's forward-looking statements disclosures, risk factor disclosures, and definition of "operational

22  risk" in its Forms 10-K and 10-Q are rendered false or misleading by omitting to disclose the unrelated

23  CPI issue.

24  **C.    Plaintiff Fails to Plead Scienter Adequately.**

25  Even plaintiffs who succeed in pleading material misstatements or omissions "face

26  formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P.

27  12(b)(6)."  *Metzler*, 540 F.3d at 1055.  Under the PSLRA, a plaintiff must allege particularized facts

28  giving rise to a "strong inference" that the defendant acted with scienter, *i.e.*, made a false or misleading

1   statement "either intentionally or with deliberate recklessness." *Zucco Partners, LLC* v. *Digimarc*

2   *Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotation marks and citation omitted).  A "strong

3   inference" is not "a mere speculative inference . . . or even a reasonable inference."  *In re Silicon*

4   *Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), as amended (Aug. 4, 1999), abrogated on

5   other grounds by *South Ferry* 542 F.3d at 784.  When evaluating a complaint, a court "must consider

6   plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the

7   plaintiff. . . .  A complaint will survive . . .  only if a reasonable person would deem the inference of

8   scienter cogent and at least as compelling as any opposing inference one could draw from the facts

9   alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007).  "[A]lthough facts

10  showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some

11  reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate

12  recklessness." *Digimarc Corp.*, 552 F.3d at 991 (internal quotation marks and citation omitted).

13  Plaintiff has not met its burden as to any Defendant.

14          As an initial matter, Plaintiff fails to plead scienter for the simple reason that the CPI

15  issue and internal review could not render any of the alleged misstatements — about the status and

16  progress of resolving the sales practices issues, the Company's commitment to transparency and

17  restoring trust, and the adequacy of the Company's financial reporting controls and litigation cost

18  accruals — false or misleading.  Plaintiff's sole basis for claiming falsity is its own unsupported

19  assertion that the CPI issue should have been disclosed prematurely, before Wells Fargo had completed

20  its investigation, and that the non-disclosure renders statements about wholly different issues false.

21  Since that is emphatically not the case when the challenged statements are read in context (as explained

22  above), no amount of CPI knowledge can demonstrate intent to defraud.  The "plausible, nonculpable

23  explanation[]" for Defendants' "nondisclosure" — *i.e.*, that the Defendants *reasonably and justifiably*

24  believed that their statements about sales practices were true and accurate notwithstanding any

25  knowledge they may have had about the ongoing investigation of CPI — is far more cogent and

26  compelling than Plaintiff's theory of scienter.  *See Tellabs,* 551 U.S. at 324.  Even aside from this

27  deficiency, however, Plaintiff's scienter allegations fall short of what is required under the PSLRA.

28          The sum of Plaintiff's scienter allegations are that:

SULLIVAN
&
CROMWELL LLP

- "[B]y July 2016, [Wells Fargo] had commissioned the global consulting firm Oliver Wyman to conduct an internal investigation, which resulted in the issuance of a 60-page report 'prepared for the bank's executives'" which "concluded that '[m]ore than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need'" and that this "'pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions." (Compl. ¶ 28.) (emphasis omitted

- "The Company's illicit insurance practices were documented in a 60-page report delivered to Wells Fargo's most senior executives by September 2016." (*Id*. ¶ 4.)

- Wells Fargo's former Senior Vice President of Consumer Lending "admitted the Company knew of the [CPI issue] in July 2016 and quickly escalated [it] to senior management and the [Board]" and stated that "[w]e knew there was going to be a day where we were talking about this in the public domain." (*Id*. ¶¶ 8, 163.)

- Sloan testified before the Senate Banking Committee that "the issue was escalated to me in 2016, in late August, early September, I talked to our team about it, and we decided at that point in time to end and tell our vendor to quit providing that insurance to our customers. . . . We then created an internal group made up of business line experts, legal experts, our auditing function to look at the matter. We brought in an independent law firm and an independent consulting firm to help us do a comprehensive and third-party review of the remediation." (*Id*. ¶¶ 15, 179, 180.)

- "By September 2016, the Company's illegal auto insurance practices had been escalated to senior management, the Wells Fargo Board of Directors, and the Company's regulators – the OCC, the CFPB and the Federal Reserve." (*Id*. ¶ 52(d).)

- "On January 10, 2017, Wells Fargo announced that Dawn Martin Harp would retire effective April 1 as head of Dealer Services, which she oversaw while the auto insurance scandal was being perpetrated. Bill Katafias, Executive Vice President of Dealer Services would also leave in April." (*Id*. ¶¶ 69.)

