ROBBINS GELLER RUDMAN
   & DOWD LLP
SPENCER A. BURKHOLZ (147029)
LUCAS F. OLTS (234843)
AUSTIN P. BRANE (286227)
KEVIN S. SCIARANI (301411)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
lolts@rgrdlaw.com
abrane@rgrdlaw.com
ksciarani@rgrdlaw.com
        – and –
DENNIS J. HERMAN (220163)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com

Attorneys for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURPLE MOUNTAIN TRUST, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-03948-JD |
| Plaintiff, | CLASS ACTION |
| vs. | LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT |
| WELLS FARGO & COMPANY, et al., | |
| Defendants. | DATE:        February 28, 2019 |
| | TIME:        10:00 a.m. |
| | CTRM:       11 |
| | JUDGE:      The Honorable James Donato |

1514102_1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  STATEMENT OF FACTS ........................................................................................5

    A.  Wells Fargo Knowingly Ripped Off Its Automobile Loan Customers for More than a Decade ..............................................................................5

    B.  With the Public's Trust in Wells Fargo and the Company's Reputation at All-Time Lows, Defendants Claimed Their "Highest Priority" Was "Restoring Trust" and Being "Transparent" ........................................6

    C.  Contrary to Their Representations, Defendants Knowingly Concealed the Auto Insurance Issues from Investors ....................................................7

    D.  *The New York Times* Exposes the Company's Illegal Insurance Practices and Forces Defendants to Come Clean – Investors Are Shocked ..........8

    E.  Defendant Sloan Admits He Knew of the Company's Illegal Insurance Practices Prior to the Class Period and Regulators Impose Landmark Fines..........9

III.  ARGUMENT ..........................................................................................................10

    A.  Plaintiff Pleads Actionable Affirmative Misstatements and Material Omissions ........................................................................................11

        1.  Defendants Made Affirmative False and Misleading Statements of Material Fact During the Class Period ........................................11

        2.  Defendants Had a Duty to Disclose the Insurance Fraud and Breaches of Customer Trust to Prevent Their Statements from Being Misleading ........................................................................14

        3.  Defendants' Arguments that They Did Not Have a Duty Disclose Wells Fargo's Insurance Schemes Fail ........................................17

        4.  Defendants' Misstatements and Omissions Regarding Their "Number One Priority" Were Not Puffery ........................................20

    B.  Plaintiff Pleads a Strong Inference of Scienter ........................................23

        1.  Defendants Had Actual Knowledge of the Insurance Schemes Before the Class Period ........................................................................24

        2.  The Core Operations Doctrine Further Supports a Strong Inference of Scienter ........................................................................27

    C.  Plaintiff Adequately Pleads Loss Causation ........................................29

    D.  Plaintiff Alleges Control Person Liability ........................................31

IV.  LEAVE TO AMEND ........................................................................................32

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD     - i -

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Azar v. Yelp, Inc.*,
 No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769
 (N.D. Cal. Nov. 27, 2018) ...................................................................................14, 23, 31

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) .........................................................................................14

*Ciresi v. Citicorp*,
 782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd*,
 956 F.2d 1161 (2d Cir. 1992)..........................................................................................18

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust v. R.H., Inc.*,
 302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...............................................................11, 19, 20, 31

*City of Pontiac Gen Emps.' Ret. Sys. v. Walmart Stores, Inc.*,
 No. 12-5162, 2014 U.S. Dist. LEXIS 136164
 (W.D. Ark. May 8, 2014)................................................................................................17

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014)............................................................................................18

*Cox v. Aurora Elecs., Inc.*,
 No. CV 93-3292 DT(JG), 1993 WL 652792
 (C.D. Cal. Oct. 18, 1993) ...............................................................................................22

*Cutler v. Kirchner*,
 696 F. App'x 809 (9th Cir. 2017) ..............................................................................16, 22

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005).......................................................................................................30

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
 316 F.3d 1048 (9th Cir. 2003) ........................................................................................32

*Hefler v. Wells Fargo & Co.*,
 No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874
 (N.D. Cal. Feb. 27, 2018)...........................................................................................4, 26

*Howard v. Everex Sys., Inc.*,
 228 F.3d 1057 (9th Cir. 2000) ........................................................................................32

*In re Amgen Inc. Sec. Litig.*,
 544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...........................................................................17

1

2                                                                                    **Page**

3

4

*In re Apple Computer, Inc., Sec. Litig.*,
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) ................................................26

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ...............................................................23

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009)..........................................................32

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v.*
    *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006)..................................18

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................21

*In re Downey Sec. Litig.*,
    No. CV 08-3261-JFW(RZx), 2009 WL 2767670
    (C.D. Cal. Aug. 21, 2009)....................................................................29

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-CV-01252-EJD, 2017 WL 1549485
    (N.D. Cal. May 1, 2017) .......................................................................26

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..............................................................31

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................29

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................21

*In re Juno Therapeutics, Inc.*,
    No. CIV-1069RSM, 2017 U.S. Dist. LEXIS 91608
    (W. Wa. June 14, 2017) ........................................................................11

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ................................................17

*In re Network Assocs., Inc., Sec. Litig.*,
    No. C 99-01729WHA, 2000 WL 33376577
    (N.D. Cal. Sept. 5, 2000) ......................................................................23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2 **Page**

3

4 *In re New Century,*
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................................29

5 *In re NVIDIA Corp. Sec. Litig.,*
768 F.3d 1046 (9th Cir. 2014) .................................................................................29
6

7 *In re Quality Sys., Inc. Sec. Litig.,*
865 F.3d 1130 (9th Cir. 2017) ...........................................................21, 24, 25, 27

8
*In re Signet Jewelers Ltd. Sec. Litig.,*
9 No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809
(S.D.N.Y. Nov. 26, 2018) ........................................................................................23
10

11 *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970
(9th Cir. 1999), *as amended* (Aug. 4, 1999). .......................................................26

12
*In re STEC Inc. Sec. Litig.,*
13 No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217
(C.D. Cal. June 17, 2011) ........................................................................................19
14
*In re Teledyne Def. Contracting Derivative Litig.,*
15 849 F. Supp. 1369 (C.D. Cal. 1993) .......................................................................18

16 *In re Wells Fargo Collateral Prot. Ins. Litig.,*
No. 8:17-ml-02797-AG-KES (C.D. Cal.)..........................................................5, 33
17

18 *In re Wells Fargo & Co. S'holder Derivative Litig.,*
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................21, 23, 27, 28
19
*Ind. Pub. Ret. Sys. v. SAIC, Inc.,*
20 818 F.3d 85 (2d Cir. 2016)........................................................................................22

21 *Irving Firemen's Relief & Ret. Fund v. Uber Techs.,*
No. 17-CV-05558-HSG, 2018 WL 4181954
22 (N.D. Cal. Aug. 31, 2018).........................................................................................22

23 *Johns v. Bayer Corp.,*
No. 09CV1935 DMS (JMA), 2010 WL 2573493
24 (S.D. Cal. June 24, 2010)..........................................................................................33

25 *Johnson v. Knapp,*
26 No. CV 02-9262-DSF (PJW), 2009 WL 764521
(C.D. Cal. Mar. 16, 2009) ........................................................................................10
27

28

Page

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................... *passim*

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................................32

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ...................................................................30, 31

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016)....................................................................22

*Markman v. Whole Foods Mkt., Inc.*,
    No. 1:15-CV-681-LY, 2016 WL 10567194
    (W.D. Tex. Aug. 19, 2016) ...................................................................22

*Menkes v. Stolt-Nielsen S.A.*,
    No. 3:03CV409(DJS), 2005 WL 3050970
    (D. Conn. Nov. 10, 2005) ...................................................................18

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...................................................................11

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...................................................................29, 30, 31

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) ...................................................................21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................................27

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    __ U.S. __, 135 S. Ct. 1318 (2015)...................................................................12, 23

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ...................................................................32

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ...................................................................11

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ...................................................................24, 27, 28

OPPOSITION TO MOTION TO DISMISS - 3:18-cv-03948-JD

Page

*Retail Wholesale & Dept. Store Union Local 338*
    *Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .......................................................................22

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).............................................................23

*Rok v. Identiv, Inc.*,
    No. 15-CV-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub*
    *nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018)....................20

*Rudolph v. UTStarcom*,
    No. C 07-04578 SI, 2008 WL 4002855
    (N.D. Cal. Aug. 21, 2008)..............................................................................30

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)......................................................28

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ....................................................................25, 27

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..............................................................14, 24, 28

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115, 1134 (N.D. Cal. 2017) .............................................. *passim*

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2006 WL 2355411
    (N.D. Cal. Aug. 14, 2006)..............................................................................32

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) .......................................................................16

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011), *cert. denied*, 566 U.S. 982 (2012)........................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................10, 23

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) .........................................................25

*United States v. Joey*,
    974 F.2d 1344, 1992 WL 219064 (9th Cir. 1992) ............................................30

1

2                                                                                          **Page**

3

*Warshaw v. Xoma Corp.*,

4       74 F.3d 955 (9th Cir. 1996) ................................................................................11

5    **STATUTES, RULES AND REGULATIONS**

6    15 U.S.C.

7       §78n(a) ..........................................................................................................18
         §78t(a) ...........................................................................................................31

8       §78u-4(b)(1)(B)..............................................................................................11

9    Federal Rules of Civil Procedure
         Rule 9(b) .................................................................................................11, 32

10      Rule 12(b)(6)..................................................................................................10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS - 3:18-cv-03948-JD

**PLAINTIFF'S RESPONSE TO THE STATEMENT OF ISSUES TO BE DECIDED**

1.      The Complaint should not be dismissed because: (i) it sufficiently alleges actionable misstatements and omissions; (ii) it contains ample factual allegations supporting the strong inference that defendants acted with scienter; and (iii) it properly alleges loss causation.

2.      The §20(a) claim should not be dismissed because: (i) the Complaint adequately alleges a predicate violation; and (ii) the Complaint adequately alleges facts demonstrating defendants exercised actual power or control over a primary violator.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 1 -

1    Lead Plaintiff Construction Laborers Pension Trust for Southern California ("Plaintiff")

2  hereby responds as follows to the motions to dismiss filed by Wells Fargo & Company (ECF No. 55,

3  "Motion" or "Mot.") and Stephen Sanger (ECF No. 59, "Sanger Mot.").[1]

4  **I.     INTRODUCTION**

5    In September 2016, Wells Fargo was facing a crisis of confidence.  The Company had

6  admitted to perpetrating one of the worst corporate scandals in recent memory by defrauding

7  millions of its own customers through the "widespread illegal practice of secretly opening

8  unauthorized deposit and credit card accounts," resulting in $185 million in fines to federal

9  regulators, a devastating loss of customers, and a sharp drop in the Company's stock price.  A

10  national public firestorm had ensued, culminating in the then-CEO, John G. Stumpf, being dragged

11  to testify before both houses of Congress, where he admitted that Wells Fargo had known it was

12  ripping off its customers for more than a decade and yet did nothing to stop it, and then being fired.

