1  Richard H. Klapper (*pro hac vice*)
   (klapperr@sullcrom.com)
2  Nicolas Bourtin (*pro hac vice*)
   (bourtinn@sullcrom.com)
3  SULLIVAN & CROMWELL LLP
   125 Broad Street
4  New York, New York 10004
   Telephone:    (212) 558-4000
5  Facsimile:    (212) 558-3588

6  Brendan P. Cullen (SBN 194057)
   (cullenb@sullcrom.com)
7  Sverker K. Hogberg (SBN 244640)
   (hogbergs@sullcrom.com)
8  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
9  Palo Alto, California 94303
   Telephone:    (650) 461-5600
10 Facsimile:    (650) 461-5700

11 Christopher M. Viapiano (*pro hac vice*)
   (viapianoc@sullcrom.com)
12 SULLIVAN & CROMWELL LLP
   1700 New York Avenue, N.W., Suite 700
13 Washington, D.C. 20006
   Telephone:    (202) 956-7500
14 Facsimile:    (202) 956-7056

15 *Counsel for Defendant Wells Fargo & Company*

## UNITED STATES DISTRICT COURT

16

## NORTHERN DISTRICT OF CALIFORNIA

17

18 PURPLE MOUNTAIN TRUST, Individually and )  Case No. 3:18-cv-03948-JD
   on Behalf of All Others Similarly Situated,  )
19                                               )  **WELLS FARGO & COMPANY'S REPLY**
                          Plaintiff,             )  **IN SUPPORT OF MOTION TO DISMISS**
20                                               )  **THE CONSOLIDATED COMPLAINT FOR**
              vs.                                )  **VIOLATION OF THE FEDERAL**
21                                               )  **SECURITIES LAWS**
   WELLS FARGO & COMPANY, TIMOTHY J.            )
22 SLOAN, JOHN R. SHREWSBERRY, STEPHEN )  Hearing: February 28, 2019
   SANGER, and MARY MACK,                       )  Time: 10:00 a.m.
23                                               )  Courtroom: 11
                          Defendants.            )  The Honorable James Donato
24                                               )
                                                 )
25 _____)

26

27

28

SULLIVAN
&
CROMWELL LLP

**<u>TABLE OF CONTENTS</u>**

**Page**

I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5. ..........................1

    A.  Plaintiff Fails to Plead an Omission Based on a Duty to Disclose the CPI Issue............... 1

    B.  Plaintiff Fails to Plead any Actionable Misstatement.......................................................... 2

    C.  Plaintiff Fails to Plead Scienter........................................................................................ 7

    D.  Plaintiff Fails to Plead Loss Causation. ............................................................................ 9

II.   PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY. .......................................................10

CONCLUSION......................................................................................................................... 10

SULLIVAN
&
CROMWELL LLP

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ......................................................................3

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) .....................................................................6

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).............................................................9

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 1549485 (N.D. Cal. May 1, 2017)...............................................................8

*John Doe Co. No. 1* v. *CFPB*,
    195 F. Supp. 3d 9 (D.D.C. 2016) ..............................................................................2

*Lloyd* v. *CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .................................................................................10

*Lopez* v. *CTPartners Exec. Search Inc.*,
    173 F. Supp. 3d 12, 26 (S.D.N.Y. 2016).....................................................................6

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)........................................................................2

*Mineworkers' Pension Scheme* v. *First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ..............................................................................4, 10

*Mulligan* v. *Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................................5

*Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................................................9

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...................................................................................9

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..............................................................................5, 8

*Shenwick* v. *Twitter*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .....................................................................9

SULLIVAN
&
CROMWELL LLP

1

*Sprewell* v. *Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001), *opinion amended on denial of reh*'g, 275 F.3d 1187
    (9th Cir. 2001)..................................................................................................................2

2

3

*In re Wells Fargo & Co. Shareholder Deriv. Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................9

4

**Other Authorities**

5

17 C.F.R. § 240...................................................................................................................7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN
&
CROMWELL LLP

WELLS FARGO & COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT
CASE NO. 3:18-CV-03948-JD

