UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURPLE MOUNTAIN TRUST,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, et al.,<br><br>Defendants. | Case No. 3:18-cv-03948-JD<br><br>**ORDER RE MOTION TO DISMISS**<br>Re: Dkt. No. 55 |

This is a securities class action against Wells Fargo & Company, its former CEO, Timothy J. Sloan, other officers, and the former chairman of its board of directors, Stephen Sanger. Lead plaintiff Construction Laborers Pension Trust for Southern California brought suit on behalf of persons who purchased or otherwise acquired Wells Fargo common stock between November 3, 2016, and August 3, 2017, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5. Dkt. No. 46 ¶¶ 2, 16. The gravamen of the consolidated amended complaint is that Wells Fargo made 67 statements during the class period that were false or misleading because they did not disclose known problems with its collateral protection insurance ("CPI") and guaranteed auto protection ("GAP") practices for auto loan customers.

Wells Fargo moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 55. All the individual defendants have joined Wells Fargo's motion. Dkt. Nos. 56, 59, 60, 61. Sanger also filed a short brief regarding the alleged falsity of his statements and lack of scienter. Dkt. No. 59 at 1-3. Defendants say the amended complaint should be dismissed for two main reasons: 1) Wells Fargo had no obligation to disclose its improper auto insurance policies when discussing its ongoing sales practices, or "fake accounts," problem; and 2) statements about the

company's commitment to transparency and restoring trust in the wake of that problem are not actionable. After an initial set of briefing and oral argument, the Court called for plaintiff to file a chart summarizing its allegations on a statement-by-statement basis and for defendants to file an accordingly reorganized supplemental brief. Dkt. No. 66; *see* Dkt. Nos. 71-1, 72. This is the Court's standard practice in securities cases.

Before reaching the merits of the motion, a constructive comment on the amended complaint is warranted. It is counterproductive, and potentially self-defeating, to feature 67 statements as grounds for relief, particularly when many of the alleged misstatements were duplicative or run-of-the-mill boilerplate. The chart summarizing the allegations on a statement-by-statement basis magnified this problem and imposed an enormous amount of additional and largely unnecessary work on the Court and defendants. On this occasion, the Court undertook the herculean effort needed to sort through the mass of allegations, but that will not be the course of action going forward. Depending on developments in response to this order, plaintiff may be required to identify its top five allegations, and proceed on that basis. Judicial economy and efficiency, as well as reasonable constraints on litigation costs, demand no less.

Defendants' arguments warrant dismissal of most of plaintiff's claims, but Wells Fargo and Sloan's failure to disclose the auto insurance problems -- specifically, the CPI issue -- when explicitly asked about the lay-of-the-land outside of sales practices is actionable. The heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") are met. Defendants' motion to dismiss is granted in part and denied in part, and plaintiff is granted leave to amend.

**BACKGROUND**

As alleged in the consolidated complaint, prior to September 2016, some auto loan customers with Wells Fargo were improperly enrolled in, and forced to pay for, collateral protection insurance they did not need. Dkt. No. 46 ¶¶ 3,10. CPI protects a lender's collateral, the car, if the borrower does not obtain auto insurance. CPI is unnecessary if a borrower has obtained insurance, or when the loan has been paid off. *See id.* ¶ 3. Wells Fargo was aware of issues with its CPI practices by July 2016, senior executives were briefed by September 2016, and the practice

2

was terminated later that month. *Id.* ¶¶ 4, 8, 10. The company also reported the problem to the Office of the Comptroller of the Currency ("OCC"), during the summer of 2016. *Id.* ¶ 5.

There was no public disclosure of Wells Fargo's CPI issue until a July 2017 New York Times article. *Id.* ¶ 9. In a press release issued the same day and in its second quarter filing with the SEC a week later, the company acknowledged that it had been aware of problems with its CPI program for approximately a year. *Id.* ¶¶ 10-11. On the dates of these disclosures, the price of Wells Fargo's stock fell. *Id.* ¶ 14.