- "[O]n August 15, 2017 . . . the Company announced that Sanger would resign his position as a director and Chairman of the Board . . ." (*Id*. ¶ 177.)

***Shrewsberry and Mack.*** Plaintiff fails to plead any facts in the above allegations, much less with particularity, that either Shrewsberry or Mack knowingly made false or misleading statements. For example, among the many necessary facts that appear nowhere in the Complaint, Plaintiff fails to allege that Shrewsberry or Mack ever received or reviewed the Wyman Report, or when they did so. Although Plaintiff alleges that "senior executives" received the report, Plaintiff nowhere alleges that Shrewsberry and Mack did so. Courts in this Circuit have repeatedly rejected attempts to impute scienter to officers because they "must have known" of certain facts by virtue of their positions. In *South Ferry*, the Ninth Circuit confirmed that a complaint with "allegations that management had an important role in the company but [that] does not contain additional detailed allegations about the defendants' actual exposure to information . . . will usually fall short of the PSLRA standard." 542 F.3d

at 784.  Moreover, a plaintiff must allege specific facts beyond the mere existence of and access to internal reports that might contradict public information.  *Silicon Graphics*, 183 F.3d at 984-85; *see also In re Apple Computer*, *Inc. Sec. Litig.,* 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) ("Mere access to data is insufficient to support a securities claim under the PSLRA." (internal citation omitted)).  Here, Plaintiff has not alleged what Shrewsberry and Mack knew about the scope of the CPI issue, the reliability of the preliminary results or the Wyman Report (if they saw it), or the status of Wells Fargo's ongoing investigation and remediation efforts.  Thus, even if Plaintiff could plead that Shrewsberry and Mack made any material false or misleading statement during the class period — and, to be clear, Plaintiff has failed to do so for the reasons set forth above — Plaintiff *still* fails to allege that Shrewsberry and Mack knew, or were deliberately reckless in not knowing, that their optimistic statements about "rebuilding trust" and "being transparent" were false or misleading.  (Compl. ¶¶ 42, 44, 49, 53, 56, 65, 76, 115, 121.)  Plaintiff similarly fails to plead that Shrewsberry or Mack knew their statements were false, or were deliberately reckless as to their truth, in describing the progress of, and public disclosures concerning, the unrelated *sales practices* matter (*id*. ¶¶ 51, 89, 90, 91), as well as Shrewsberry's certifications regarding the effectiveness of Wells Fargo's financial reporting controls (*id*. ¶¶ 130, 136, 148).[6]  *See In re Hansen Nat. Corp. Sec. Litig*., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("[A]llegations that Defendants had deficient internal controls . . . does [sic] not create a strong inference that Defendants knowingly [made] false or misleading statements.") (citation omitted).

   *Sanger.*  Plaintiff's allegations with respect to Sanger fare no better, as set forth in more detail in Sanger's Motion to Dismiss.  Although Plaintiff alleges that the CPI issue was "escalated" to the Board by September 2016 (*e.g.*, Compl. ¶¶ 8, 52(d)), Plaintiff again fails to plead with particularity *what* information Sanger was told about the scope of the CPI issue and its potential remediation.  Similarly, Plaintiff's allegation that Sanger retired on August 15, 2017, two weeks after the public announcement of the CPI issue on July 27, 2017, does not without more support Plaintiff's allegation of

---

[6]   Plaintiff also may not plead scienter on the basis of Wells Fargo's after-the-fact acceptance of "full responsibility for our failure to appropriately manage the CPI program."  (Compl. ¶ 156.)  *See Ronconi* v. *Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) ("[F]raud by hindsight is not actionable.") (alteration in original) (citation omitted).  Similarly, Plaintiff's lengthy citations to news articles and analyst reports after the announcement of the CPI issue add nothing to Plaintiffs' scienter allegations.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2014) ("[A]rticles [by outside observers] . . . were written in hindsight  and do not reflect" management's knowledge at the time).

scienter. *See Cornerstone Propane*, 355 F. Supp. 2d at 1092-93 (allegations of "notable departures," whether terminations or resignations, were not evidence of scienter because there was "no evidence that defendants' termination was based on fraud"). Plaintiff does not allege anywhere in the Complaint that Sanger's retirement was related to any culpability or knowledge concerning CPI. Accordingly, Plaintiff has not met its burden to plead a "cogent inference" of scienter with respect to Sanger's statements regarding, *inter alia*, the importance of restoring "trust" (*id*. ¶¶ 83, 97) and the efforts the Company had taken to resolve the unrelated *sales practices* issues (*id*. ¶¶ 94, 98).