13    In the midst of this public relations nightmare, it was well known that rebuilding trust was

14  essential to Wells Fargo's business.  As financial analysts following the Company repeated:

15  "banking is a business of trust[; d]amage to the Wells Fargo brand could result in permanent loss of

16  customers" and a "***loss of customer trust would be the biggest potential threat to Wells Fargo's***

17  ***competitive advantage***."  Defendants sought to repair this damage by asserting – publicly and

18  repeatedly – that they had disclosed all the misconduct they were aware of, were committed to

19  transparency in their business, and were reviewing all aspects of Wells Fargo's operations and would

20  promptly disclose any additional improprieties that were found.

21    In fact, at the time these assurances were made, defendants were knowingly hiding yet

22  another massive scandal in Wells Fargo's Community Banking Division through which the

23  Company had again ripped off its own customers to the tune of tens of millions of dollars by

24  charging them for services they had not requested and did not need.  The Company could ill-afford

25  to disclose these practices in the wake of the fake account scandal.  So once again – and despite their

26

27  _____
[1]    Unless otherwise stated, defined terms have the same meaning as used in the Consolidated

28  Complaint (ECF No. 46, "Complaint"), all "¶" or "¶¶" references are to the Complaint, and all
emphasis is added and citations are omitted.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 1 -

1    assurances of transparency – they decided to hide it.

2           The truth was that, for more than a decade while the fake account scandal was ongoing,

3    Wells Fargo had also engaged in a scheme intentionally designed to bilk millions of dollars out of

4    unsuspecting auto finance customers by charging them for insurance they did not need.  First, by

5    charging them, without their consent or knowledge, for Collateral Protection Insurance ("CPI") they

6    did not need or want.  The illegal forced placement and, in many cases, automatic deduction of

7    insurance premiums from borrowers' bank accounts, resulted in account delinquencies, overdrawn

8    accounts, increased interest rates, repossessed vehicles, and damage to borrowers' credit.  Second,

9    the Company was also failing to refund certain guaranteed auto protection ("GAP") insurance

10   premiums that it owed to people who had paid off their car loans early.  Laws in all 50 states require

11   that the amount of any unused insurance be credited to borrowers' accounts, reducing the amount

12   they owe.  Wells Fargo knowingly withheld those sums from its customers.

13          As Wells Fargo has admitted, its executives knew about the practice of illegally charging

14   customers for unwanted and unneeded automobile insurance no later than ***July 2016***, when an

15   overwhelming number of customer complaints triggered an internal investigation.  The results of that

16   investigation were reported to defendant Sloan, other members of "senior management," and the

17   Board of Directors by ***September 2016***, and federal regulators were immediately notified of the

18   fraudulent practices.  It is therefore indisputable that, ***prior to the November 3, 2016*** start of the

19   Class Period, defendants ***knew*** that: (1) Wells Fargo had ***intentionally*** perpetrated the insurance

20   fraud since at least 2005; (2) more than 800,000 customers had been defrauded by tens of millions of

21   dollars; (3) more than 25,000 customers had their cars wrongfully repossessed; and (4) federal

22   regulators had initiated an investigation into the acknowledged misconduct.  Despite this knowledge,

23   defendants concealed the fraud from Wells Fargo's customers and investors while repeatedly

24   assuring them in the wake of the fake account scandal that all such practices had been fully

25   investigated and publicly disclosed.

26          When Sloan addressed the public as the new CEO on November 3, 2016, he assured

27   investors, customers and the public that: "***My primary objective and the objective of our senior

28   leadership team is to restore trust in Wells Fargo***."  To achieve this "primary objective," defendants

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 2 -

1    claimed they had come clean and accepted responsibility for the toxic culture that had permeated the

2    bank for years.  Throughout the Class Period, Wells Fargo repeatedly told investors that the

3    Company had fully disclosed its unethical, illegal, and fraudulent practices of defrauding its

4    customers, and that the new leadership's commitment to disclosure would mean the end of the

5    scandals that had plagued the Company under Stumpf's leadership.  When specifically asked by

6    analysts about any undisclosed scandals, Sloan repeatedly stated, "[w]e are going to leave no stone

7    unturned," and "*if we find something that's important, we'll communicate that* . . . I think *given*

8    *our desire to be very transparent, we'll probably err on the side of overcommunicating* as opposed

9    to undercommunicating," but proclaimed that "*I am not aware of any issues*."

10    Defendants' misstatements and omissions continued throughout the Class Period.  On

11    April 10, 2017, for example, Wells Fargo released its Board of Director's independent investigation,

12    which was touted as "a comprehensive independent investigation" that "describes everything to

13    date," even though it made no mention of the auto insurance fraud.  Sloan again reassured investors

14    "our oversight of the company and commitment to accountability are stronger than ever," and that

15    "*[t]here is not another large shoe to drop*."  ¶98.

16    Those statements were all lies, as revealed by an exposé published by *The New York Times*

17    on July 27, 2017, which disclosed some of the details of Wells Fargo's insurance fraud.  Analysts,

18    investors and the public were shocked by the revelations, causing an immediate decline in Wells

19    Fargo's stock price that wiped out $7 billion in shareholder value.  Analysts decried defendants'

20    failure to admit to the fraud months earlier, called into question "management's credibility," and

21    noted the negative impact the news would have on the bank's reputation and business in the wake of

22    its prior scandals arising from deliberate false charges made to its customers.  Wells Fargo stock fell

23    again on August 4, 2017, when the Company disclosed the GAP insurance fraud, and additional

24    material information about the insurance schemes, wiping out another $2.5 billion in shareholder

25    value.

26    Like Stumpf before him, Sloan was called to testify to Congress about the insurance fraud,

27    where he was excoriated by members of the Senate Banking Committee, who told him that, "*[t]he*

28    *company, pure and simple, lied to this Committee and lied to the public*" and "*that it took you, you*

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 3 -

1   *the company – you personally 8 months, you the company 13 months to disclose such a violation*

2   *of the public trust just makes me incredulous*." ¶¶179-180.  The Office of the Comptroller of the

3   Currency (the "OCC") and the Bureau of Consumer Financial Protection ("CFPB") later fined the

4   Company $500 million for the illegal insurance fraud.

5          Defendants' breach of customer trust in this case is similar to the Company's egregious

6   conduct in the fake account scandal, which also resulted in the filing of a securities fraud class

7   action.  That action, which Judge Tigar upheld over defendants' motions to dismiss raising nearly

8   identical arguments as here, recently settled for $480 million. *See Hefler v. Wells Fargo & Co.*, No.

9   16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874, at *34 (N.D. Cal. Feb. 27, 2018).

10          Defendants' Motion attempts to whitewash the Company's insurance fraud by claiming that

11   it was just an "error in an internal process" which "potentially" harmed its customers, while asserting

12   that Wells Fargo was unaware of the "mistake" until "August or early September 2016."  Mot. at 1.

13   Defendants' rewriting of the facts ignores the Complaint's detailed allegations and their own

14   admissions that they were fully aware of the insurance fraud before the Class Period began.

15   Defendants also attempt to avoid liability by suggesting, in hindsight, their statements did not mean

16   what investors understood, that investors should have known not to trust defendants' promises of

17   transparency, and that the stock price decline that accompanied the revelation of their fraud must

18   have been caused by something else.  Mot. at 10-20, 25-26.  The Complaint adequately and

19   specifically alleges that defendants recklessly made materially false statements and omissions that

20   inflated Wells Fargo's stock price during the Class Period, and the corrective disclosures caused

21   damage to Plaintiff and the other members of the Class.  Defendants' fact-based contentions provide

22   no reason to dismiss this case prior to discovery.  Accordingly, the Motion should be denied in its

23   entirety.

24

25

26

27

28

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD       - 4 -

## II.    STATEMENT OF FACTS[2]

### A.    Wells Fargo Knowingly Ripped Off Its Automobile Loan Customers for More than a Decade

By no later than mid-2016, due to internal fair-lending reviews concerning the wrongful repossession of military service members' cars, internal Wells Fargo daily and quarterly reports documenting the practice, meetings raising red flags, and customer complaints, Wells Fargo knew of the illegal practices within its auto loan insurance programs. ¶¶157, 167, 181. Since at least 2005, "[m]ore than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need . . . ." ¶155. With regards to CPI, Wells Fargo and its vendor failed to verify the customer's insurance status via internal databases, notify customers of its intention to enroll and bill them for CPI and, even worse, cancel and refund CPI after customers complained that they already obtained their own insurance. ¶¶29-31, 181. Wells Fargo further concealed this practice by automatically deducting the premiums for the CPI policies from customers' bank accounts along with the regularly scheduled principal and interest payments for their auto loans. ¶30. The CPI premiums caused account delinquencies, overdrawn accounts, increased interest rates, repossessed vehicles and damage to borrowers' credit. ¶¶31, 181. Wells Fargo had also failed to refund excess GAP insurance payments when customers paid off their loans early, as required by law. ¶175. The illegal practices and resulting costs pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in at least 27,000 wrongful vehicle repossessions. ¶¶155, 175, 181.

Defendants kept detailed records of their fraud since its inception in 2005. As the CFPB concluded: "*[t]hrough quarterly reports from its vendor and its own daily reports, [Wells Fargo]*

---

[2] The Complaint's allegations have recently been confirmed by internal Wells Fargo documents, interrogatory responses, and the testimony of Company 30(b)(6) designees cited in the Amended Consolidated Class Action Complaint filed in *In re Wells Fargo Collateral Prot. Ins. Litig.*, No. 8:17-ml-02797-AG-KES (C.D. Cal.) (the "Consumer Action") on November 5, 2018. Those internal documents and testimony confirm that: (1) Wells Fargo's CPI program existed from 2002 through September 30, 2016; (2) between October 2005 and 2017, Wells Fargo made more than $143 million in commissions and interest from force-placed CPI; (3) in June and July 2016, Wells Fargo escalated issues concerning the CPI program to Tim Sloan, the Company's Chief Risk Officer, the Operating Committee, and Board of Directors; (4) a Wells Fargo internal audit determined that the bank's billing statements were "deceptive" as to CPI charges; and (5) in August 2016, "senior executives" at Wells Fargo contemplated terminating the CPI scheme, because it "***could lead to reputational risk and potential legal exposure***." *See* §IV, *supra*.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD       - 5 -

1    *was aware of high rates of Force-Placed Insurance cancellations, and [Wells Fargo] received*

2    *briefings on the root causes of the cancellations*." ¶181.  The regulator also concluded that "[t]he

3    high rates of cancellation *were also apparent within [Wells Fargo]'s own system of record* because

4    it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that

5    refund information back to the vendor." *Id.*

6         **B.    With the Public's Trust in Wells Fargo and the Company's
                   Reputation at All-Time Lows, Defendants Claimed Their "Highest
7                  Priority" Was "Restoring Trust" and Being "Transparent"**

8         After the fake account scandal and the $190 million in fines and restitution were disclosed in

9    September 2016, restoring customer trust became the most important issue for the Company.  ¶¶37-

10   39.  As numerous analysts recognized, the revelation that Wells Fargo had opened two million

11   unauthorized deposit and credit card accounts was a "black eye for a company that has long touted

12   its corporate values" and "Wells Fargo's reputation as a consumer-friendly bank suffered a

13   significant blow." ¶38.  The alarm was sounded – an additional "loss of customer trust would be the

14   biggest potential threat to Wells Fargo's competitive advantage."  ¶5.