As set forth in Wells Fargo's Motion to Dismiss (ECF No. 55) (the "Motion" or "Mot."),[1] Plaintiff has failed in numerous ways to plead securities fraud in connection with the CPI issue.  The facts alleged in the Complaint are unremarkable:  Wells Fargo discovered an operational error that impacted customers (mistakenly placing CPI when it was not needed), immediately sought to investigate the scope of the problem and come up with a plan to fix it, and then disclosed the problem.  (Mot. at 5-6.)  At the same time, Wells Fargo was dealing with the aftermath of the serious and widely reported sales practices issues in its Community Bank, in which employees opened unauthorized accounts to meet sales goals.  In its Opposition (ECF No. 63) ("Opp."), Plaintiff repeatedly tries to conflate the sales practices and CPI issues in order to manufacture a securities fraud claim.  Plaintiff also repeatedly asserts, without any factual basis, that Wells Fargo did not intend to disclose the CPI issue once it had completed its investigation.  But none of the facts in the Complaint connect the sales practices issues with the CPI issue and Plaintiff's own allegations show that Wells Fargo was still investigating the CPI issue when it was disclosed in 2017.  Because Plaintiff has failed to plead any facts to suggest that any of Defendants' statements were false or misleading, or that any such statements were made with scienter, Plaintiff's complaint must be dismissed.

## I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5.

### A.    Plaintiff Fails to Plead an Omission Based on a Duty to Disclose the CPI Issue.

Wells Fargo did not have any freestanding duty to disclose the CPI issue, the ongoing investigation into its scope and the remediation thereof, or any potential liabilities or litigation accruals resulting therefrom.  (Mot. at 9-10.)  In its Opposition, Plaintiff contends that the numerous cases cited in the Motion that hold that there is no freestanding duty under U.S. law to disclose "uncharged, unadjudicated wrongdoing" are somehow inapposite because those cases either involved "misconduct [that] had been *disclosed* to investors" or "other circumstances inapplicable to the facts at issue here." (Opp. at 18.)  Plaintiff, however, has failed to cite a single case imposing a duty to disclose uncharged wrongdoing and has failed to explain how its supposed distinctions undermine the proposition repeatedly articulated in these cases that "nothing in the securities laws — *standing alone* — requires

---

[1]    Unless otherwise defined, capitalized terms have the same definition as set forth in the Motion.

affirmative disclosure of an inchoate government investigation." *John Doe Co. No. 1* v. *CFPB*, 195 F. Supp. 3d 9, 19 (D.D.C. 2016); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (dismissing § 10(b) claims because "Corporations do not, as a general matter, have a duty 'to disclose uncharged, unadjudicated wrongdoing'" (citation omitted)).

Plaintiff next argues that Wells Fargo "improper[ly] attempt[s] to call into question the completeness of Wells Fargo's internal investigation" because, supposedly, "the Complaint's well-sourced allegations clearly allege" that "Defendants' internal investigation began in July 2016 and was complete by September 2016" and thus, according to Plaintiffs required to be disclosed.  (Opp. at 18-19.)  But there are no *facts* in the Complaint to support that contention and Plaintiff is not entitled to any such inference.  *See Sprewell* v. *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'*g, 275 F.3d 1187 (9th Cir. 2001) (court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). Although Plaintiff alleges that the Wyman Report was "delivered to Wells Fargo's most senior executives by September 2016" (Compl. ¶ 4), the Complaint itself quotes Wells Fargo's July 27, 2017 press release explaining that the report constituted only the "*initial findings*" and that "*[s]ince then*, the company has gone through a comprehensive review using independent consultants to ensure the remediation plan it develops addresses customers' situations in a thorough and thoughtful way."  (*Id*. ¶ 156 (emphasis added).)  That same press release, as quoted in the Complaint, also states that "Wells Fargo reviewed policies placed between 2012 *and 2017*" — which refutes the contention that the CPI investigation was complete by September 2016.  (*Id*. (emphasis added).)  Plaintiff also quotes Sloan's Senate testimony on October 3, 2017 that, *after* the CPI issue was escalated to him in "late August, early September" 2016, "[w]e *then* created an internal group made up of business line experts, legal experts, our auditing function to look at the matter" and "brought in an independent law firm and independent consulting firm to help us do a comprehensive . . . review of the remediation."  (*Id*. ¶ 180. (emphasis added).)  The Complaint thus makes clear that the CPI investigation was not complete in September 2016 — it was just beginning — and Plaintiff has not alleged a single fact that suggests otherwise.