Days after the 10-Q filing, the New York Times published an article reporting that Wells Fargo was under investigation by the Federal Reserve Bank of San Francisco for failing to refund unused portions of guaranteed auto protection premiums. *Id.* ¶ 33. GAP insurance is optional coverage that protects auto lenders against the practical reality that the collateral for an auto loan loses a tremendous amount of value almost immediately -- i.e., when it is driven off the lot. *Id.* ¶ 32. Other insurance only pays up to the market value of the vehicle at the time of an accident or other adverse event. *Id.* Many states require that unused portions of the GAP premium be paid back to customers if loan repayment is completed early. *Id.* ¶ 33.

While the consolidated complaint's nonconclusory allegations are taken as true for the motion to dismiss, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), the parties disagree about the salient facts. Plaintiff says that a separate Wells Fargo's sales practices issue, in which bank employees were found to have opened unauthorized accounts for customers, makes certain statements failing to disclose its auto insurance problems during the class period false or misleading. *See* Dkt. No. 46 ¶¶ 36-39; Dkt. No. 63 at 6-7. Defendants deny the relevance of the fake accounts to this case. *See* Dkt. No. 55 at 6-7, 12-15. Statements relating to those improper sales practices were the subject of another securities case in this district, which has settled. *See Hefler v. Wells Fargo & Co.*, Case No. 16-cv-05479-JST (N.D. Cal.). A consumer class action relating to the improper CPI policy also settled in the Central District of California. *See In re Wells Fargo Collateral Prot. Ins. Litig.*, Case No. 17-ml-02797-AG-KES (C.D. Cal.). Wells Fargo has entered into consent orders, including fines, relating to its CPI policies with the Consumer Financial Protection Bureau and the OCC. Dkt. No. 46 ¶ 34.

**DISCUSSION**

**I.     LEGAL STANDARDS**

Well-established standards govern the motion to dismiss. The complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), including "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility analysis is "context-specific" and not only invites, but "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Additional requirements apply because this is a securities fraud action. The circumstances constituting the alleged fraud must be stated with particularity under Federal Rule of Civil Procedure 9(b). *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). In addition, pursuant to the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). For each alleged misstatement or omission, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

"To plead a claim under Section 10(b) and Rule 10b-5, [plaintiff] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund.*, 774 F.3d at 603 (citing *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Defendants do not contest elements (3) through (5), so the Court addresses only whether plaintiff has adequately pleaded falsity, scienter, and loss causation.

**II.    SECTION 10(B) AND RULE 10B-5 CLAIM**

Plaintiff challenges 67 statements made by defendants between November 3, 2016, and August 3, 2017, in a multitude of filings, reports, conference calls, and other public fora.

Although plaintiff did not group these claims in an organized manner, it in effect alleges that defendants made five types of false or misleading statements during the class period: 1) statements about sales practices; 2) statements about Wells Fargo's commitment to transparency and accountability; 3) statements about risk factors; 4) statements about corporate controls and procedures; and 5) litigation expense estimations. The Court evaluates the 67 statements in these groupings, and uses the statement numbering in the supplemental claims chart, Dkt. No. 71-1.

### A. Material Misrepresentations or Omissions

#### 1. Sales Practices/Fake Account Statements

Defendants' statements limited to sales practices issues were not false or misleading despite their failure to disclose the auto insurance problems. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Federal securities laws and regulations "prohibit only misleading and untrue statements, not statements that are incomplete." *Huang v. Avalanche Biotechs., Inc.*, Case No. 15-cv-03185-JD, 2016 WL 6524401, at *4 (N.D. Cal. Nov. 3, 2016) (citing *In re Rigel Pharm, Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012)). Accordingly, a public statement is only "misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation and citation omitted).

Discussions of sales practices during the class period did not give the "false impression" that Wells Fargo had disclosed all of its misconduct. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1013 (9th Cir. 2018). A reasonable investor would not have the mistaken impression that there were no issues in the company's auto insurance programs from, for example, Statement 16, where Sloan assured participants at the December 2016 Goldman Sachs U.S. Financial Services Conference: "We are going to bring in other consultants and we are going to look at sales practices in every business of this Company. Even though I am not aware of any issues, but I don't want there ever to be a concern about sales practices in Wells Fargo." Dkt. No. 46 ¶ 62.

5

Sloan's statement is clearly limited to other "sales practices," and plaintiff has not alleged that Wells Fargo's CPI or GAP policies were sales practices or that auto insurance was a banking product. *See* Dkt. No. 46 ¶ 96 (Statement 46). At oral argument, plaintiff confirmed this case was "absolutely" not related to the separate securities suit which concerned the fake accounts, *Hefler*, adding "this is a separate fraud." Dkt. No. 70 at 32:2-11.