    ***Sloan.*** For substantially the same reasons that Plaintiff fails to plead scienter as to the other Defendants, Plaintiff fails to plead scienter as to Sloan. Although Plaintiff alleges that Sloan received the Wyman Report and was subsequently involved in directing the follow-on investigation and remediation efforts, Plaintiff fails to plead any facts with particularity to establish a cogent and compelling inference that Sloan made any of the alleged misstatements in the Complaint with scienter. Even viewing Plaintiffs' scienter allegations "holistically" to assess whether they have pleaded sufficient facts to "raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations,'" *see South Ferry*, 542 F.3d at 784 (quoting *Tellabs*, 551 U.S. at 324), the "plausible, nonculpable explanations for the defendant's conduct" here are far more cogent and compelling with respect to Sloan than Plaintiff's theory of scienter. *See Tellabs,* 551 U.S. at 324. The plausible nonculpable explanation — *i.e.*, that Sloan and the other Defendants (i) understood, *correctly*, that CPI was not related to the sales practices issues and involved very different conduct and culpability; (ii) intended to disclose the Company's findings regarding CPI once the internal review finished; and (iii) believed that Wells Fargo's widespread efforts to resolve the sales practices issues and other corporate reforms unrelated to CPI were increasing transparency and helping to build customer trust — is far more cogent and compelling than Plaintiff's scienter theory.[7]

---

[7]  Plaintiff also has failed to plead a single fact regarding any Defendant's purported knowledge of the GAP issue — much less with the required particularity. The Complaint does not contain any allegations about when the GAP issue was discovered by Wells Fargo or when or what any Defendant knew about this issue during the class period, if anything. (*See*, *e.g.*, Compl. ¶ 169 (alleging that "defendants learned about the CPI issue no later than September 2016" but failing to allege whether or when any Defendant knew about the GAP issue, and alleging only that it was publicly disclosed in Wells Fargo's SEC filings on August 4, 2017).) Plaintiff alleges only that the GAP issue was publicly disclosed in Wells Fargo's 2017 Q2 Form 10-Q on August 4, 2017 (Compl. ¶ 11) — *after* the alleged misstatements were made.

**D.    Plaintiff Fails to Plead Loss Causation Adequately.**

Plaintiff's Section 10(b) claims also fail because it has not adequately pleaded loss causation.  "[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of [the] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."  *Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (internal quotation marks and citation omitted).  A plaintiff cannot plead loss causation "by showing that the market reacted to the purported 'impact' of the alleged fraud" — *i.e.*, the negative effects from resulting regulatory actions or public scrutiny — "rather than to the fraudulent acts themselves."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010).  "Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction."  *Id.*; *see also Metzler*, 540 F.3d at 1065 (rejecting allegation that stock drop was caused by defendant's disclosure of "systematic manipulation of student enrollment" in earnings press release, where the press release "contained a far more plausible reason for the resulting drop in [defendant's] stock price — the company failed to hit prior earnings estimates").

Plaintiff alleges that Wells Fargo's stock price fell on July 28, 2017 after the New York Times article about the CPI issue was published the previous evening, and again on August 4, 2017 when Wells Fargo issued its Form 10-Q for the second quarter of 2017 — which increased Wells Fargo's accruals for probable and estimable losses from legal actions to $3.3 billion (from $2.0 billion as of the end of the prior quarter (Wells Fargo 2017 Q1 Form 10-Q , Cullen Decl. Ex. E, at 121)) and disclosed "certain issues related to the unused portion of guaranteed auto protection [GAP] waiver or insurance agreements between the dealer and, by assignment, the lender, which may result in refunds to customers in certain states."  (Compl. ¶¶ 183-187; Cullen Decl. Ex. B at 124, 126.)  Plaintiff fails, however, to plead facts to show that these drops were caused by "revealing the truth" about any of Defendants' alleged misstatements — *e.g.*, by revealing that Wells Fargo was not, in fact, committed to increased transparency and rebuilding trust.[8]  Rather, at most, Plaintiff alleges that it was harmed by the

---

[8]    Plaintiff also has failed to plead facts to show that the increase in Wells Fargo's litigation-related accruals to $3.3 billion was related to the CPI issue, rather than to "the Company's existing mortgage

1   disclosure that new, previously unknown operational errors at Wells Fargo had caused economic harm

2   to customers and possibly invited additional regulatory scrutiny and penalties.  But that is not sufficient

3   to plead loss causation here.  *See Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) ("[T]he

4   ultimate issue is whether the defendant's misstatement, *as opposed to some other fact*, foreseeably

5   caused the plaintiff's loss.") (emphasis added).  Plaintiff, therefore, has failed to plead that it was

6   harmed by the disclosure of the "truth" concerning any of the purported misstatements alleged.