15        Taking heed of these warnings, defendants went to great lengths to reassure the public that

16   rebuilding trust in the Company was its "immediate and highest priority" and remained a "top

17   priority" throughout the Class Period.  ¶¶42-44, 50, 53-54, 56, 64-65, 81, 83, 112, 124-125, 139.  On

18   November 3, 2016, the first day of the Class Period, Sloan pledged to "leave no stone unturned" in

19   the Company-wide investigation and proclaimed that he was "***not aware of any issues***" in the

20   Community Bank or elsewhere.  ¶¶44, 47.  Sloan promised "if we find something that's important,

21   we'll communicate that."   ¶72.  CFO Shrewsberry confirmed that defendants "voluntarily

22   commissioned reviews of really the rest of Wells Fargo," in part, by appointing Chairman of the

23   Board Sanger to lead an "exhaustive" independent internal investigation. ¶¶72, 90, 94.  Defendants

24   also promised to "be more transparent in [their] communications" and, as Sloan put it, intended to

25   "err on the side of overcommunicating as opposed to undercommunicating." ¶¶72, 85.  Wells Fargo

26   held monthly conference calls focused on its "rebuilding trust" initiative, further purporting to

27   demonstrate its commitment to restoring trust and increasing transparency.  ¶¶55, 65, 76, 89.  For

28   example, on the December 16, 2016 call, and repeated throughout the Class Period, Mack assured

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 6 -

1    investors that her "number one priority remains rebuilding trust," and Shrewsberry likewise

2    "committed to maintaining increased transparency." ¶¶65, 76.

3          The purported display of transparency culminated with the April 10, 2017 release of Wells

4    Fargo's Board of Director's report on its independent investigation, which was touted as "a

5    comprehensive independent investigation" that "describes everything to date," even though it made

6    no mention of the CPI or GAP insurance issues. ¶¶82-85, 90-91, 94. That day, Sanger reassured

7    investors "our oversight of the company and commitment to accountability are stronger than ever"

8    and Sloan promised "[t]here is not another large shoe to drop." ¶¶97-98. This deception relieved

9    securities analysts who were anxious to move beyond customer trust issues. ¶¶107, 120. Defendants

10   continued to parrot these misleading statements throughout the rest of the Class Period. ¶¶103, 114-

11   116, 121, 126. All of defendants' statements created an impression of a bank fully revealing its

12   mistakes and making amends with its customers, investors and the public. But these efforts were

13   merely a smokescreen behind which defendants hid the CPI and GAP insurance scandals.

14       **C.    Contrary to Their Representations, Defendants Knowingly Concealed
                 the Auto Insurance Issues from Investors**

15

16         Defendants concealed the illegal insurance practices throughout the Class Period. Wells

17   Fargo was aware of the wrongful insurance practices for more than a decade before they were

18   publicly disclosed in July and August 2017. As the CFPB found when it, along with the OCC, fined

19   Wells Fargo $500 million for the illegal insurance practices, Wells Fargo received frequent customer

20   complaints, internal daily reports, fair-lending reviews, and quarterly reports and presentations to

21   Wells Fargo management, all of which highlighted that insurance was being improperly forced upon

22   customers. ¶¶34, 156, 161, 166, 167, 181.

23         In July 2016, prompted by a flood of customer complaints, the Company conducted an

24   internal investigation of its auto insurance practices. Based on that review and its presentation to

25   senior management and the Company's Board of Directors, defendants ceased the decade-long

26   revenue-generating insurance programs and reported the illegal practices to the Company's

27   regulators. ¶¶155-156. Defendants formed dedicated internal review teams and commissioned the

28   global consulting firm Oliver Wyman to conduct a "review of the remediation" owed to Wells Fargo

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 7 -

1   customers.  ¶¶25, 180, 183.  Oliver Wyman's 60-page report – "***prepared for the bank's executives***"

2   – further detailed the extent of the harm inflicted on Wells Fargo auto loan customers (the "Oliver

3   Wyman Report").  ¶¶28, 31.  The Company's discussions with regulators intensified as regulators

4   sought documents on the practices.  ¶¶161, 166, 178.

5       Despite this knowledge, defendants falsely represented throughout the Class Period that its

6   practices of deliberately overcharging its customers had been fully identified and disclosed.  ¶¶47-

7   51, 56, 62-65, 70-72, 76, 89-91, 97-99, 101-103, 109, 114-117, 121, 124-126.

8       **D.**    ***The New York Times* Exposes the Company's Illegal Insurance**
               **Practices and Forces Defendants to Come Clean – Investors Are**

9                **Shocked**

10       On the evening of July 27, 2017, *The New York Times* published an article titled "Wells

11  Fargo Forced Unwanted Auto Insurance on Borrowers."  ¶¶9, 155.  Based on a leaked copy of an

12  internal Wells Fargo report, the article detailed the illegal CPI scheme and its appalling impact on

13  Wells Fargo customers.  *Id.*  The article revealed that "[m]ore than 800,000 people who took out car

14  loans from Wells Fargo were charged for auto insurance they did not need, and some of them are

15  still paying for it. . . .  The expense of the unneeded insurance pushed roughly 274,000 Wells Fargo

16  customers into delinquency."  ¶155.  The article also reported that Wells Fargo had upended 25,000

17  customers' lives when it wrongfully repossessed their vehicles.  *Id.*  The internal report estimated the

18  Company owed $73 million to harmed customers.  *Id.*  ***Just two hours after the article was***

19  ***published, Wells Fargo admitted it had known of the illegal practices for at least a year***, including

20  defective internal controls, and accepted responsibility for all of the reported misconduct.  ¶156.

21       The revelations shocked investors.  Analysts found it incredible that, behind their promises of

22  trust and transparency, defendants had concealed yet another fraud.  "***We were surprised that this***

23  ***wasn't disclosed when the original sales practices were disclosed***," wrote one analyst.  ¶¶157-158.

24  Others echoed his sentiment.  *See, e.g.*, ¶157 ("Why didn't the company address these issues

25  publicly while they were already dealing with the account scandal rather than address them now?").

26  As noted in a July 28, 2017 *Reuters* article: "Shareholders, analysts, lawmakers and consumer

27  advocates demanded answers about how the situation manifested, and why Wells Fargo did not

28  disclose the problems sooner."  ¶161.  Another analyst wrote that "[l]egal penalties and fines likely

1    to follow" and "[l]arge reputational hit and further scrutiny" would follow the Company in the wake

2    of the revelations.  ¶164.  Others noted "the cost of the insurance would be bigger than the $80

3    million of remediation already in place," and "[w]hile WFC has already announced remediation

4    efforts, the nature of the issue (misrepresentation of consumer data, auto repossessions, impact to

5    related consumer credit profiles, lack of internal controls to catch the issue) is likely to draw flies

6    quickly . . . in the form of new government investigations, civil & criminal suits, fines, and

7    regulatory actions." ¶¶158-159.  New York City Comptroller Scott Stringer put it bluntly: "This is a

8    full-blown scandal – again. . . .  It's caused real human harm."  ¶161.

9         The market's reaction was swift.  On July 28, 2017, the day after the CPI scandal was

10   disclosed, Wells Fargo shares declined sharply from a July 27 close of $54.71 to trade as low as

11   $53.18 intraday on July 28 before closing at $53.30 per share – down $1.41 per share on unusually

12   high trading volume.  ¶160.  On August 4, 2017, Wells Fargo filed its 2Q17 10-Q.  The Company

13   revealed its illegal practices relating to GAP and increased the Company's litigation reserves by $1.3

14   billion (65%) to $3.3 billion.  ¶¶168-172.  An August 4, 2017, *The Wall Street Journal* article further

15   detailed the insurance scandal, reporting that the Company was facing additional sanctions "in light

16   of the new insurance revelations."  ¶¶166-167, 186.  Analysts again remarked that "reputational

17   damage could impair the value of Wells' retail and even commercial banking franchises."  ¶173.

18   Upon this new information, Wells Fargo stock again declined by nearly $1 per share.  ¶174.

19        **E.    Defendant Sloan Admits He Knew of the Company's Illegal Insurance
            Practices Prior to the Class Period and Regulators Impose Landmark**
20        **    Fines**

21        On October 3, 2017, Sloan was hauled before the Senate Banking Committee to testify on

22   Wells Fargo's ongoing and newly-disclosed breaches of public trust.  The senators were angered that

23   Wells Fargo did not report the insurance issues to the public when defendants discovered them in

24   July 2016.  Senator Brown accused Wells Fargo of lying to the committee a year earlier when it

25   assured them that there were no other issues beyond the sales practices disclosed in September 2016:

26        [Senator Brown:]  In my opening, Mr. Sloan, I talked about Mr. Stumpf's testimony
          last year that this activity was limited to the Community Banking Division.  ***The
27        company, pure and simple, lied to this Committee and lied to the public***.  The
          company recently disclosed it knew in July 2016 that customers had auto insurance
28        policies added to their auto loans without their consent – about 800,000 customers,

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 9 -

roughly the size of the State that Senator Rounds represents.

Every day since you have become the head of Wells Fargo for the last 11 months, every day you have made a decision to not disclose this information to the public.  Your company knew about the auto insurance policy when former CEO Mr. Stumpf testified. . . .

¶179.

Sloan then confirmed he personally knew about the insurance scheme in "late August, early September [2016]," prompting Senator Brown to state: ***"that it took you, you the company – you personally 8 months, you the company 13 months to disclose such a violation of the public trust just makes me incredulous."*** ¶180.

On April 20, 2018, the CFPB and OCC announced fines of $500 million against Wells Fargo for its decade-long illegal insurance schemes – fines far greater than the $185 million for the fake account scandal.  ¶181.  The CFPB findings confirmed that the Company had deliberately and "forcibly" placed unnecessary insurance coverage on millions of auto loan borrowers prior to the Class Period.  *Id.*  And that defendants knew of the illegal practices prior to the Class Period but failed to inform investors.  *Id.*

## III.   ARGUMENT

In assessing a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  The Ninth Circuit has cautioned that:

If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is ***implausible***.  The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable.

*Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (emphasis in original), *cert. denied*, 566 U.S. 982 (2012); *see also Johnson v. Knapp*, No. CV 02-9262-DSF (PJW), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's version . . . .").

By specifically alleging the "'who, what, when, where, and how' of the fraud," Plaintiff's

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD       - 10 -

claims meet the heightened pleading requirements of Rule 9(b) and the PSLRA.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).

> **A.    Plaintiff Pleads Actionable Affirmative Misstatements and Material Omissions**

A statement is misleading ""if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."""  *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust v. R.H., Inc.*, 302 F. Supp. 3d 1028, 1039 (N.D. Cal. 2018) (quoting *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011)).  Statements that are "literally true" may be misleading due to ""their context and manner of presentation."""  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (considering the "fair and reasonable implication an ordinary investor would derive" from the alleged misstatements in assessing falsity).  Whether a statement is materially misleading is "an intensely fact-specific inquiry," which is generally left to the trier of fact.  *In re Juno Therapeutics, Inc.*, No. CIV-1069RSM, 2017 U.S. Dist. LEXIS 91608, at *10, *18 (W. Wa. June 14, 2017).  "'[O]nly if "reasonable minds" could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6).'"  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1134 (N.D. Cal. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

The Complaint properly alleges falsity by "'specify[ing] . . . each statement alleged to have been misleading, . . . the reason or reasons why the statement is misleading, and . . . stat[ing] with particularity all facts on which that belief is formed.'"  *Khoja*, 899 F.3d at 1008; 15 U.S.C. §78u-4(b)(1)(B); ¶¶46-128.  Nothing more is required at this stage.