**B.**    **Plaintiff Fails to Plead any Actionable Misstatement.**

*Statements Regarding the Sales Practices Issues*.  The vast majority of the supposedly

1   false or misleading statements in the Complaint are optimistic statements that Defendants made about

2   the progress of Wells Fargo's ongoing investigation and remediation of the well-publicized sales

3   practices issues, which are unrelated to the CPI issue.  (Mot. at 12-15.)  This is fatal to Plaintiff's

4   attempt to plead falsity here because Plaintiff cannot allege (and has not alleged) that any of those

5   statements were inaccurate with respect to the ongoing sales practices investigation.  (*Id*. at 13-14.)  In

6   its Opposition, Plaintiff does not seriously contest this point, but argues only in conclusory fashion that

7   the distinction between the sales practices investigation and the CPI issue is "meritless" and that

8   Defendants may not "re-cast the Complaint's allegations."  (Opp. at 19.)  But it is Plaintiff, not

9   Defendants, that seeks to "re-cast" the facts alleged in the Complaint to make CPI a part of the sales

10   practices issues.  *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1086 (C.D. Cal.

11   2012) (denying inference of scienter where "Plaintiffs omit key words from documents or statements

12   they quote, and take other statements out of context to suggest that defendants were making false

13   representations.").  The facts alleged in the Complaint (as opposed to Plaintiff's characterizations of

14   those facts in its Opposition) — including among many other things the OCC's and CFPB's descriptions

15   of the scope of the sales practices issues — make clear that the "sales practices" issues refer to "Wells

16   Fargo employees secretly open[ing] unauthorized accounts to hit sales targets and receive bonuses" and

17   resulted from "product sales goals . . . along with a high-pressure culture."  (Mot. at 12; Compl. ¶¶ 37,

18   40.)  Similarly, the Wells Fargo Board report cited in the Complaint (Compl. ¶¶ 94, 95) explained that

19   the Board committee's investigation that resulted in that report was undertaken "to understand the root

20   causes of *improper sales practices* in the Community Bank" and found that "[t]he root cause of *sales*

21   *practice* failures was the distortion of the Community Bank's *sales culture* and performance

22   management system, which, when combined with *aggressive sales management*, created pressure on

23   employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized

24   accounts."  (Declaration of Brendan P. Cullen ("Cullen Decl.") Ex. A, at 2 (emphases added).)

25           By contrast, the CPI issue, as described by the CFPB (and Plaintiff's Complaint), arose

26   out of Wells Fargo's failure to "sufficiently monitor its vendor and internal processes, resulting in

27   control and execution weaknesses, such as within the insurance-verification and cancellation processes

28   and the protocols for processing refunds" and resulted in the mistaken placement of CPI on accounts that

SULLIVAN
&
CROMWELL LLP

3

did not need it.  (Mot. at 13; Compl. ¶ 181.)  Plaintiff does not allege a single fact that suggests that the CPI issue resembled sales practices issues in any way — there is no allegation that the CPI issue involved anyone intentionally opening "unauthorized accounts to hit sales targets and receive bonuses," a "high-pressure culture," or "aggressive sales management" or any sales pressure on employees whatsoever.  The Complaint itself quotes an analyst report "confirm[ing] that the auto insurance issue is *new news*, *and not related to the sales practice issues*."  (Mot. at 2-3; Compl. ¶ 159 (emphasis altered).)

Plaintiff's only response is to point to statements cited in the Complaint that the sales practices investigation was not limited to Wells Fargo's Community Banking Division but was extended to "all of our businesses."  (Opp. at 19.)  That the sales practices investigation looked at *sales practices* — such as employee sales incentives, bonuses, and sales culture — outside of the Community Bank, however, does not mean that the CPI issue was related to the sales practices issues.  Plaintiff, in fact, alleges the opposite in the Complaint — namely that the investigation into the CPI issue arose from an unrelated $24 million settlement with the Justice Department and the OCC "over the process by which it repossessed military member's cars," which "prompted the Bank to look at other issues within the business" and "led to the discovery of the auto insurance-related issues with vendor National General Insurance."  (Compl. ¶ 167 (internal quotation marks and citation omitted).)  In short, the facts alleged in Plaintiff's own Complaint refute Plaintiff's Opposition contention that the CPI issue was part of, related to, or discovered through Wells Fargo's investigation into the sales practices issues.  Because it is well settled that a statement discussing one internal issue (sales practices) is not misleading because it fails to disclose another, different issue (CPI) (Mot. at 15), Plaintiff has failed to plead actionable misrepresentations with respect to the statements in the Complaint concerning the sales practices issues.