Plaintiff's efforts to equate the fake account and auto insurance issues are unavailing. While both may have "involved breaches of customer trust where customers received products they did not want and did not need, and both occurred within Wells Fargo's Community Banking Division," the statements at issue were explicitly restricted to sales practices. Dkt. No. 63 at 20. In order to be misleading, an omission must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Public statements about Wells Fargo's sales practices simply do not create any impression about Wells Fargo's auto insurance policies. Plaintiff's claims for statements concerning sales practices are dismissed. These are Statements 2, 5, 7, 10, 15, 16, 17, 23, 31, 35, 39, 41, 42, 43, 44, 45, 46, 48, 49, 50, 52, 55, 56, 60, and 67.

### 2. Statements Incapable of Objective Verification

The alleged false and misleading statements relating to Wells Fargo's commitment to transparency and regaining trust in the wake of its fake account problems are also not actionable. "To be misleading, a statement must be capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation and citation omitted).

Statement 54, Sloan's expression of "hope" that the board's report on the fake accounts "and the events around it sort of represent the high watermark I guess of headline risk to the company," Dkt. No. 46 ¶ 103, is not actionable for this reason. "[M]ildly optimistic, subjective . . . statements have been held to be non-actionable puffing." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). While opinion statements can violate Section 10(b) and Rule 10b-5, plaintiff "has failed to sufficiently plead falsity" here. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610 (9th Cir. 2017). Sloan's statement was not

6

false, even if he knew at the time that the insurance issues were looming, because the fake accounts still could represent the "high watermark" of Wells Fargo's problems.

Defendants' statements that their "number one priority remains rebuilding trust," that they are "committed to maintaining increased transparency," and the like, are also not capable of objective verification. Dkt. No. 46 ¶ 65 (Statements 19 and 20). Our circuit confronted a very similar fact pattern in *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017). In that case, shareholders sued Hewlett-Packard for failing to adhere to a corporate code of ethics that had been instituted in the wake of a previous ethics scandal, after it was disclosed that the CEO, Mark Hurd, had lied about an improper relationship with an independent contractor. Like plaintiff here, the class in *Retail Wholesale* argued that "the context . . . somehow make[s] the [Standards of Business Conduct] and related representations capable of being objectively false." *Id.* at 1276. Our circuit rejected the argument that the context "surrounding the adoption and promotion of the [Standards of Business Conduct] transforms what would otherwise be aspirational statements into statements capable of objective verification," noting that this "context more appropriately factors into the question of whether an alleged misrepresentation was material to investors, not into whether a statement itself could be a misrepresentation." *Id.* at 1276-77. *Retail Wholesale* also recognized that creating fraud liability for "statements such as . . . 'we make ethical decisions' . . . is simply untenable, as it could turn all corporate wrongdoing into securities fraud." *Id.* at 1276. Plaintiff's claims based on Statements 3, 4, 12, 18, 19, 20, 21, 22, 24, 25, 26, 37, 38, 40, 47, 51, 53, 54, 62, 63, 64, 65, and 66 are dismissed.

### 3. Risk Factor Disclosures

Claims based on discussions of potential operational and reputational risk factors in Wells Fargo's SEC filings are also dismissed. Statements about risk factors can be actionable if the risk has already "come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (citation omitted), *aff'd*, 563 U.S. 27. That standard has not been met here. In *Siracusano*, Matrixx's 10-Q statement that it might "incur significant costs resulting from product liability claims," *id.* at 1172, was misleading because it failed to disclose that the company had

7

already been sued. In this case, Wells Fargo had not yet suffered, for example, "reputational damage from negative publicity, protests, fines, penalties and other negative consequences" due to auto insurance issues when it made the alleged misstatements. Dkt. No. 46 ¶ 132 (Statement 9). Claims based on Statements 8, 9, 32, 33, 34, 58, and 59 are consequently dismissed.