7   **II.      PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER**
8   **           SECTION 20(A).**

9           Plaintiff makes Section 20(a) control person claims against all of the individual

10  Defendants and Wells Fargo.  (Compl. ¶¶ 20-26, 213.)  To state a claim for control person liability under

11  Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Plaintiff must show "a primary violation of

12  federal securities laws."  *Digimarc Corp.*, 552 F.3d at 990. (citation omitted)  Having failed to allege

13  any primary violation of the securities laws under Section 10(b), Plaintiff also has failed to allege a

14  Section 20(a) violation.

15          Even if Plaintiff had pleaded a primary violation, it has failed to plead factual allegations

16  that Sloan, Shrewsberry, Sanger, or Mack exercised actual control over the Wells Fargo employees who

17  drafted or made any of the alleged false or misleading statements that they themselves did not make, as

18  required by Section 20(a) — much less with sufficient particularity as required under Rule 9(b).  *See*

19  *Howard* v. *Hui*, 2001 WL 1159780, at *4 (N.D. Cal. Sept. 24, 2001) (plaintiffs "must plead the

20  circumstances of the control relationship with sufficient particularity to satisfy rule 9(b)" (citations

21  omitted)).[9]  At best, Plaintiff alleges only that Sloan, Shrewsberry, Sanger, and Mack are purported

22  control persons based on their positions as Wells Fargo officers or board members.  But an officer or

---

23  related regulatory investigations" or other matters, as disclosed in Wells Fargo's Form 10-Q.  (Cullen
24  Decl. Ex. B at 126.)

25  [9]      Although some courts in this District have held that Rule 9(b) does not apply to pleading the
    circumstances of control under Section 20(a), *see*, *e.g.*, *Hefler* v. *Wells Fargo & Co. et. al.*, No. 16-CV-
26  05479-JST, 2018 WL 1070116, at *14 (N.D. Cal. Feb. 27, 2018) (applying Rule 8 pleading standard to
    Section 20(a) claims), the weight of authority supports applying the heightened standard.  *See, e.g.*, *In re*
27  *Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability. Litig.*, MDL No. 2672, 2017
    WL 66281, at *19 (N.D. Cal. Jan. 4, 2017) (applying Rule 9(b)'s heightened pleading standard to
28  Section 20(a) claims); *In re Energy Recovery Inc. Sec. Litig.*, No. 15-cv-00265-EMC, 2016 WL 324150,
    at *8-9, 25 (N.D. Cal. Jan. 27, 2016) (same).

board member "is not automatically liable as a controlling person."  *Burgess* v. *Premier Corp*., 727 F.2d 826, 832 (9th Cir. 1984) (citation omitted); *In re Oak Tech. Sec. Litig*., No. 96–20552 SW, 1997 WL 4461688, at *145 (N.D. Cal. Aug. 1, 1997) (holding that such a position alone "does not create any *presumption* of control" and "does not by itself sustain an allegation of control person liability." (emphasis in original)).

For example, in *Paracor Financiale, Inc*. v. *General Electric Capital Corp*., the Ninth Circuit held that the company's CEO was not a control person with respect to a memorandum distributed by the company to investors because, although the CEO was involved in company management, the plaintiffs had introduced no evidence that he was involved in or authorized to execute the particular acts alleged in the complaint.  96 F.3d 1151, 1161, 1163 (9th Cir. 1996).  The CEO in *Paracor* "did not 'directly or indirectly induce the act or acts constituting the violation or cause of action.'"  *Id*. at 1164 (citations omitted); *see also Howard* v. *Everex Sys., Inc*., 228 F.3d 1057, 1065-67, 1067 n.13 (9th Cir. 2000) (director not liable under Section 20(a) because he did not exercise "any specific control over the preparation and release of the financial statements at issue"). (citation omitted) Here, Plaintiff does not plead any facts — much less with the required particularity under Rule 9(b) — to show that Sloan, Shrewsberry, Sanger, or Mack had any control over the alleged misstatements made by anyone else at Wells Fargo.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint.

Dated:   November 2, 2018

/s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)
Sverker K. Hogberg (SBN 244640)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

Richard H. Klapper (*pro hac vice*)
(klapperr@sullcrom.com)
Nicolas Bourtin (*pro hac vice*)
(bourtinn@sullcrom.com)

SULLIVAN
&
CROMWELL LLP

Case 3:18-cv-03948-JD   Document 55   Filed 11/02/18   Page 37 of 37

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Christopher M. Viapiano (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-6985
Facsimile: (202) 956-7056

*Counsel for Defendant Wells Fargo & Company*

SULLIVAN
&
CROMWELL LLP