> **1.    Defendants Made Affirmative False and Misleading Statements of Material Fact During the Class Period**

During the Class Period, defendants misrepresented that the Company's "number one priority" (¶65) was restoring customer trust and that the extent of its practices of defrauding its customers had been fully identified and disclosed.  ¶¶47-51, 56, 62-65, 70-72, 76, 89-91, 97-99, 101-103, 109, 112-116, 121, 124-126.  For example, the Complaint specifically pleads that, on the first day of the Class Period, November 3, 2016, Sloan and Mack presented at the BancAnalysts Association of Boston Conference.  ¶¶46-51.  An audience member asked Sloan about (in Sloan's

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 11 -

words) "activities outside of retail banking focused and reviews focused on sales practices and culture." ¶47. Sloan's response could not have been more clear: "We are going to engage a separate firm to look at sales practices *across the rest of the Company*. We are going to leave no stone unturned. *I am not aware of any issues* . . . ." ¶47. This was a deliberate lie. By the time he made that statement, Sloan and the Company executives were aware that the illegitimate sales practices resulting in deliberate and wrongful charges levied against auto loan customers had been going on during the entire time that the fake account fraud was being perpetrated. *See* ¶¶52-53 ("[b]y July 2016, an internal review had put the Company on notice of the illegal insurance practices"). These allegations are further corroborated by Sloan's testimony to the Senate Banking Committee in October 2017 that he personally became aware of the insurance scandal "in 2016, in late August, early September" (*i.e.*, prior to his November 3 misstatement). ¶180. Sloan repeated the lie on December 6, 2016, when he promised investors that, "we are going to look at *sales practices in every business of this Company*" while falsely assuring that, as of then, "*I am not aware of any issues*." ¶62. The Complaint again details the specific reasons Sloan's December 6 statement was false and misleading. ¶¶66-67.

On January 13, 2017, Sloan again told investors defendants were "look[ing] at sales practice across other businesses within the Company," and again assured them that "if we find something that's important, we'll communicate that." ¶72. On April 10, 2017, after the Wells Fargo Board of Directors released a report concerning its "exhaustive" internal investigation into the Company's Community Banking Division, Sloan reassured investors that "'[t]here is not another large shoe to drop.'"[3] ¶¶94, 98. On April 13, 2017, in response to a question about whether the bad press that had plagued the Company since the fake account scandal had come to an end, Sloan said, "I hope so," despite knowing that the other shoe *was* eventually going to drop when the fraudulent insurance practices were disclosed. ¶¶77-78, 103-104; *cf. Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1329 (2015) (statements of belief actionable where speaker knows of information tending to significantly undermine basis for purported belief).

---

[3]   Analysts keyed in on Sloan's misstatement and "were glad that there was no new large-scale problems that have come to light." ¶¶106-107.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD      - 12

1    The Complaint also pleads the Company's misleadingly evasive answer in written testimony

2    to the Senate Banking Committee.  The Company was asked: "are you confident that this type of

3    fraudulent activity does not exist in other Wells business lines?  Have you discovered other types of

4    misconduct involving other products aside from credit cards or basic banking (such as misconduct

5    related to . . . insurance . . .)?"  ¶57.  The Company knowingly misled the public and Congress: "We

6    believe that the activity at issue here was limited to certain team members within the Community

7    Banking Division."  *Id.*

8         The Complaint specifically pleads that each of these misstatements was false and misleading

9    when made.  ¶¶60-61, 73-74, 103-105.  In truth, defendants knew by September 2016 that their

10   decade-long insurance schemes had harmed hundreds of thousands of Wells Fargo customers,

11   including the wrongful repossession of thousands of customers' automobiles.  *Id.*  Defendants also

12   knew that those practices would be publicly revealed, resulting in negative publicity, regulatory

13   fines, significant legal exposure, and a devastating blow to customer trust and the Company's

14   reputation.  *Id.*

15        The Complaint further identifies defendants' misrepresentations regarding their purported

16   commitment to restoring trust and the progress that had been made in that regard during the Class

17   Period.   For example, on November 3, 2016, Sloan falsely represented that "I am fully

18   committed . . . to restore our customers' trust."  ¶50.  On November 17, 2016, Shrewsberry said his

19   "highest priority right now is rebuilding trust in Wells Fargo."  ¶56.  On December 16, 2016, Mack

20   told investors that her "number one priority remains rebuilding trust."   ¶65.   In their letter to

21   shareholders on March 15, 2017, Sanger and Sloan continued the false mantra: "Restoring your trust

22   and the trust of all key stakeholders is our top priority . . . ."  ¶83; *see also* ¶¶42, 81, 112, 124, 139.

23   The Complaint alleges further defendants' repeated claims that "Wells Fargo continued to make

24   meaningful progress . . . in rebuilding trust" (¶100) and was "on the right track" (¶124) to repairing

25   its damaged reputation.  *See also* ¶¶70, 76, 83, 116, 125.  Defendants also frequently told investors

26   that they were "committed to maintaining increased transparency" (¶65), "if we find something

27   that's important, we'll communicate that" (¶72), and that they would "err on the side of

28

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD      - 13 -

overcommunicating."[4]  *Id.*

Again, the Complaint alleges each of these statements was materially false and misleading when made.  ¶¶52-53, 60-61, 66-67, 73-74, 77-78, 86-87, 104-105, 117-118, 127-128.  Rather than being committed to restoring trust or having made progress in that regard, or being transparent with investors, defendants had discovered, but were actively concealing, a massive breach of customer trust.  Both the breach of trust and the cover-up thereof were in direct contradiction with defendants' proclamations of trust and transparency.  Because defendants' statements gave a "reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists," they were false and misleading when made.  *Shenwick*, 282 F. Supp. 3d at 1133.

### 2. Defendants Had a Duty to Disclose the Insurance Fraud and Breaches of Customer Trust to Prevent Their Statements from Being Misleading

In addition to defendants' affirmative misrepresentations, the Complaint pleads that defendants' omission of their discovery of the automobile insurance fraud and extensive customer harm caused defendants' Class Period statements to be misleading.  Omissions that "'give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists'" are actionable.  *Shenwick*, 282 F. Supp. 3d at 1133 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  "Even if a statement is not false, it may be misleading if it omits material information."  *Khoja*, 899 F.3d at 1008-09.  "An omission is material when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769, at *27 (N.D. Cal. Nov. 27, 2018).  Once corporations choose to speak on a topic, the securities laws require they do so "'in a manner that wouldn't mislead investors', including disclosing adverse information that cuts against the positive information."  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th

---

[4]  *See also* ¶114 (Sloan: "will continue to be as transparent with you as we can"); ¶121 (Mack: "we are working very hard to ensure that we're as transparent as possible"); ¶97 (Sanger: the Board of Directors' "oversight of the Company and commitment to accountability are stronger than ever").  In addition to being false and misleading in their own right (¶104), the Complaint alleges that defendants' promises of transparency underscored the misleading impression defendants' other Class Period misstatements and omissions gave investors.  ¶105.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 14 -

1  Cir. 2016).

2    Defendants' Class Period statements omitted any mention of the insurance scandal.  Those

3  omissions caused defendants' statements about a commitment to restoring trust, making progress in

4  restoring trust, and that defendants were being more transparent than ever to be misleading.

5  Defendants had detailed knowledge of the insurance scandal prior to the Class Period from, among

6  other things, an internal review initiated in July 2016 that culminated with the findings reported to

7  senior management and the Board of Directors and the abrupt cessation of the decade-long insurance

8  practices.  ¶¶155, 166, 180.  Despite that knowledge, as discussed above, defendants proclaimed

9  throughout the Class Period that they had disclosed all of Wells Fargo's scandals.  Sloan represented

10  that he, "along with the rest of our entire leadership team" were "fully committed" "to restore our

11  customers' trust" and Sloan's "primary objective and the objective of our senior leadership team is

12  to restore trust in Wells Fargo."  ¶50.  Defendant Mack similarly stated that "nothing gets in the way

13  of doing what is right for our customers."  ¶51.  Defendants' false narrative of a commitment to

14  restoring trust continued throughout the Class Period.  ¶¶42, 50, 56, 64-65, 81, 83, 100, 112, 116,

15  124-125, 139.

16    Defendants also told investors "we're committed to maintaining increased transparency."

17  ¶65.  Defendant Sloan boldly stated that he would "leave no stone unturned here . . . [a]nd if we find

18  something that's important, we'll communicate that . . . we'll probably err on the side of

19  overcommunicating."  ¶72.  Furthermore, defendants told investors that not only was "rebuilding

20  trust" their "number one priority" (¶65) but that defendants had in fact "made progress in restoring

21  customers' and team members' trust."  ¶71.  Even near the end of the Class Period, as the number of

22  customers harmed by the Company's illegal insurance practices climbed and regulatory scrutiny

23  increased, Sloan told investors that "we continued to make progress on rebuilding trust, which

24  remains our top priority."  ¶125.

25    "[S]et against Defendants' claims" that their number one priority was restoring trust, they

26  were leaving "no stone unturned" (¶72), looking "across the [C]ompany" (¶70) and were being "as

27  transparent . . . as we can" (¶114), "the omission of" the fact that Wells Fargo had uncovered yet

28  another fraud in the Community Bank and was facing increased regulatory scrutiny "was

misleading." *Shenwick*, 282 F. Supp. 3d at 1138.  "[B]y failing to inform investors" of these material facts, defendants "gave the false impression" that they had disclosed their fraudulent practices.  *Khoja*, 899 F.3d at 1014.  Indeed, defendants said they would do just that: "***if we find something that's important, we'll communicate that***."  ¶72.

Defendants' omission of the insurance scandal also rendered the Company's Class Period statements concerning its internal controls misleading.  ¶¶129-154.  In its 2016 10-K, filed on March 1, 2017, defendants told investors that the Company had "policies and procedures in place intended to detect and prevent conduct by team members and third party service providers that could potentially harm customers or our reputation."  ¶138.  The 2016 10-K further represented that "appropriate controls are in place to reduce risks to . . . protect Wells Fargo's long-term . . . reputation."  ¶137.  Class Period SEC filings repeatedly warned only of the "risk of loss resulting from inadequate or failed internal controls" (¶¶132, 140, 149) or the risk of "reputational damage from . . . regulatory violations and legal actions" (¶¶132, 141-142, 149).  But as defendants admitted at the end of the Class Period: "Wells Fargo's [July 2016] review determined that certain external vendor processes and internal controls were inadequate."[5]  ¶156.  The Company's SEC filings likewise misleadingly warned of the risk that "[n]egative public opinion could result from our actual or alleged conduct in . . . lending."  ¶142.  But defendants knew that the Company's illegal insurance practices had caused extensive and, in many cases, irreparable harm to thousands of Wells Fargo's customers, the disclosure of which would result in negative public opinion.  Defendants' warnings "were misleading because they disclosed a risk 'in the abstract' but omitted the fact it had 'already . . . come to fruition.'"  *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (unpublished) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009)).