***Statements Regarding Transparency and Customers' Trust.***  Plaintiff's attempt to plead securities fraud based on  Defendants' general, optimistic statements that, *e.g.*, Wells Fargo "remained committed to being transparent" and had "made progress in restoring customers' . . . trust" (Mot. at 16; Compl. ¶¶ 70, 71) also fails.

*First*, Plaintiff has not alleged facts to show that these statements were in fact false or misleading.  In its Opposition, Plaintiff fails totally to address, and has thus conceded, its failure to plead facts to show that Wells Fargo was *not* committed to greater transparency or had *not* made progress in

restoring trust — especially with regard to the sales practices issues.  (Mot. at 17.)  In fact, Plaintiff itself cites *multiple* new and extraordinary measures that Wells Fargo took in response to the sales practices issues to try to increase transparency and restore trust, including, *inter alia*, (i) launching a new webpage to provide updates on the sales practices issues, (ii) providing monthly updates on the impact of the sales practices issues on customer activity, and (iii) forming a new "Rebuilding Trust Office."  (Compl. ¶ 85.)

*Second*, these statements are paradigmatic, non-actionable puffery that Courts routinely hold cannot support a securities fraud claim.  (Mot. at 15-18.)  Plaintiff does attempt to address this shortcoming of its allegations, but none of the cases Plaintiff cites supports its contention that these statements were actionable.  For example, in *In re Quality Systems, Inc. Securities Litigation*, the Ninth Circuit held that a CEO's statements that, *inter alia*, "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales" and "[t]here is nothing drying up and there is nothing slowing down" was not puffery because it constituted a "a concrete description of the past and present state of the pipeline" and specifically "reassured investors . . . that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters."  865 F.3d 1130, 1143-44 (9th Cir. 2017).  Similarly, in *Mulligan* v. *Impax Labs., Inc.*, the court held that the company's statements reassuring investors that its responses to an FDA letter concerning manufacturing problems preventing the sale of its products were "well underway" or "nearly completed" — when it was clear that the company would be unable to address the identified issues — were not puffery.  36 F. Supp. 3d 942, 968 (N.D. Cal. 2014).  These cases involved optimistic statements that were *not* general — they were made specifically with respect to the state of the company's product pipeline prospects and a particular FDA approval issue.  None of Defendants' optimistic statements about prioritizing the restoration of customers' trust or being committed to transparency were made specifically about the CPI issue or referred to Wells Fargo's auto loan lending business in any way.  All of these statements were made generally or in connection with the unrelated sales practices issues.

Plaintiff also has failed to distinguish the many cases cited in the Motion that repeatedly have held that general optimistic statements concerning a company's commitment "*to build trust*"; its "*dedication towards transparent . . . decision-making process*"; its efforts "*to raise the bar even higher on our standards of transparency*"; and its "*renewed commitment to accountability and transparency in*

1  *the marketplace*" are paradigmatic, non-actionable puffery.  (Mot. at 16-17 (emphasis added).)

2  Plaintiff's argument why these cases do not apply here is the spurious contention that "defendants'

3  statements specifically assured investors Wells Fargo had already identified and was transparent in

4  disclosing all misconduct in the Community Bank" and that "[t]hese representations were objectively

5  verifiable and false."  (Opp. at 22 n.10.)  Plaintiff, however, has not alleged any statements by

6  Defendants that "all misconduct in the Community Bank" had been disclosed or that any issues *other*

7  *than* sales practices issues would be investigated and disclosed.  (*See*, *e.g.*, Compl. ¶ 47 (conceding that

8  Sloan's statements concerning "the thoroughness of the Company-wide review" and that "he was 'not

9  aware' of any undisclosed problems" were expressly made "*concerning sales practices or culture*"

10  (emphasis added)).)  Plaintiff's further argument that these general, optimistic statements are rendered

11  actionable when read "in context" fares no better.  (Opp. at 22-23.)  Each of these statements was made

12  expressly about the sales practices issues and in response to questions concerning the sales practices

13  issues, context which Plaintiff ignores when it attempts to allege that the statements had something to do

14  with the CPI issue.  (Mot. at 12-15.)