#### 4. Controls and Procedures Statements

Plaintiff has not adequately alleged that defendants' statements during the class period that Wells Fargo had effective disclosure controls and procedures were false or misleading. Plaintiff does not explain to whom information must be disclosed, what information must be disclosed, or why the company's processes fell short. Consequently, plaintiff has failed to state the circumstances constituting this alleged fraud with particularity as required under Federal Rule of Civil Procedure 9(b). Claims based on Statements 6, 27, 28, 29, 30, and 57 are dismissed.

Any claim based on Wells Fargo's response to the U.S. Senate Banking Committee that it had "policies, procedures, and internal controls that are reasonably designed to comply with its legal obligations to monitor, detect, and report suspicious activities," is dismissed as well. Dkt. No. 46 ¶ 58 (Statement 14). Statement 14 does not give "the false impression" that defendants had disclosed all their improper practices. Dkt. No. 71-1 at 15 (quoting *Khoja*, 899 F.3d at 1013-14).

#### 5. Litigation Expense Estimations

Plaintiff also claims that Wells Fargo's estimations of its litigation expenses in its SEC filings prior to the disclosure of the auto insurance issues in the summer of 2017 were false or misleading. However, the Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). The amended complaint only correlates the rise in Wells Fargo's estimated litigation costs to $3.3 billion from $1.7 billion in September 2016, Dkt. No. 46 ¶ 133 (Statement 11), $1.8 billion in December 2016, *id.* ¶ 144 (Statement 36), and $2.0 billion in March 2017, *id.* ¶ 152 (Statement 61), with public disclosures about the auto insurance policies. But plaintiff does not state with particularity any facts that the increase in estimated litigation-related exposure was due to the CPI and GAP issues, rather than any other Wells Fargo or environmental factor. Claims based on Statements 11, 36, and 61 are dismissed.

### 6. Statements 1 and 13

Two class-period statements by defendants Wells Fargo and Sloan meet the falsity threshold. Plaintiff has adequately alleged "the reason or reasons why [Statements 1 and 13 are] misleading." 15 U.S.C. § 78u-4(b)(1). According to the complaint, Wells Fargo and Sloan were asked on separate occasions whether they knew about potential misconduct outside of the already disclosed improper retail banking sales practices. Each time they failed to disclose the CPI issue in a misleading statement.

Sloan's actionable statement is Statement 1. On November 3, 2016, a participant at the annual BancAnalysts Association of Boston Conference asked a question the former CEO summarized as being about Wells Fargo's review of "activities outside of retail banking focused and reviews focused on sales practices and culture." Dkt. No. 46 ¶ 47. In his response, Sloan described how the company was going to go beyond the sales practices consent orders and "leave no stone unturned." *Id.* He added that at that time he was "not aware of any issues." *Id.* However, in response to questioning by Senator Sherrod Brown about CPI almost a year later, in October 2017, Sloan stated "the [CPI] issue was escalated to me in 2016, in late August, early September, I talked to our team about it, and we decided at that point in time to end it and tell our vendor to quit providing that insurance to our customers." *Id.* ¶ 180. This means that, as alleged in the complaint, Sloan was aware of issues "outside of retail banking . . . and . . . sales practices," namely the CPI situation, when he said he was not in November 2016. The allegations for this statement are sufficiently particular under the prevailing standards to state a claim that Statement 1 was false.

Similarly, Wells Fargo made a material omission when answering the following questions posed by the U.S. Senate Banking Committee in November 2016:

> [A]re you confident that this type of fraudulent activity does not exist in other Wells business lines? Have you discovered other types of misconduct involving other products aside from credit cards or basic banking (such as misconduct related to applications for mortgages or personal or other loans, or lines of credit, insurance, or other investment areas)? If so, how did the company obtain this information? When was the first reported case, how many cases have been discovered, and what is the nature of these cases? Have you reported those cases to federal financial regulators?

*Id.* ¶ 57. In a formal written response to this inquiry that defendants do not dispute is properly attributable to the company, Wells Fargo stated, "We believe that the activity at issue here was limited to certain team members within the Community Banking Division." *Id*. (Statement 13). As with Sloan, Wells Fargo was asked point blank about problems outside of sales practices issues. Like Sloan, Wells Fargo did not disclose the CPI issue that it admitted in a press release it had "initiated a review of" in July 2016 because of "customer concerns" and "discontinued" in September 2016. *Id.* ¶ 10. Unlike Sloan's statement, Wells Fargo's written response may not have been literally false because, as alleged, those responsible for the auto insurance issues were members of Wells Fargo's Community Banking Division. *Id.* ¶ 21. But failing to disclose the CPI issue that it had already reviewed and terminated was an omission that made Wells Fargo's "actual statements misleading" in responding to the Senate committee's questions about misconduct broadly. *In re Rigel*, 697 F.3d at 880 n.8.