Similarly, defendants' Class Period SEC filings omitted entirely any mention of the illegal

---

[5]  Defendants attempt to distinguish three of their statements concerning the Company's internal controls, arguing they concerned controls not at issue here. Mot. at 18-19.  Defendants' argument ignores the Company's admission that the Company's "internal control were inadequate" during the Class Period (¶156) and, regardless, does not support dismissal as it only concerns three of defendants' numerous misrepresentations.  Curiously, in making the argument, defendants admit what they contest elsewhere in the Motion – that the Complaint "repeatedly alleges" the "CPI issue was . . . immediately reported to Sloan." Mot. at 19.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD     - 16 -

1  insurance schemes, their harm to Wells Fargo customers, or defendants' intensifying discussions

2  with regulators.  ¶¶129-154.  In particular, the Company's Class Period SEC filings misrepresented

3  the Company's legal exposure.  ¶¶133, 144, 152.  Having discovered a breach of customer trust

4  involving illegal charging or retention of insurance premiums and financial harm in the tens of

5  millions of dollars, defendants knew, before the Class Period, that the Company would be subjected

6  to significant regulatory fines and legal expenses.  ¶¶159, 178.  Indeed, when *The New York Times*

7  exposé forced defendants to come clean, they immediately upped the Company's reserves for

8  litigation expenses by 65% ($1.3 billion).  That the only change in circumstances from defendants'

9  Class Period SEC filings omitting the insurance scandal to the 2Q17 10-Q disclosing it was *The New*

10  *York Times* exposé further demonstrates the misleading nature of the Company's Class Period SEC

11  filings. ¶155.  *City of Pontiac Gen. Emps.' Ret. Sys. v. Walmart Stores, Inc.*, No. 12-5162, 2014 U.S.

12  Dist. LEXIS 136164, at *16 (W.D. Ark. May 8, 2014).

13       In addition, because the development of the allegedly concealed adverse facts rendered prior

14  statements misleading, defendants were required to disclose them.  *Khoja*, 899 F.3d at 1015 (finding

15  press release did not contain misstatements but was misleading because it omitted facts that

16  "indicated . . . earlier [statements] were not so promising after all"); *see also In re LendingClub Sec.*

17  *Litig.*, 254 F. Supp. 3d 1107, 1117-18 (N.D. Cal. 2017) (omissions actionable because "investors

18  would also have been interested to know" the omitted facts).

19           **3.    Defendants' Arguments that They Did Not Have a Duty**
               **Disclose Wells Fargo's Insurance Schemes Fail**

20

21       Defendants' argument that there was no duty to disclose Wells Fargo's insurance fraud

22  because the Company's investigation was not "complete" and there is no duty to disclose

23  "uncharged, unadjudicated wrongdoing" misstates the law, ignores the Complaint's allegations, and

24  improperly raises questions of fact that should not be decided at this stage.  Mot. at 9-10.  First, the

25  issue is not whether the internal investigation was "complete," but whether defendants'

26  misrepresentation and omission of material facts "'create[] an impression of a state of affairs [that]

27  differ[s] in a material way from the one that actually exist[s].'"  *In re Amgen Inc. Sec. Litig.*, 544 F.

28  Supp. 2d 1009, 1028 (C.D. Cal. 2008) (rejecting defendants' argument that "they . . . believed it was

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 17 -

1   premature" to disclose a report "based on the 'interim' nature of the report"). As discussed above,

2   defendants knew by September 2016 that their illegal insurance schemes had defrauded hundreds of

3   thousands of their customers out of tens of millions of dollars (¶¶155-156, 166-167, 181), and this

4   information was material, as demonstrated by the fact investors and analysts were shocked when the

5   *same information* was disclosed in July and August 2017 (¶¶157-159, 164, 173) (analyst reaction),

6   its disclosure caused substantial declines in Wells Fargo stock (¶¶160, 174), and resulted in federal

7   regulators fining the Company $500 million. ¶181.

8        Defendants' support to argue that Wells Fargo's admitted insurance fraud is "uncharged,

9   unadjudicated wrongdoing" which it had no duty to disclose are all inapposite, as the underlying

10  allegations of misconduct had been ***disclosed*** to investors, or involved other circumstances

11  inapplicable to the facts at issue here. Mot. at 9; *In re Teledyne Def. Contracting Derivative Litig.*,

12  849 F. Supp. 1369, 1381 (C.D. Cal. 1993) (limited to the disclosures prospective directors must

13  make under §14(a) of the Securities Exchange Act and the specific SEC regulations addressing the

14  issue (citing SEC regulations regarding director elections)); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823

15  (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) (same). Similarly, in *City of Pontiac*

16  *Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), although

17  defendants were not required to disclose an admission of guilt in an uncharged tax scheme, they

18  sufficiently "disclosed that the DOJ was investigating whether . . . UBS [helped] U.S. clients evade

19  their tax obligations." Defendants here made no such disclosure, and instead hid the fact they had

20  reported the existence of their insurance fraud to regulators, while at the same time telling investors

21  that they were unaware of any additional scandals that would further damage customer trust.[6]

22       Second, defendants' improper attempt to call into question the completeness of Wells Fargo's

23  internal investigation must be rejected, as the Complaint's well-sourced allegations clearly allege

24

25  _____

    [6]   Defendants' citation to *Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409(DJS), 2005 WL 3050970,
26  at *7 (D. Conn. Nov. 10, 2005), is unremarkable. *Menkes* stands for the proposition that uncharged
    illegal activity must be disclosed if it would mislead investors. *Id.* at *8 (agreeing there is a "duty to
27  disclose uncharged illegal conduct arising from the corporation's own misleading statements"); *cf. In
    re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (finding no duty to disclose
28  potential litigation untied to "projections or revenue predictions" impacted by the litigation), *aff'd
    sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (unpublished).

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD

otherwise.   ¶¶155-156, 166-167, 180-181; *City of Miami*, 302 F. Supp. 3d at 1042 (rejecting defendants' attempt to spin alleged misstatements and narrow their scope); *see also Khoja*, 899 F.3d at 1014 ("fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"). ***Defendants' internal investigation began in July 2016 and was complete by September 2016***, when Wells Fargo's senior management and Board of Directors received reports on the illegal schemes, abruptly ceased the decade-long practices, formed additional internal committees, and hired outside legal counsel and consultants to conduct a "review of the ***remediation***."  ¶¶156, 180.  Defendants' knowledge of the scope of the ***remediation*** may have grown during the Class Period when the Company began issuing remediation checks to harmed customers, but defendants did not learn anything material about their illegal insurance schemes after the Class Period.  *Id*.

Defendants' argument that the alleged misstatements and omissions concerning their "leave no stone unturned" Company-wide investigation and declarations that they were "***not aware of any issues***" in response to questions were just limited to the fake account scandal is meritless.  Mot. at 12-15; Sanger Mot. at 1-2.  First, defendants' attempt to re-cast the Complaint's allegations is inappropriate at the motion to dismiss stage.  *City of Miami*, 302 F. Supp. 3d at 1042.  Second, even if the Court were to consider defendants' interpretation, a cursory review of the facts belies the argument.  Defendants went out of their way to assure investors "we're going to be looking at ***all of our businesses***" (¶63) and that "we've voluntarily commissioned reviews of really ***the rest of Wells Fargo***" (¶90).  And defendants were asked specifically about "other Wells business lines" than those involved in the fake account scandal.  ¶57; *see also* ¶¶103, 126.  Thus, the Motion's discussion of factual differences between the insurance and fake account scandals (Mot. at 12-13) is irrelevant because defendants specifically made misrepresentations regarding conduct beyond the scope of the fake account scandal.[7]

---

[7]   Analyst commentary during the Class Period supports the Complaint's allegations. *See, e.g.*, ¶54 (RBC Capital Markets research report, November 3, 2016: Wells Fargo's "review of sales practices will ***extend beyond retail banking*** to ensure all facets of the company have adequate controls in place.").  *See Shenwick*, 282 F. Supp. 3d at 1136 (analyst interpretation relevant to falsity determination); *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (same).

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD      - 19 -

1       Regardless, as the fake account and insurance scandals both involved breaches of customer

2  trust where customers received products they did not want and did not need, and both occurred

3  within Wells Fargo's Community Banking Division, defendants' statements that they were unaware

4  of any other scandals were false and misleading.[8]   Indeed, analysts referred to the fake account

5  scandal as "the original sales practices" (¶158) and the insurance scandal as the "new sales abuses"

6  (¶161).  Investors focused on the breach of trust and impact to the Company's reputation for both

7  scandals.  ¶159 ("Another hit to management's credibility."); ¶164 ("[l]arge reputational hit"); ¶173

8  ("reputational damage could impair the value of Wells' retail and even commercial banking

9  franchises").  Thus, defendants' argument that a duty to disclose the insurance scandal could not

10  have arisen by discussing the fake account scandal because the two were so "unrelated" (Mot. at 12-

11  15, 19, 24; Sanger Mot. at 2), is inconsistent with and contrary to the facts alleged.

12       Indeed, when the market learned of the insurance scandal, the collective shock centered on

13  defendants' failure to disclose the insurance scandal when discussing the fake account scandal.  *See*

14  ¶158 ("We were surprised that this wasn't disclosed when the original sales practices were disclosed

15  . . . ."); ¶161 ("Shareholders, analysts, lawmakers and consumer advocates demanded answers about

16  how the situation manifested, and why Wells Fargo did not disclose the problems sooner, given

17  existing turmoil over phony deposit and credit card accounts opened in customers' names without

18  their permission.").

### 4.    Defendants' Misstatements and Omissions Regarding Their "Number One Priority" Were Not Puffery

20       Defendants argue that their statements regarding the Company's purported campaign to

21  restore customer trust and to provide transparency to investors and customers constitute inactionable

---

[8]   Contrary to defendants' claim, it is not "well settled" that a company may fail to disclose a material issue just because they also discuss a related issue.  Mot. at 15.  Unlike their cited authority, defendants affirmatively represented they were looking for additional misconduct and were asked questions regarding any discovery of misconduct separate from the fake account scandal.  ¶¶57, 94, 103, 114, 126; *In re Bofi Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147 (S.D. Cal. 2018).  In *Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2017 WL 35496, at *8 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) (unpublished), the internal controls over financial reporting were unrelated and separate from the undisclosed control issues regarding expense reimbursements for executive officers, whereas here, both issues involved Wells Fargo's Community Banking Division forcing unwanted products on unsuspecting Wells Fargo customers.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD  - 20 -

1   puffery.  Mot. at 15-17.[9]  Not so.

2          "'[G]eneral statements of optimism, when taken in context, may form a basis for a securities

3   fraud claim' when those statements address specific aspects of a company's operation that the

4   speaker knows to be performing poorly."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143

5   (9th Cir. 2017).   Importantly, "the line between puffery and a misleading statement is often

6   indistinct, and requires an analysis of the context in which the statements were made."  *Wells Fargo*,

7   282 F. Supp. 3d at 1097.  "'"Even a statement of opinion or an expression of corporate optimism

8   may be deemed actionable in certain circumstances because 'there is a difference between

9   enthusiastic statements amounting to general puffery and opinion-based statements that are anchored

10  in "misrepresentations of existing fact."'"  *Id.*  "[T]he defining question is 'whether the statement is

11  so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total

12  mix of available information.'"  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083,

13  1096 (C.D. Cal. 2008).