15          *Finally*, Plaintiff's proffered reasons for why the puffery cases cited in the Motion do not

16  apply to the facts here actually confirms their applicability.  For example, with respect to *In re*

17  *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) —

18  wherein the defendant made optimistic statements regarding the company's "measurable progress" and

19  "continuing improvements" in its financial results and operations — Plaintiff cites as a purportedly

20  distinguishing fact that the alleged misstatements were "rosy adjectives[,] unmoored to any objective

21  measures."  (Opp. at 21 n.10.)  But Plaintiff has identified no objective measure against which to

22  measure the statements at issue here.  (*See, e.g.,* Compl. ¶ 70 ("We continued to make progress in the

23  fourth quarter in rebuilding the trust of our customers, team members and other key stakeholders."

24  (emphasis omitted)).)  Similarly, in trying to distinguish *Lopez* v. *CTPartners Exec. Search Inc.*, 173 F.

25  Supp. 3d 12, 26, 28 (S.D.N.Y. 2016), Plaintiff argues that a statement touting a "renewed commitment

26  to accountability and transparency in the marketplace" was not actionable because it did "not provide

27  any specific or concrete guarantee."  (Opp. at 22 n.10.)  Neither did any statement in the Complaint.

28          ***Reporting on Disclosure Controls and Litigation.***  Plaintiff has failed to allege any facts

1    to show that the statements in Wells Fargo's Forms 10-K and 10-Q concerning disclosure controls,

2    litigation risks, or the "Sales Practices Matters" were false or misleading merely because those sections

3    did not refer to the then-ongoing investigation of the CPI issue.  (Mot. at 18-20.)  In the Opposition,

4    Plaintiff fails meaningfully to respond to these arguments and instead simply doubles down on its

5    attempt to improperly conflate Wells Fargo's statements about its "disclosure controls and procedures"

6    — which are specifically defined under 17 C.F.R. §§ 240.13a-15(e) and 240.15d-15(e) — with the

7    unrelated "external vendor processes and internal controls" that Wells Fargo put in place for its CPI

8    program and which were later found to be deficient.  (Opp. at 16.)  Plaintiff's argument is emblematic of

9    its approach throughout the Complaint of taking statements out of context and conflating one issue

10   (disclosure controls and procedures) with unrelated issues (external vendor processes and internal

11   controls related to CPI) in an attempt to manufacture a misstatement.  This is inadequate to state a claim.

12          Plaintiff also argues that Wells Fargo's risk disclosures were misleading because "they

13   disclosed a risk 'in the abstract' but omitted the fact it had 'already . . . come to fruition.'"  (Opp. at 16

14   (quoting *Cutler* v. *Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017)).)  But Plaintiff's sole example in the

15   Opposition of this type of purported misstatement once again (and again improperly) conflates the sales

16   practices and CPI issues.  (*See* Opp. at 16; Compl. ¶ 142 (quoting section concerning "Risks Related to

17   Sales Practices").)  Again, Plaintiff cannot state a fraud claim by taking statements out of context.

18          **C.    Plaintiff Fails to Plead Scienter.**

19          The Opposition does not salvage Plaintiff's scienter allegations either.  Those allegations

20   fail in the first instance because the "plausible, nonculpable explanation[]" for Defendants' supposed

21   "nondisclosure" of the ongoing CPI investigation is far and away the most cogent and compelling:

22   Defendants had a reasonable belief that all of their statements regarding the *sales practices investigation*

23   and Wells Fargo's commitment to increased transparency and restoring customers' trust were entirely

24   true and accurate and were not rendered false by any knowledge they may have had concerning the *still*

25   *ongoing* investigation into the unrelated CPI issue because their statements had nothing to do with CPI.

26   (Mot. at 21-22, 24.)  That alone is enough to defeat Plaintiff's fraud claims.

27          Plaintiff's scienter allegations also still fail for a variety of other reasons.  As to

28   Defendants Shrewsberry, Mack, or Sanger, Plaintiff has not alleged with the required particularity when

1    or how any of them received or reviewed any information concerning the CPI issue (including the

2    Wyman Report), much less how any such information would have suggested to them that their

3    statements were in any way false or misleading.  (Mot. at 22-23.)  Rather, Plaintiff has alleged only that

4    "Wells Fargo's most senior executives" (whoever they are) received the Wyman Report and that the CPI

5    issue was "escalated . . . to senior management and the [Board]."  (Mot. at 22.)