It is also clear that information about consumer-related problems outside of Wells Fargo's sales practices issues was material to stockholders. "The materiality of the misrepresentation or an omission depends upon whether there is a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale*, 845 F.3d at 1274 (internal quotation and citation omitted) (alteration in original). As discussed above, the amended complaint alleges that a participant at a bank analyst conference prompted Sloan to discuss Wells Fargo's review of, as the CEO summarized, "activities outside of retail banking focused and reviews focused on sales practices and culture." Dkt. No. 46 ¶ 47. The fact this question was posed shows that the answer was viewed as altering the total mix of information useful for investment decisions.

**B.    Scienter**

For securities fraud scienter, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010). In this case, both Sloan and Wells Fargo later admitted they knew about problems with CPI when they made their November 2016 misstatements or omissions.

10

The July 2017 corporate press release disclosed that in "response to customer concerns, in July 2016 Wells Fargo initiated a review of the CPI program and related third-party vendor practices. Based on the initial findings, the company discontinued its CPI program in September 2016." Dkt. No. 46 ¶ 10. Sloan stated in his October 2017 Senate testimony that he had been aware of the problem "in 2016, in late August, early September." *Id.* ¶ 180. Plaintiff has met its burden under the PSLRA to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## C. Loss Causation

Plaintiff has also adequately pleaded loss causation. In order to establish loss causation, "a securities fraud plaintiff must prove that the defendant's misrepresentation was a 'substantial cause' of his or her financial loss." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citation omitted). "At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.*

The requisite allegations have been made here. "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 264 (2014)). The amended complaint states that on July 27, 2017, the day the New York Times article revealed the improper CPI policies and Wells Fargo's press release confirmed them, "the price of Wells Fargo common stock [fell] from a close of $54.71 per share on July 27, 2017, to as low as $53.18 per share in intraday trading on July 28, 2017, before closing at $53.30 per share -- down $1.41 per share on unusually high trading volume of more than 32.5 million shares." Dkt. No. 46 ¶ 14. It also alleges that on "August 4, 2017, driven by the additional disclosures and the market's recognition of additional risks of regulatory and litigation costs from the auto insurance disclosures, the price of Wells Fargo common stock fell even further, trading as low as $51.91 per share on August 4, 2017, before closing at $52.84 per share -- again on unusually high trading volume of more than 44.6 million shares." *Id.* This is enough.

11

## III. SECTION 20(A) CLAIM

While plaintiff has adequately alleged a primary violation of the securities laws, which is required for a Section 20(a) claim, *see In re Invensense, Inc. Sec. Litig.*, Case No. 15-cv-00084-JD, 2016 WL 1182063, at *8 (N.D. Cal. Mar. 28, 2016), its conclusory efforts to allege controlling person liability are not sufficient. The amended complaint has barebones allegations that "[b]y virtue of their positions and their power to control public statements about Wells Fargo, the Individual Defendants had the power and ability to control the actions of Wells Fargo and its employees. Wells Fargo controlled the Individual Defendants and its other officers and employees." Dkt. No. 46 ¶ 213. Whether a defendant "is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "The fact that a person is a CEO or other high-ranking officer within a company does not create a presumption that he or she is a 'controlling person.'" *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citation omitted). This claim is dismissed.

## CONCLUSION

The motion is granted and denied in part. Plaintiff's Section 10(b) and Rule 10b-5 claims against Wells Fargo and Sloan based on Statements 1 and 13 will go forward. The remaining claims are dismissed.

Plaintiff may file a second amended complaint consistent with this order by January 31, 2020. No new claims or parties may be added without the Court's prior approval. If plaintiff chooses to amend, it should organize all of the challenged statements or omissions in a logical and efficient manner, and should file a revised claims chart with the new complaint.

**IT IS SO ORDERED.**

Dated: January 10, 2020

JAMES DONATO
United States District Judge