14          Here, the importance that defendants themselves put on rebuilding customer trust renders

15  those statements actionable.  As defendants stated: "our **highest priority** right now is rebuilding trust

16  in Wells Fargo" (¶56), "it is **critically important** that we . . . move forward to rebuild trust" (¶109),

17  and "the trust customers, employees and investors place in Wells Fargo **is paramount**" (¶97).  *See*

18  *also*, *e.g.*, ¶65 ("number one priority remains rebuilding trust"); ¶83 ("[r]estoring your trust . . . is our

19  top priority"); ¶102 ("the most important job at this company is rebuilding trust").  The notion that

20  statements concerning the Company's "number one priority" were so "'obviously unimportant to a

21  reasonable investor that reasonable minds could not differ on the question of their unimportance'" is

22  absurd.  *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).[10]

23

---

24  [9]   Defendants make the blanket statement that "Plaintiff also fails to plead materiality."  Mot. at 11.
    Defendants' only attempt to support that contention is their puffery argument, which fails for the
25  reasons stated herein.  Regardless, all of the alleged misstatements and omissions were material, and,
    "'"[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact."'"
26  *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1091-92 (N.D. Cal.
    2017); *see also Khoja*, 899 F.3d at 1009 ("The Supreme Court has eschewed brightline tests for
27  materiality.").

28  [10]  Defendants' authority does not support dismissal.  Mot. at 16-17.  Unlike the "rosy adjectives[,]-
    unmoored to any objective measures" (*In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F.

1    Critically, the context in which these statements must be considered includes how investors

2    understood the misstatements.  *Cutler*, 696 F. App'x at 814 ("the question is whether a reasonable

3    investor would understand them, in context, to communicate only a general optimism, or a factual

4    representation").  As analysts warned during the Class Period, a "loss of customer trust would be the

5    biggest potential threat to Wells Fargo's **competitive advantage**."  ¶¶5, 88; *see also* ¶173 ("we

6    continue to worry that reputational damage could impair the value of Wells' retail and even

7    commercial banking franchises").  And analysts' reaction upon the disclosure of the insurance

8    schemes also demonstrates that the practice was "obviously" important, thus rendering the

9    statements non-puffery.

10    Likewise, defendants' statements claiming they were being transparent regarding additional

11    scandals inside the Company were not puffery.  ¶¶42, 47, 72, 94, 96-99.  Defendants' misstatements

12    were not vague expressions of corporate optimism, but representations of fact that defendants were

13    being "as transparent with you as we can."  ¶114.  When considered alongside defendants'

14    misrepresentations that their "highest priority is restoring trust," defendants' proclamations of

15    transparency took on added significance.  *Cox v. Aurora Elecs., Inc.*, No. CV 93-3292 DT(JG), 1993

16    WL 652792, at *4 (C.D. Cal. Oct. 18, 1993) ("Defendants' statements 'must be viewed as part of a

17    "mosaic" to see if those statements in the aggregate, create a misleading impression.'").[11]

18    The fact that defendants spoke about and were asked questions about the importance of

19    Supp. 2d 1069, 1087 (N.D. Cal. 2005)), or "'vague statement[s] of optimism'" (*Retail Wholesale &
20    Dept. Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir.
      2017)), defendants' statements specifically assured investors Wells Fargo had already identified and
21    was transparent in disclosing all misconduct in the Community Bank.  These representations were
      objectively verifiable and false, and thus sufficiently contradicted by the alleged disclosures.  *Cf.*
22    *Markman v. Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 WL 10567194, at *6 (W.D. Tex.
      Aug. 19, 2016) (the statement "'raise the bar'" for food labeling transparency was not rendered
23    objectively false because it was an aspiration not entirely contradicted when some food labels were
      mislabeled); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-CV-05558-HSG, 2018 WL
24    4181954, at *8 (N.D. Cal. Aug. 31, 2018) (statements regarding being "'honest'" and
      "'trustworthy'" were not specifically related to allegations of gender discrimination); *Lopez v.*
25    *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (statements were puffery
      because they did "not provide any specific or concrete guarantee").

26    [11]   *See also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016) (statements about a
      company's reputation "may amount to more than 'puffery' and may in some circumstances violate
27    the securities laws: for example, a company's specific statements that emphasize its reputation for
      integrity or ethical conduct as central to its financial condition or that are clearly designed to
28    distinguish the company from other specified companies in the same industry").

1    restoring trust and the progress they had purportedly made in that regard on every investor call

2    during the Class Period further demonstrates materiality.  ¶¶47-51, 56, 62-65, 70-72, 76, 89-91, 97-

3    99, 101-103, 109, 112-116, 121, 124-126.  *Wells Fargo*, 282 F. Supp. 3d at 1096-97 (statements

4    regarding "commitment to providing value for customers" and that Wells Fargo's "cross-selling

5    scheme was meant to 'satisfy[] customers' needs and help[] them succeed financially'" not puffery);

6    *Azar*, 2018 U.S. Dist. LEXIS 200769, at *37 (statements made in response to a "specific question"

7    are material); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS

8    199809, at *35 (S.D.N.Y. Nov. 26, 2018) ("'when the statements are "made repeatedly in an effort to

9    reassure the investing public about matters particularly important to the company and investors,

10   those statements may become material"'"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d

11   261, 277-80 (S.D.N.Y. 2012) (statements such as "'[i]ntegrity and honesty are at the heart of our

12   business'" and "'[o]ur reputation is one of our most important assets'" are not puffery).[12]

13          **B.      Plaintiff Pleads a Strong Inference of Scienter**

14          The Complaint pleads facts collectively giving rise to a "strong inference" of scienter.  "The

15   inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun'

16   genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  A "strong

17   inference" is one that a reasonable person would deem "cogent and at least as compelling as any

18   opposing inference one could draw from the facts alleged."  *Id.*  "The PSLRA calls for a 'strong

19   inference,' not an outright confession or an airtight case."  *In re Network Assocs., Inc., Sec. Litig.*,

20   No. C 99-01729WHA, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000).  The question is

---

[12]  Defendants argue that some of their statements about trust and transparency were the speaker's opinion and, thus, are subject to a "heightened pleading burden."  Mot. at 17-18.  But, as defendants acknowledge, statements of opinion are actionable if the speaker "was 'aware of undisclosed facts tending seriously to undermine the statement's accuracy,' or omitted facts the omission of which makes the statement misleading 'to a reasonable person reading it fairly and in context.'"  Mot. at 17.  As alleged in the Complaint and discussed herein, defendants made all of their Class Period misstatements with full knowledge of the insurance scandals, their extensive harm to Wells Fargo customers, the damage the scandals would have on the Company's reputation, and that the issues had been reported to regulators.  *See, e.g.*, ¶¶52-53; *see also infra*, §III.B.  Defendants' promises of a commitment to trust and that they were being transparent did not "fairly align[] with the information in [defendants'] possession at the time" and, thus, are actionable.  *Omnicare*, 135 S. Ct. at 1329; *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (opinion statements actionable where "omitted facts . . . conflict with what a reasonable investor would take away from the statement").

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 23

"'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("*Reese II*") (emphasis in original).

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman*, 840 F.3d at 705. "'An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d at 1134 (citing *Reese II*, 747 F.3d at 569); *see also Quality Sys.*, 865 F.3d at 1145 ("'particularized allegations that defendants had "actual access to the disputed information,"' . . . raise a strong inference of scienter'").

### 1.    Defendants Had Actual Knowledge of the Insurance Schemes Before the Class Period

The Complaint specifically alleges that defendants had direct knowledge of the automobile insurance fraud when they made statements and omissions rendered false and misleading by the existence of the fraud.  Defendants have admitted that an internal Wells Fargo investigation into its automobile insurance fraud was initiated in July 2016, that the investigation concluded Wells Fargo had defrauded at least 800,000 of its own customers out of at least $73 million, and the results of that investigation were presented to Sloan, "senior management" and to the Board of Directors (including defendant Sanger) by September 2016.  ¶¶155-162.  As a result of that internal investigation, the insurance scheme was terminated, the Company's regulators were notified, and an outside consultant was engaged to conduct review of the Company's plan for repaying customers.  *Id*.  Defendants also do not dispute the CFPB's findings that since the inception of the CPI program in 2005, "***[t]hrough quarterly reports from its vendor and its own daily reports, [Wells Fargo] was aware of high rates of Force-Placed Insurance cancellations, and [Wells Fargo] received briefings on the root causes of the cancellations***."  ¶181.  The regulator also concluded that "[t]he high rates of cancellation ***were also apparent within [Wells Fargo]'s own system of record*** because it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that refund information back to the vendor."  *Id*.  Access to this information establishes defendants' scienter.  *Reese II*, 747 F.3d at 572

1  ("'[b]y making . . . detailed factual statement[s], contradicting important data to which [defendant]

2  had access, a strong inference arises that [defendant] knowingly misled the public as to its clear

3  meaning").

4        Sloan admitted in his Senate Banking Committee testimony that the CPI "issue was escalated

5  to me in 2016, in late August, early September" and that Wells Fargo "created an internal group

6  made up of business line experts, legal experts, [and] our auditing function to look into the matter."

7  ¶180.[13]  Before the Class Period, defendants had the results of the July 2016 internal investigation,

8  the Company shut the scheme down and reported its existence to regulators.  Defendants' knowledge

9  of the fraud grew during the Class Period as consultants provided additional reports on how to

10  remediate customers and discussions with regulators intensified.  ¶¶156-178, 180.  And yet, despite

11  all of that direct knowledge, Sloan repeatedly told investors that he was "***not aware***" of any other

12  scandals inside the Company.  ¶47; *see also* ¶15 ("for the last 11 months, every day you have made a

13  decision not to disclose this information").

14        These facts support a strong inference of scienter.  *See S. Ferry LP, No. 2 v. Killinger*, 542

15  F.3d 776, 785 (9th Cir. 2008); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029,

16  1045 (N.D. Cal. 2016) (management's admissions support a strong inference of scienter).[14]

17        The Complaint also alleges that Mack, Shrewsberry and Sanger had knowledge of the

18  Company's insurance fraud.  As Sloan's testimony confirmed, Wells Fargo's senior management

19  was briefed on the results of the Company's internal investigation no later than September 2016.

20  ¶180.[15]  Mack was a member of the Operating Committee and the head of the Community Banking

21  Division where the automobile insurance scandals occurred, and she was primarily responsible for

22

---

23  [13]   In fact, internal Wells Fargo documents now show that Sloan was aware of insurance fraud by
July 2016.  *See* §IV, *infra*.

24  [14]   Unable to deny his admissions of knowledge of the concealed facts, Sloan makes a half-hearted

25  claim that a "plausible, non-culpable explanation[]" exists to rebut the Complaint's scienter
allegations.  Mot. at 24.  First, Sloan misconstrues the standard for pleading scienter.  *Quality Sys.*,

26  865 F.3d at 1145 ("'particularized allegations that defendants had "actual access to the disputed
information," . . . raise a strong inference of scienter'").  Second, Sloan's argument simply recycles
defendants' incorrect duty to disclose argument.  As discussed *supra*, §III.A.2., that argument fails.