6            Plaintiff argues that the "Complaint specifically alleges that defendants had direct

7    knowledge" of the CPI issue and that the "results" of the CPI investigation (by which Plaintiff

8    presumably means the Wyman Report) "were presented to Sloan, 'senior management' and to the Board

9    of Directors (including defendant Sanger) by September 2016."  (Opp. at 24.)  Plaintiff cites for support

10   Paragraphs 155-162 of the Complaint (*id.*) but none of these paragraphs mentions Shrewsberry, Mack,

11   Sanger, Sloan or even "senior management," much less "specifically alleges" facts to show that any of

12   those Defendants (or anyone else) knew of the CPI issue.  Although Plaintiff has alleged elsewhere in

13   the Complaint that the CPI issue was "escalated" to Sloan in late August or September 2016 and

14   "escalated" to the Board on which Sanger served (Mot. at 22-23), there are no such allegations about

15   either Shrewsberry or Mack about the CPI issue.  Nor are there any allegations whatsoever about *what*

16   *specific* information concerning the CPI issue was escalated to Sloan and the Board.  (Mot. at 22-24.)

17           Plaintiff's contention that it can adequately plead scienter merely by alleging that the CPI

18   issue was "escalated" to Sloan, the Board, and the Operating Committee (Opp. at 25-26) is plainly

19   incorrect.  Plaintiff was required to plead "particularized facts" about the specific information

20   concerning the CPI issue that was known by Shrewsberry, Mack, Sanger, and Sloan, *when* they knew it,

21   and *how* that information put them on notice when they made them that their statements concerning the

22   sales practices investigation or Wells Fargo's commitment to "being transparent" or "rebuilding trust"

23   were false or misleading.[2]  (Mot. at 23.)  As set forth in the Motion (Mot. at 24), Plaintiff also cannot

24   _____

     [2]    None of Plaintiff's case law is to the contrary.  *See, e.g., In re Finisar Corp. Sec. Litig.*, No.
25   5:11-CV-01252-EJD, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (scienter adequately alleged
     where variety of other factors "[t]aken collectively" allowed inference of scienter, including, *inter alia*,
26   that industry analyst speculation about inventory build-up; defendants made large stock offering shortly
     after statement at issue; and individual officer "sold an unusually large portion of his own shares" during
27   the relevant time); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter
     adequately alleged where particularized allegations concerning "actual access" to allegedly misstated
28   sales projections included confidential witness reports that: (1) management had real-time access to

1  plead scienter as to Sanger (or anyone else) based on Sanger's resignation from the Board or the

2  retirement of "high level employees" *other* than Defendants.[3]  Plaintiff also cannot rely on the "core

3  operations" doctrine to supplement its deficient scienter allegations because Plaintiff nowhere has

4  pleaded any facts to show that the placement of CPI with respect to auto loan customers "was critical to

5  the company's success and growth prospects" or that it was "closely tracked, both at the company level

6  and at the individual branch level."  *In re Wells Fargo & Co. Shareholder Deriv. Litig.*, 282 F. Supp. 3d

7  1074, 1100-1101 (N.D. Cal. 2017).  Plaintiff also has failed to allege that any Defendant engaged in,

8  *inter alia*, suspicious stock trades or any other corroborating facts to support a strong inference of

9  scienter.  In short, Plaintiff has not come close to meeting its burden in pleading scienter.[4]

10         **D.     Plaintiff Fails to Plead Loss Causation.**

11                Plaintiff contends in its Opposition that it adequately pleaded loss causation because it

12  supposedly has alleged facts to show that the purported misstatements were a "proximate cause" of the

13  

---

14  relevant Salesforce reports; (2) the CEO stated on a call that the market was saturated; and (3) a sales
    analyst personally arranged to have the relevant reports be delivered to the CFO's office); *Nursing*

15  *Home Pension Fund, Local 144* v. *Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (scienter
    adequately alleged with respect to allegedly misstated sales targets where (1) all sales information was

16  in database to which executive stated they had access and (2) where CEO admitted that "[w]e know
    exactly how much we have *sold* in the last hour around the world").

17  [3]     Plaintiff's cited cases are not to the contrary.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046,

18  1062-63 (9th Cir. 2014) (holding that employee departures did not contribute to pleading of scienter
    where plaintiffs failed to connect departures with the problems at issue and failed to explain executives'

19  role in alleged misconduct); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21,
    2009) (terminations did not contribute to scienter allegations where plaintiff failed to allege

20  particularized facts refuting reasonable assumption that defendant was fired simply because errors
    occurred on his watch or because he failed adequately to supervise his department); *Shenwick* v. *Twitter*,

21  282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (departure contributed to finding scienter because, *inter*
    *alia*, witnesses stated that senior executive was "understood [to have been] pushed out of the Company

22  due to a lack of user growth" when alleged misstatements concerned that metric).