27  [15]   *See also* ¶161 ("The auto insurance program was quickly suspended, and the problem escalated

28  to senior management, the board and regulators . . . .").

1    monitoring and resolving those issues. ¶¶25, 50-51, 115, 121.  Shrewsberry, Wells Fargo's CFO and

2    member of the Operating Committee, was intimately involved and a spokesperson for the

3    Company's "restoring trust" campaign.[16]   ¶23.   Furthermore, Mack and Shrewsberry were

4    responsible for assuring investors, on a monthly basis throughout the Class Period, of the progress

5    Wells Fargo made on restoring customer trust, and assured investors the Board's investigation

6    "describes everything to date."   ¶¶55-56, 91; *Shenwick*, 282 F. Supp. 3d at 1147 ("As the Ninth

7    Circuit has explained, an assertion that [d]efendants were unaware of an alleged issue can be

8    'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'").

9         Defendants argue that these allegations do not sufficiently describe "what [Defendants] knew

10   about the scope of the CPI issue" and call into question the "reliability" of the Company's own

11   internal investigation.   Mot. at 22-23.[17]   These contentions ignore the Complaint's detailed

12   allegations and seek inferences to which defendants are not entitled at the pleading stage.  *Hefler*,

13   2018 U.S. Dist. LEXIS 31874, at *34 (denying motion to dismiss on identical scienter arguments

14   made by Sloan and Shrewsberry, holding "it is implausible that Wells Fargo's senior

15   management . . . was unaware of alleged fraud"); *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-

16   01252-EJD, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (noting if defendants were not

17   directly involved, "they were either aware or should have been aware of this materially relevant

18   business information").[18]

19

---

20   [16]   Internal Wells Fargo documents also now confirm that the details of the insurance fraud were
21   disclosed to members of Wells Fargo's Operating Committee, including Shrewsberry, Sloan, and
     Mack in June 2016.  *See* §IV, *infra*.

22   [17]   Defendants' authority is distinguishable.  Unlike in *In re Silicon Graphics Inc. Sec. Litig.*, where
23   "unsubstantiated internal reports" were insufficient to establish scienter, Plaintiff identifies the
     specific information provided to defendants, such as the Oliver Wyman Report, internal reviews,
24   quarterly updates from the CPI vendor and the bank's own daily reports.  *See* 183 F.3d 970, 985 (9th
     Cir. 1999), *as amended* (Aug. 4, 1999); ¶181.  In addition, unlike *In re Apple Computer, Inc., Sec.*
25   *Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002), Plaintiff has alleged more than a general "hands
     on management style" by pointing to various statements indicating defendants had direct
     management of the specific breaches of customer trust at issue here.  ¶¶7, 27, 50-51, 62-63, 90-91.

26   [18]   Sanger's claim that Plaintiff does not allege "what specifically" he knew regarding the CPI issue
27   also ignores the Complaint's allegations.  Sanger Mot. at 2-3.  The Board was presented with the
     results of Wells Fargo's internal investigation and CPI issue no later than September 2016, and
     Sanger directed the purportedly "exhaustive" review of the Community Banking Division during the
28   Class Period, which failed to disclose the insurance schemes.  ¶¶24, 44, 82-85.  These allegations

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 26 -

By demonstrating that defendants had actual knowledge of facts that directly contradicted their public statements, the Complaint alleges a strong inference that they knowingly misled the public.[19]  *S. Ferry*, 542 F.3d at 785 (holding that "detailed and specific allegations about management's exposure to factual information within the company" supports a strong inference of scienter); *Quality Sys.*, 865 F.3d at 1145 ("'particularized allegations that defendants had "actual access to the disputed information," . . . raise a strong inference of scienter'"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").[20]

### 2.     The Core Operations Doctrine Further Supports a Strong Inference of Scienter

The fact that rebuilding customer trust was Wells Fargo's "highest priority" before and during the Class Period allows the Court to infer defendants' scienter, "based on the inference that [they] have knowledge of the 'core operations' of the company." *Reese II*, 747 F.3d at 575.  When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred just on the basis of the core operations doctrine.  *S. Ferry*, 542 F.3d at 786.

As explained above, prior to and throughout the Class Period defendants publicly proclaimed

---

"plausibly suggest that [Sanger] either 'knew his . . . statements were false, or was consciously reckless as to their truth or falsity.'"  *Wells Fargo*, 282 F. Supp. 3d at 1100.

[19]   Defendants' suggestion that the Complaint fails to allege defendants' knowledge of the illegal GAP practices is wrong.  Mot. at 24 n.7; *see, e.g.*, ¶52(a) (facts "known to or disregarded by each of the defendants" included "unlawful withholding of insurance premiums after a customer's automobile loan had been paid off").  As alleged in the Complaint, defendants discovered the GAP issues during an "internal review."  ¶175.  Both the CPI and GAP practices resulted in the wrongful repossession of Wells Fargo customers' automobiles.  ¶¶155-156, 175.  Also, Wells Fargo admitted it last revised its GAP "refund process in 2014."  ¶175.  The reasonable inference is that defendants discovered the GAP issue during the July 2016 internal review of the Company's insurance practices.  Regardless, at the very least, defendants discovered the GAP issue prior to its disclosure on August 4, 2017, *i.e.*, during the Class Period, and, thus, defendants' argument on the timing of that discovery does not support dismissal.

[20]   Defendants' argument that there are no false statements or omissions so there can be no scienter fails (Mot. at 21-22) as Plaintiff has alleged falsity.  *See* §III.A, *supra*.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD      - 27 -

"the most important job at this company is rebuilding trust" and they were being "as transparent as possible." ¶¶102, 121.  Just as defendants' statement about the importance of cross selling metrics inferred they knew about the fake account scandal, this Court can conclude defendants' focus on rooting out scandals and rebuilding customer trust and transparency infers they knew about other breaches of customer trust like the CPI and GAP insurance schemes.  *See Wells Fargo*, 282 F. Supp. 3d at 1100.  In conjunction with allegations that internal and external reviews determined the issue was critical enough to form dedicated internal review teams, hire expensive consultants, and cancel the decade-long CPI program in September 2016, it is absurd to suggest that defendants were oblivious to the issue.[21]  In particular, it strains credulity to suggest that Mack, as the head of the Community Banking Division, would not have been informed or sought out information on the kind of misconduct that had been the focus of her job at Wells Fargo.  ¶50.[22]  Likewise, Shrewsberry joined defendants on their restoring customer trust campaign, and it would be equally implausible that he did not know about the insurance fraud because he was knowledgeable enough regarding customer trust issues to speak publicly on it.  *See Wells Fargo*, 282 F. Supp. 3d at 1100.  Moreover, the Company was in frequent discussion with its primary regulators during the Class Period concerning the insurance fraud.  ¶178.  It is simply implausible that the Individual Defendants – CEO, CFO, Chairman of the Board, Senior Executive Vice President Community Banking (the segment where the illegal practices occurred) – were unaware of the illegal insurance practices the Company was discussing with its regulators.  ¶¶159, 181.  If they were somehow unaware, they were deliberately reckless.  *Shenwick*, 282 F. Supp. 3d at 1134 ("'An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'") (citing *Reese II*, 747 F.3d at 569); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (noting when defendant speaks and does not have actual

---

[21]   *Schueneman*, 840 F.3d at 708 ("'Defendants' own response to the issue contributes to an inference of scienter here.'").

[22]   It is even more implausible that Mack was unaware about the CPI issues during the Class Period because the January 2017 announcement of the departures of the heads of the Dealer Services Unit within the Community Bank, Dawn Martin Harp and Bill Katafias, was a result of their involvement in the CPI scandal.  ¶¶69, 162.

1    knowledge about the subject, "it would be at least actionably reckless to reassure the public about

2    these matters at all").

3         Further, the Complaint details multiple terminations and resignations of high-level employees

4    directly "held accountable for their actions" regarding the insurance scandals. ¶¶69, 162, 177. An

5    executive's abrupt termination following the revelation of misconduct supports an inference of

6    scienter.[23]  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062-63 (9th Cir. 2014) (executive

7    resignations demonstrate scienter if plaintiffs "connect the[] departures with the problems at issue in

8    this lawsuit").    Moreover, because they are "accompanied by additional evidence of the

9    defendant[s'] wrongdoing," these resignations and terminations are strong evidence of scienter. *See,*

10   *e.g.*, *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZx), 2009 WL 2767670, at *13 (C.D. Cal.

11   Aug. 21, 2009); *Shenwick*, 282 F. Supp. 3d at 1148 (same).[24]

12        **C.    Plaintiff Adequately Pleads Loss Causation**

13        Defendants' argument that the Complaint fails to adequately allege loss causation is without

14   merit.  Mot. at 25-26.  As the Ninth Circuit recently held, pleading loss causation "requires no more

15   than the familiar test for proximate cause."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881

16   F.3d 750, 753 (9th Cir. 2018) ("*First Solar*") ("To prove loss causation, plaintiffs need only show a

17   'causal connection' between the fraud and the loss, by tracing the loss back to the 'very facts about

18

---

19   [23]  Sanger faults Plaintiff's allegations for not alleging he stepped down from the Board as a result
20   of the CPI misconduct.  Sanger Mot. at 3 n.2.  Wells Fargo urged shareholders to vote to retain
     Sanger in April 2017 for his work "strengthen[ing] oversight and increas[ing] accountability" in the
21   face of sharp criticism from proxy advisors.  ¶177.  Yet, only three months after the vote, Sanger was
     removed immediately following the revelation that the Company had engaged in the insurance
22   schemes.  This is an additional indicium of scienter.

23   [24]  Defendants' argument that deficient internal controls cannot establish a strong inference of
     scienter applies an incorrect standard of law instead of the required holistic review of the facts
24   alleged.  Mot. at 23 (citing *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D.
     Cal. 2007)).  Here, inadequate internal controls supports an inference of deliberate recklessness
25   because Wells Fargo's internal control failure to identify the pervasive opening of unwanted and
     unneeded accounts was an ongoing problem.  Thus, even if Shrewsberry was unaware of the
26   insurance fraud, which is highly implausible, he was certainly aware that the risk of insufficient
     controls would lead to a misstatement but spoke confidently about the issues anyway.  *In re New*
27   *Century*, 588 F. Supp. 2d 1206, 1228-31, 36 (C.D. Cal. 2008) (holding "courts . . . view . . . scienter
     allegations holistically with respect to each allegedly violative act" and that "prior knowledge of
28   problems with internal controls from before the time of the alleged misrepresentations" can "give
     rise to a strong inference of scienter").

1  which the defendant lied.'").[25]  "We start from the premise that loss causation is a 'context-

2  dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss."  *Lloyd v. CVB*

3  *Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  "[T]he ultimate issue is whether the defendant's

4  misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id.*

5         Pleading loss causation is "not meant to impose a great burden upon a plaintiff," but to

6  "provide a defendant with some indication of the loss and the causal connection that the plaintiff has

7  in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  In general, "loss causation is a

8  fact-intensive inquiry better suited for determination at trial than the pleading stage."  *Rudolph v.*

9  *UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008).  A plaintiff

10  must simply provide "fair notice" of the "relevant economic loss" and what the causal connection

11  "might be between that loss and the misrepresentation."  *Dura*, 544 U.S. at 346-47.  The Complaint

12  exceeds this standard.