23  [4]     Plaintiff also cannot overcome its failure "to plead a single fact regarding any Defendant's
    purported knowledge of the GAP issue."  (Mot. at 24 n.7.)  Plaintiff's only response is to refer the Court

24  to the wholly conclusory allegation in Paragraph 52(a) of the Complaint that the GAP issue was "known
    to or disregarded by each of the defendants."  (Opp. at 27 n.19.)  That, of course, does not come close to

25  pleading scienter.  Plaintiff also cites to the allegation in Paragraph 175 that the GAP issue was
    discovered in an "internal review" and argues — without any basis whatsoever — that "[t]he reasonable

26  inference is that defendants discovered the GAP issue during the July 2016 internal review of the
    Company's insurance practices" or, alternatively, that Defendants "at the very least" discovered the

27  GAP issue prior to its disclosure on August 4, 2017.  (Opp. at 27 n.19.)  None of Plaintiff's speculation
    is supported by even a single well-pleaded fact to show what, if anything, Defendants knew about this

28  issue, or when, and does not come close to pleading scienter with the required particularity.

1   loss suffered, as required under the Ninth Circuit's decision in *Mineworkers' Pension Scheme* v. *First*

2   *Solar Inc*., 881 F.3d 750 (9th Cir. 2018).  (Opp. at 29-31.)  In support, Plaintiff points to allegations

3   "that Wells Fargo's share price fell significantly after the truth regarding the Company's automobile

4   insurance schemes became known through disclosures on July 27 and August 4, 2017."  (Opp. at 30.)

5   But those two disclosures — the New York Times article discussing the Wyman Report and Wells

6   Fargo's Form 10-Q — did not reveal that any of the prior alleged misstatements concerning Wells

7   Fargo's attempts to increase "transparency" and restore "trust" were false but instead disclosed only

8   previously undisclosed operational errors that could invite additional regulatory scrutiny and penalties.

9   (Mot. at 25-26.)  As Plaintiff concedes (Opp. at 31), although "the disclosure need not precisely mirror

10  the earlier misrepresentation" it still "must at least relate back to the misrepresentation *and not to some*

11  *other negative information about the company*."  *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th

12  Cir. 2016) (emphasis added) (quoting *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1140

13  (10th Cir. 2009)).  Here, the New York Times article and Form 10-Q disclosed "other negative

14  information" about Wells Fargo (the previously undisclosed CPI issue and GAP issue) rather than

15  anything concerning its prior statements that it was trying to increase transparency and restore trust.

16  ## II.      PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY.

17              Plaintiff has failed to plead control person liability as to any Defendant because it has

18  failed to allege a primary violation of the securities laws or any particularized facts to show that Sloan,

19  Shrewsberry, Sanger, or Mack exercised actual control over the alleged false statements *that they*

20  *themselves did not make.*  (Mot. at 26-27.)  For example, in its Opposition Plaintiff does not point to a

21  single well pleaded allegation to show that Sloan had *any* control (or role with respect to reviewing or

22  approving) the alleged misstatements made by Shrewsberry, Sanger, or Mack.  This pleading deficiency

23  is true for every Defendant with respect to every other Defendant.  Plaintiff, instead can cite only to

24  generalized allegations that certain Defendant were involved with the Community Banking Division or

25  had involvement in "commission[ing] reviews" at Wells Fargo.  (Opp. at 32.)  As set forth in the

26  Motion, these allegations fall far short of pleading control person liability.  (Mot. at 26-27.)

27  ## CONCLUSION

28              Given its incurable deficiencies, the Complaint should dismissed with prejudice.

SULLIVAN
&
CROMWELL LLP

Dated:   January 25, 2019

/s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)
Sverker K. Hogberg (SBN 244640)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

Richard H. Klapper (*pro hac vice*)
(klapperr@sullcrom.com)
Nicolas Bourtin (*pro hac vice*)
(bourtinn@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Christopher M. Viapiano (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-6985
Facsimile: (202) 956-7056

*Counsel for Defendant Wells Fargo & Company*

SULLIVAN
&
CROMWELL LLP