13         The Complaint alleges that Wells Fargo's share price fell significantly after the truth

14  regarding the Company's automobile insurance schemes became known through disclosures on

15  July 27 and August 4, 2017.  ¶¶155-174.  Specifically, in direct response to the disclosures on

16  July 27, 2017, in *The New York Times* exposé and Wells Fargo's own press release admitting that the

17  Company had engaged in the CPI insurance scheme, Wells Fargo's common stock price declined

18  $1.41 per share on unusually high trading volume of more than 32.5 million shares.  ¶¶182-185.

19  Analysts and news reports confirmed that this information was "new news" and linked that stock

20  price decline directly to investors' concern that the disclosure of Wells Fargo's CPI fraud would

21  result in a loss of customers' trust, management's credibility, and the risk of additional regulatory

22  fines and litigation.  ¶184.  Likewise, the Complaint specifically alleges that the disclosures in the

23  Company's 10-Q and in *The Wall Street Journal* on August 4, 2017, revealed for the first time that:

24  (1) the Company had engaged in the GAP insurance scheme; (2) the Company's reserve for legal

25  and regulatory costs was increasing by $1.3 billion; and (3) the OCC was investigating the

26

27  _____

[25]   That a petition for certiorari to the Supreme Court is currently pending in *First Solar* does not

28  negate its binding authority.  *See United States v. Joey*, 974 F.2d 1344, 1992 WL 219064 (9th Cir.
1992) (unpublished).

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 30 -

1  Company's insurance schemes and that Wells Fargo was facing additional sanctions "in light of the

2  new insurance revelations."  ¶186.  On this news, Wells Fargo common stock fell to $51.91 per

3  share, again on unusually high trading volume.  ¶187.  Wells Fargo's admissions of the insurance

4  schemes, the announcement of a government investigation, and the revelation of an increase in

5  reserves to cover the costs of defendants' conduct all revealed the falsity of Wells Fargo's

6  statements.  *Lloyd*, 811 F.3d at 1210 (announcement of government investigation coupled with

7  revelation of prior false statements sufficient to allege loss causation).

8       Defendants' argument that the Complaint does not allege a "disclosure of the 'truth'

9  concerning any of the purported misstatements" ignores the allegations and misstates the law.  Mot.

10  at 25-26.  For example, the immediate stock price decline following the revelations on July 27, 2017,

11  in both *The New York Times* exposé and Wells Fargo's press release admitting to the CPI scheme

12  explicitly revealed that defendants' previous statements were false and misleading.  ¶160.  "That a

13  stock price drop comes immediately ***after*** the revelation of fraud can help to rule out alternative

14  causes."  *First Solar*, 881 F.3d at 754.  The same analysis applies to the August 4, 2017 disclosures,

15  which revealed the GAP insurance scheme, increased reserves, and the government investigation.

16  ¶174.  "'To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but

17  it must at least relate back to the misrepresentation and not to some other negative information about

18  the company.'"  *Lloyd*, 811 F.3d at 1210; *Azar*, 2018 U.S. Dist. LEXIS 200769, at *66 (loss

19  causation alleged where there is "no dispute that the revelation of [information previously concealed

20  by fraud] was a substantial factor in causing the [stock price decline]").[26]

21      **D.**    **Plaintiff Alleges Control Person Liability**

22       Defendants claim Plaintiff's allegations do not establish any Individual Defendant is a

23  control person under §20(a).  Mot. at 26-27.  To state a claim under §20(a), Plaintiff must

24

---

25  [26]  Defendants' factual argument that Wells Fargo's increase in litigation-related accruals might
have been related to "other matters" than the insurance schemes ignores the Complaint. Mot. at 25-
26  26 n.8.  Regardless, a misrepresentation "need not be the sole reason for the decline in value of the
securities, but it must be a '"substantial cause."'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055
27  (9th Cir. 2008); *City of Miami*, 302 F. Supp. 3d at 1046 ("'Whether the stock drop was due to other
factors is a factual inquiry better suited for determination on summary judgment or trial, rather than
28  at the pleading stage.'").

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD   - 31

demonstrate "a primary violation of federal securities law" and "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Courts have found 'general allegations concerning an individual's title and responsibilities' to be sufficient to establish control at the motion to dismiss stage." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citing cases).[27]

All the Individual Defendants are high-ranking Wells Fargo employees or directors who made false and misleading statements on behalf of Wells Fargo and controlled its efforts to restore customer trust, the control person claim should not be dismissed. *See* ¶¶22-25. Each defendant had a role in overseeing the illegal automobile insurance schemes and took personal responsibility for restoring customer trust and increasing transparency, and regularly highlighted the efforts they undertook to do so. *See, e.g.*, ¶¶7, 47, 50, 62-63 (Sloan); ¶12 (senior executives took "full responsibility for these errors"); ¶51 (Mack oversaw Community Banking Division where insurance schemes occurred); ¶¶90-91 (Shrewsberry participated in "commission[ing] reviews of really the rest of Wells Fargo."); ¶¶24, 82-85 (Sanger, as Chairman of the Board, led the four-director independent review of Wells Fargo's scandals). *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009) ("Where a board member is alleged to have signed the registration statements at issue, however, courts have presumed that the director exercised actual authority and control, at least over the contents of and/or release of those statements.").[28]

## IV.    LEAVE TO AMEND

Plaintiff maintains the sufficiency of the Complaint, but if the Court finds otherwise, Plaintiff respectfully requests leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality,'" especially in

---

[27]    To assert Rule 9(b) applies to allegations of control, defendants appear to conflate averments of fraud with control. Because "[t]he control exerted by [defendants] is not a circumstance that constitutes fraud[,] [p]laintiff is only required to assert fraud with particularity as to the primary violations." *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006).

[28]    Defendants' reliance on *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996), does nothing to alter the analysis. *Paracor* presented a unique situation where despite the title of CEO, the defendant was a mere "idea man" who was not authorized to work on the financial statements at issue. *See Kyung Cho*, 890 F. Supp. 2d at 1205.

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD      - 32

1  securities fraud cases).  Should amendment be required, the recently released internal Wells Fargo

2  documents and testimony provide a rich source of factual information which is available to permit

3  Plaintiff to add additional context to, or expand upon, enhance and confirm the existing allegations.

4  *See, e.g.*, Consumer Action, ECF No. 182 (Amended Class Action Complaint, filed Nov. 5, 2018)

5  ("Consumer Complaint"), ¶141 (Wells Fargo internal audit showing that, as of August 2015, Wells

6  Fargo had already determined the customer trust and legal issues inherent in the CPI program were,

7  in its own words, a "'*[n]egative impact to customers (deceptive) and [a] violation of regulations*

8  (CFPB).'") (quoting WFCPI_00048650); *id*., ¶165 (internal email demonstrating that, in August

9  2016, Wells Fargo's senior executives recognized that "'[k]eeping *the program could lead to*

10 *reputational risk and potential legal exposure*'") (quoting WFCPI_00035207 at 208).[29]

11 DATED: December 21, 2018                    Respectfully submitted,

12                                             ROBBINS GELLER RUDMAN & DOWD LLP
                                               SPENCER A. BURKHOLZ
13                                             LUCAS F. OLTS
                                               AUSTIN P. BRANE
14                                             KEVIN S. SCIARANI

15

16                                                      s/ LUCAS F. OLTS
                                               ──────────────────────────────
17                                                      LUCAS F. OLTS

18                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
19                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)

20

21

22

23

24   ────────────────────────────
     [29]   The additional facts cited from the Consumer Complaint are not unproven allegations and
25   attorney legal argument, but specifically identified Wells Fargo documents, testimony and
     interrogatory responses.  Such documents are reliable and could be considered.  *See Johns v. Bayer*
26   *Corp.*, No. 09CV1935 DMS (JMA), 2010 WL 2573493, at *2 (S.D. Cal. June 24, 2010) (permitting
     allegations from another complaint when plaintiffs' counsel "determin[ed] that there is a factual
27   basis for the allegations," "provides citations to the sources of Plaintiffs' information" and
     "conducted an independent investigation and . . . provided the sources for publicly available
28   information").

1514102_1

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD          - 33 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Lead Plaintiff

LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT - 3:18-cv-03948-JD        - 34 -

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify under penalty of perjury that on December 21, 2018, I authorized the

3   electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4   send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

5   and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

6   the non-CM/ECF participants indicated on the attached Manual Notice List.

7                                                   s/ LUCAS F. OLTS
                                                    LUCAS F. OLTS
8
                                                    ROBBINS GELLER RUDMAN
9                                                     & DOWD LLP
                                                    655 West Broadway, Suite 1900
10                                                  San Diego, CA  92101-8498
                                                    Telephone:  619/231-1058
11                                                  619/231-7423 (fax)

12                                                  E-mail:  lolts@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1514102_1

# Mailing Information for a Case 3:18-cv-03948-JD Purple Mountain Trust v. Wells Fargo & Company et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephanie Albrecht**
  salbrecht@orrick.com

- **Austin P. Brane**
  abrane@rgrdlaw.com

- **Walter F. Brown**
  wbrown@orrick.com,casestream@ecf.courtdrive.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Nanci L. Clarence**
  nclarence@clarencedyer.com,achin@clarencedyer.com,ahunt@clarencedyer.com

- **Josh Alan Cohen**
  jcohen@clarencedyer.com,achin@clarencedyer.com,ahunt@clarencedyer.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,viapianoc@sullcrom.com,s&cmanagingclerk@sullcrom.com,brendan-cullen-5099@ecf.pacerpro.com,loevinsohnd@sullcrom.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,lauren@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **Jordan Eth**
  jeth@mofo.com,jordan-eth-3756@ecf.pacerpro.com,tkhadoo@mofo.com,trina-khadoo-5939@ecf.pacerpro.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sverker K. Hogberg**
  hogbergs@sullcrom.com

- **Katharine Ann Kates**
  katharine@ramsey-ehrlich.com

- **James N Kramer**
  jkramer@orrick.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Lucas F. Olts**
  Lolts@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com,9870190420@filings.docketbird.com

- **Lesley Frank Portnoy**
  lfportnoy@pomlaw.com

- **Ismail Jomo Ramsey**
  izzy@ramsey-ehrlich.com,samuel@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Kevin Shen Sciarani**
  ksciarani@rgrdlaw.com,3827167420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lauren B. Seaton**
  lseaton@orrick.com

- **Adam F. Shearer**
  ashearer@clarencedyer.com,achin@clarencedyer.com,ahunt@clarencedyer.com

- **Christopher Michael Viapiano**
  viapianoc@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Anna Erickson White**
  awhite@mofo.com,anna-erickson-white-9788@ecf.pacerpro.com,andrea-vickery-5658@ecf.pacerpro.com,avickery@mofo.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Peretz              Bronstein
Bronstein Gewirtz & Grossman, LLC
60 East 42nd Street, Suite 4600
New York, NY 10154
```